IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA )<br>  )<br>  v. )<br>  )  Case No. 1:22-cr-92<br>ALLISON FLUKE-EKREN, )<br>    a/k/a "Allison Ekren," )  Hon. Leonie M. Brinkema<br>    a/k/a "Umm Mohammed al-Amriki," )<br>    a/k/a "Umm Mohammed," )  Sentencing: October 25, 2022<br>  )<br>         Defendant. ) | |

### UNITED STATES' MOTION TO PERMIT WITNESS-1 TO SPEAK AT SENTENCING PURSUANT TO THE CRIME VICTIMS' RIGHTS ACT

*"There is no greater agony than bearing an untold story inside you."*

-Maya Angelou, *I Know Why the Caged Bird Sings*

The United States of America, by and through undersigned counsel, respectfully submits this motion to seek the Court's permission for Witness-1 to speak during the October 25, 2022 sentencing hearing pursuant to the Crime Victims' Rights Act. As explained further below, Witness-1 intends to describe how she was directly and intentionally harmed by the defendant, both physically and emotionally, in connection with the offense of conviction. In support thereof, the government provides the Court with the following information:

I.   **Background**

On June 7, 2022, Allison Fluke-Ekren ("the defendant" or "Fluke-Ekren") pleaded guilty before this Court to conspiring to provide material support or resources to a foreign terrorist organization, namely the Islamic State of Iraq and al-Sham ("ISIS"), in violation of 18 U.S.C. § 2339B. *See* Dkt. Nos. 34-35. Fluke-Ekren was located outside the United States for over

eleven consecutive years since on or about January 8, 2011, until she was transferred in custody to the Eastern District of Virginia on January 28, 2022. *See* Dkt. No. 9 at 2-3.

As set forth in the signed Statement of Facts accompanying the Plea Agreement (*see* Dkt. No. 36), from in or about September 2011 through in or about May 2019, Fluke-Ekren, a 42-year-old United States citizen, traveled overseas and engaged in an eclectic array of extremely serious terrorism-related activities in multiple countries, including Libya, Iraq, and Syria. Fluke-Ekren ultimately served as the leader and organizer of an ISIS military battalion, known as the Khatiba Nusaybah, where she trained women and young girls on the use of automatic firing AK-47 assault rifles, grenades and suicide belts packed with explosives. Over 100 women and young girls, including as young as 10 or 11-years-old (and including Witness-1), received military training from Fluke-Ekren in Syria on behalf of ISIS.

Fluke-Ekren's terrorism-related conduct related to the aftermath of the September 11, 2012 Benghazi attack, her violent attack aspirations and plots against the United States, and her extensive support to ISIS in Syria and Iraq are detailed in the signed Statement of Facts and will discussed, among Fluke-Ekren's other horrific acts, in connection with her upcoming sentencing, rather than being fully recounted here. As noted above, the purpose of this motion is to explain why Witness-1 should be permitted to speak during next month's sentencing hearing pursuant to the Crime Victims' Rights Act ("CVRA"), which is set forth at 18 U.S.C. § 3771. *See also* Dkt. No. 37 at 40 (The Court: "Well, make a motion and we'll see, and defense counsel have a right to respond to it.").

## II.     Proposed Bifurcated Victim Impact Statement Procedure

During Fluke-Ekren's plea hearing, the government informed the Court that one or more of her family members "may travel here for the sentencing hearing and request an opportunity to

address the Court in person to provide additional information beyond what is included in the Statement of Facts." Dkt. No. 37 at 39. As it relates to family members who wish to describe "domestic conduct" (and, impliedly, Fluke-Ekren's pre-ISIS conduct), the Court stated that the government "can advise them, like any other person who has an interest in a criminal case, that they can certainly file written materials, which we will certainly consider. It would also be made part of the presentence report if they write and send it to the probation office." *Id.* at 40. One of Fluke-Ekren's family members has done exactly that and his letter has been filed with the initial Presentence Investigation Report ("PSR"). *See* Dkt. No. 45 at 31-34.[1] As the letter makes clear, this family member has information about Fluke-Ekren's ruthless and vile conduct even before she led an ISIS battalion, including how he has been personally victimized by her for many years, which is relevant to the Court's sentencing determination under 18 U.S.C. §§ 3553(a) and 3661.[2]

---

[1] For the Court's ease of reference, the September 19, 2022 letter is also attached to this motion as Exhibit 1. The author of the letter has provided his full support and approval for undersigned counsel to reference the contents of his letter in the government's forthcoming Position on Sentencing and during its sentencing hearing argument. However, to safeguard his privacy and preserve his options until then, the government requests that the letter remain under seal. If the author wishes to disclose his letter, he is certainly entitled to do so. Upon the author's request, the government intends to move the Court to unseal Exhibit 1 during the sentencing hearing.

[2] The author of Exhibit 1 would welcome the opportunity to address the Court at sentencing, but understands that the information that he communicated about the defendant in his September 19, 2022 letter—notwithstanding the horrific nature of it—is likely not covered under the CVRA for this offense of conviction. However, as this Court is well aware, the substantive sentencing statute requires that "in determining the particular sentence to be imposed," the court "shall consider . . . the nature and circumstances of the offense *and the history and characteristics of the defendant.*" 18 U.S.C. § 3553(a)(1) (emphasis supplied). Thus, by including the defendant's history and characteristics alongside the more limited "nature and circumstances of the offense," Congress necessarily contemplated consideration of uncharged conduct that is established by a preponderance of reliable (but not necessarily trial-admissible) evidence. *See, e.g.*, *United States v. Grubbs*, 585 F.3d 793, 802 (4th Cir. 2009) (noting the applicable standard for uncharged conduct); Fed. R. Evid. 1101(d)(3) (excluding sentencings from evidentiary rules).

Separately, Witness-1 has also availed herself of the invitation to submit a letter for the Court's consideration. The signed letter from Witness-1 is dated September 23, 2022 and similarly focuses on Fluke-Ekren's unconscionable and callous conduct even before she conspired to provide material support and resources to ISIS.[3] Although the immeasurable pain

---

Courts have routinely noted that this statutory command requires the consideration of uncharged conduct about the defendant's past actions. *See, e.g.*, *United States v. Brown*, 816 F. App'x 240, 247 (11th Cir. 2020) (noting that the district court "was required to consider what [an FBI agent] learned about [the defendant's] past conduct, even if uncharged, as part of the 'nature and circumstances' of the charged conduct and [the defendant's] 'history and characteristics'"); *United States v. Waller*, 589 F.3d 947, 960 (8th Cir. 2012) (holding that an uncharged murder was, "[l]ike other prior criminal conduct, whether or not related to the offense of conviction, . . . part of the history and characteristics of the defendant that the district court shall consider in imposing an appropriate sentence"); *United States v. Chavez-Calderon*, 494 F.3d 1266, 1270 (10th Cir. 2007) ("The sentencing court is well within its discretion and, indeed, is required to carefully consider the facts contained in the PSR when evaluating the § 3553(a) sentencing factors, including the history and characteristics of the defendant . . . ." (quoting *United States v. Mateo*, 471 F.3d 1162, 1167 (10th Cir. 2006)).

The weight to be given such evidence in imposing a sentence is, of course, committed to this Court's sound discretion. But this family member's description of defendant's pre-ISIS conduct—and Witness-1's similar evidence—should be a part of the sentencing record for the Court to consider. This family member intends to travel to the Eastern District of Virginia for the sentencing hearing, and he is available to answer any questions in open court that Your Honor may have on that day, if deemed necessary. Similar to Witness-1's information (*see infra*), this family member's information may also become highly relevant for the Court's consideration under the § 3553(a) sentencing factors depending on what arguments defense counsel assert as "mitigation" at sentencing.

[3] Witness-1's September 23, 2022 letter, which is expected to be included with the final Presentence Investigation Report, has been disclosed to defense counsel and the assigned U.S. Probation Officer. For the Court's ease of reference, Witness-1's letter is attached to this motion as Exhibit 2. Witness-1 has provided her full support and approval for undersigned counsel to reference the contents of this letter in the government's forthcoming Position on Sentencing and during its sentencing hearing argument. However, to safeguard her privacy and preserve her options until then, the government requests that the letter remain under seal. If Witness-1 wishes to disclose her letter, she is certainly entitled to do so. Upon Witness-1's request, the government intends to move the Court to unseal Exhibit 2 during the sentencing hearing.

Additionally, undersigned counsel and FBI agents traveled outside of the Eastern District of Virginia earlier this month and interviewed numerous individuals about the defendant's

and trauma that Fluke-Ekren inflicted upon Witness-1 before she joined ISIS is inexorably intertwined with countless acts of extreme cruelty to which Fluke-Ekren subjected Witness-1 while she ascended the ranks of ISIS, this proposed bifurcated procedure ensures that Witness-1's victim impact statement at the sentencing hearing is primarily focused on how Fluke-Ekren's offense of conviction directly harmed her.  As Witness-1 wrote, "everything I mention in this letter happened before [the defendant] joined ISIS.  <u>Your Honor, I would like to speak in court because I have more to say on the abuse and victimization</u> [the defendant] <u>did to me while in ISIS</u> (emphasis supplied)."  Ex. 2 at 10.

### III. <u>Confidential Information (Including Medical) about Witness-1</u>



---

background, radicalization, and the immense impact that the defendant's crimes had on them. All reports of these interviews (including reports explaining what Witness-1 intends to speak about during the upcoming sentencing hearing, if permitted by the Court) were immediately disclosed to defense counsel and the assigned U.S. Probation Officer on September 13, 2022. Summaries of these interviews, including with Witness-1 and others, are set forth in the initial PSR.  *See* Dkt. No. 45 at 21-24 (¶¶ 104-116).  As further evidence that Witness-1 is a CVRA victim of Fluke-Ekren's ISIS-related offense conduct, and to provide the Court with a preview of what Witness-1 anticipates largely focusing on during her victim allocution, the government intends to provisionally file under seal a report summarizing, *inter alia*, that information.  *See* Ex. 3.  This report was previously disclosed to defense counsel and the assigned U.S. Probation Officer.



███ is set forth in the initial PSR. *See* Dkt. No. 45 at 22-24 (¶¶ 109-116).[4]

---

[4] The U.S. Probation Officer's final PSR is due on or about October 17, 2022. The government intends to offer comments and suggested edits to the initial PSR on or before October 7, 2022, such as ███



██████████████████████████████████████████████████████████[5]

Witness-1's strong desire to speak publicly using her true name at Fluke-Ekren's sentencing is her own decision. As part of the healing process and to obtain a measure of closure given the extensive physical and emotional harm that Fluke-Ekren repeatedly inflicted upon her in connection with the charged ISIS-related conduct, Witness-1 seeks to invoke her rights under the CVRA and provide a verbal victim impact statement at the upcoming sentencing hearing.

Additionally, as the Court heard during the defendant's plea hearing, the government has "turned over [to the defense] grand jury transcripts where these young girls, who were minors at the time, testified under oath that they did, in fact, receive military training from Ms. Fluke-Ekren." Dkt. No. 37 at 32. The government has informed the known and located victims of their CVRA rights, but as of now, Witness-1 is the only victim of the charged offense conduct who wishes to address the Court at sentencing. Certain victims of the offense (*i.e.*, those who were forced to undergo terrorist training by Fluke-Ekren when they were young children; adults who voluntarily chose to receive ISIS training from Fluke-Ekren are, of course, co-conspirators rather than victims) informed undersigned counsel that they do not intend to address the Court. These victims wish to remain anonymous to the public and are, understandably, intensely afraid of Fluke-Ekren and severely traumatized by her chilling conduct.

IV. **Legal Standard**

A. **Witness-1 is a "crime victim" under the CVRA**

---

[5] Witness-1's lodging and travel-related expenses to attend the October 25, 2022 sentencing hearing is expected to be paid through the Federal Crime Victim Assistance Fund, pending approval from the Executive Office for United States Attorneys. ████████████████
████

Among the eight enumerated rights that the CVRA affords to crime victims is "[t]he right to be reasonably heard at any public hearing in the district court involving . . . sentencing . . . ." 18 U.S.C. § 3771(a)(4).  The CVRA defines "crime victim" as any "person directly and proximately harmed as a result of the commission of a Federal offense[.]"  18 U.S.C. § 3771(e)(2)(A).  The CVRA also provides crime victims direct standing to assert their rights in criminal cases independently of the government, and imposes on the judiciary an affirmative obligation to "ensure" that those rights are "afforded."  *See* 18 U.S.C. §§ 3771(d) and 3771(b)(1).  Additionally, prosecutors and other relevant personnel of the Department of Justice are statutorily required to "make their best efforts to see that crime victims are notified of, and accorded" their rights under the CVRA.  *Id.* § 3771(c)(1).  This District has acknowledged that, "[a]lthough victims need not be 'the target of the crime,' a party may nonetheless qualify as a victim if 'it suffers harm as a result of the crime's commission.'"  *United States v. Credit Suisse AG*, No. 1:14CR188, 2014 WL 5026739, at *4 (E.D. Va. Sept. 29, 2014) (Beach, C.J.) (citing *In re Stewart*, 552 F.3d 1285, 1289 (11th Cir. 2008) and *United States v. Washington*, 434 F.3d 1265, 1268 (11th Cir. 2006)).

Neither the Supreme Court nor the Fourth Circuit has elaborated on the CVRA's definition.  However, the Sixth Circuit recognizes a two-prong test to guide the sentencing court's analysis:

> The court must (1) look to the offense of conviction, based solely on facts reflected in the jury verdict or admitted by the defendant; and then (2) determine, based on those facts, whether any person or persons were 'directly and proximately harmed as a result of the commission of [that] Federal offense.'

*In re McNulty*, 597 F.3d 344, 351 (6th Cir. 2010) (citing *United States v. Atl. States Cast Iron Pipe Co.*, 612 F. Supp. 2d 453, 536 (D.N.J. 2009) (compiling district court cases that used the

8

two-prong approach)).[6] Here, the defendant's offense of conviction—as reflected in the nine-page signed Statement of Facts—is a vast terrorism conspiracy to provide material support and resources to ISIS in Syria and Iraq in violation of 18 U.S.C. § 2339B, including Fluke-Ekren's admission that over 100 women and young girls (including as young as 10 or 11-years old) received military training from her in Syria on behalf of ISIS. *See* Dkt. No. 36 at 7 (¶ 21).

To satisfy the direct causation requirement, courts have held that the victim must first show that the conduct underlying at least one offense element was a "but-for" cause of the harm. *In re Fisher*, 640 F.3d 645, 648 (5th Cir. 2011) (*Fisher I*). Second, to satisfy the proximate causation requirement, courts have stated that the victim must show that the harm was "a reasonably foreseeable consequence of the criminal conduct." *Id.* Both tests are similar to the traditional "but-for" and "proximate cause" analyses used in tort law. *See In re Rendon Galvis*, 564 F.3d at 175 (citing *In re Antrobus*, 519 F.3d 1123, 1126 (10th Cir. 2008) (concurrence)).

In deciding who qualifies as a CVRA "crime victim," some courts have taken an "inclusive approach" that refuses to parse the meaning of the statutory definition. *See United States v. Vance*, No. 1:94-CR-0022-1, 2019 WL 4491333, at *5 (W.D. Va. Sept. 18, 2019) (Urbanski, C.J.); *see also United States v. Turner*, 367 F. Supp. 2d 319, 327 (E.D.N.Y. 2005) ("[I] will presume that any person whom the government asserts was harmed by conduct attributed to a defendant . . . enjoys all of the procedural and substantive rights set forth in § 3771."); *United States v. Babich*, 301 F. Supp. 3d 213, 216–17 (D. Mass. 2017) (quoting *Turner* and stating that the Court agrees with adopting "an 'inclusive approach' to determining whether individuals qualified as crime victims under the CVRA").

---

[6] CVRA claimants must establish their victim status by a preponderance of the evidence. *United States v. Giraldo-Serna*, 118 F. Supp. 3d 377, 382 (D.D.C. 2015) (citing *In re McNulty*, 597 F.3d at 351).

As explained below, the conduct encompassing Fluke-Ekren's conviction for conspiracy to provide material support to ISIS was the "but-for" cause of Witness-1's physical and emotional injuries, and those injuries were a foreseeable consequence of being forced as a child to undergo extensive ISIS military training led by a defendant devoted to the organization's murderous ideology. Had Fluke-Ekren not engaged in such conduct, the harm to Witness-1 would have been avoided.

   1. ***The offense conduct was the direct cause of the harm to Witness-1.***

Courts have stated that "[a]n act is a but-for cause of an event if the act is a *sine qua non* of the event—if, in other words, the absence of the act would result in the non-occurrence of the event." *In re Fisher*, 649 F.3d 401, 403 (5th Cir. 2011) (*Fisher II*); *see also United States v. Credit Suisse AG*, No. 1:14CR188, 2014 WL 5026739, at *4 (E.D. Va. Sept. 29, 2014) (recognizing "but-for cause of the 'crime victim's' harm" analysis) (citations omitted). The severe harm that Witness-1 suffered—and continues to suffer today—would not have occurred if Fluke-Ekren had not sought to cultivate and lead a terrorist battalion by conspiring to provide material support to ISIS through, among other callous acts, the exploitation and manipulation of children. *See* Ex. 2 at 9-10; Ex. 3 at 3-6.

Beginning in 2011, Fluke-Ekren spent at least eight years supporting terrorist organizations throughout the Middle East. *See* Dkt. No. 36 at 1-2. While living in Syria, Fluke-Ekren described to Witness-1, with specificity, her desire to conduct a widespread terrorist attack in the United States and how she would accomplish that goal. *Id.* at 3. Fluke-Ekren told Witness-1 "that she considered any attack that did not kill a large number of individuals to be a waste of resources" and that she wished external attacks elsewhere "had occurred on United States soil instead." *Id.* She also explained to Witness-1 how to make bombs and other

10

explosives. *Id.* Witness-1 was a defenseless child during the events described in the Statement of Facts. *See* Dkt. No. 37 at 30 (The Defendant: "Some of these statements were made by <u>a witness who was very young at the time</u> . . . But the essence of these conversations I -- <u>I agree that those conversations happened</u>.") (emphasis supplied).

Fluke-Ekren later became the leader of the "Khatiba Nusaybah"—a military battalion comprised of female ISIS members. *See* Dkt. No. 36 at 5-6. Over 100 women and young girls received military training from Fluke-Ekren in Syria on behalf of ISIS. *Id.* at 7. One of those children, some of whom were as young as 10 or 11 years old, was Witness-1. During training sessions, Fluke-Ekren instructed the women and young girls on the use of AK-47 assault rifles, grenades, and explosive suicide belts. *Id.* at 6. While doing so, she sought to motivate her trainees by explaining how female fighters could help "ISIS expand and to remain" through the use of weapons and explosives. *Id.* at 7.

Fluke-Ekren's conduct irreparably harmed Witness-1, who was forced to reckon with the fact that the defendant wanted to kill innocent civilians. Fluke-Ekren coerced Witness-1 to train as a child soldier, "with instructions to kill," which included standing on the front lines of battle in Syria "with a suicide belt strapped to [her] belly and an "AK-47 that [she] could barely hold in [her] hands." Ex. 2 at 1. The irrevocable emotional harm to Witness-1 resulting from the violence, strife, and instability to which she was subjected in a war zone cannot be fully described through words alone.[7] The harm to Witness-1 only occurred because the defendant made the decision to travel to Syria and ascend the ranks of ISIS. *See* Dkt. No. 45 at 22, 24 (¶¶ 110, 117); Ex. 3 at 2. Had she not, Witness-1 would not have been exposed to ISIS's devastating

---

[7] Physical harm is not a prerequisite for CVRA coverage. Both emotional and pecuniary injuries can lead to "crime victim" status. *United States v. Maldonado-Passage*, 4 F.4th 1097, 1103 (10th Cir. 2021).

brutality through the defendant's crimes, let alone forced to undergo military training on behalf of a terrorist organization as a young child.

### 2. *The offense conduct was also the proximate cause of the harm to Witness-1.*

The harm that Witness-1 experienced was also proximately caused by Fluke-Ekren's offense of conviction. The key question for this second element of the "crime victim" analysis is whether that harm was "a reasonably foreseeable consequence of the criminal conduct." *Fisher I*, 640 F.3d at 648; *see also United States v. Sharp*, 463 F. Supp. 2d 556, 565 (E.D. Va. 2006) (Dohnal, M.J.) ("Foreseeability is at the heart of proximate harm; the closer the relationship between the actions of the defendant and the harm sustained, the more likely that proximate harm exists) (citing *Babbitt v. Sweet Home Chapter of Cmtys. for a Great Or.*, 515 U.S. 687, 713 (1995) (O'Connor, J., concurring)).

Here, there is no intervening cause that severs the connection between Fluke-Ekren's conduct and the resulting harm to Witness-1. Fluke-Ekren trained Witness-1 to fight for ISIS. Fluke-Ekren told Witness-1 that she desired to carry out mass casualty attacks in the United States. And Fluke-Ekren deprived Witness-1 of any semblance of a normal childhood that did not involve being surrounded by inhumane acts of terror across multiple war zones. Moreover, the harm sustained by Witness-1 was clearly a foreseeable consequence of Fluke-Ekren's terrorist conduct. The mere fact that the defendant instructed Witness-1 on how to detonate a suicide belt when she was a young child underscores the appropriateness of a CVRA designation. *Cf. Moore v. United States*, 178 F.3d 994, 1001 (8th Cir. 1999) (bank customer was a MVRA victim where the defendant pointed a sawed-off gun at him during an attempted robbery).

The two cases from this District holding that the claimant was not a CVRA "crime victim" involved independent causes that are absent from the case at hand. In *United States v. Sharp*, the defendant pleaded guilty to conspiracy to possess with intent to distribute marijuana. 463 F. Supp. 2d 556, 558 (E.D. Va. 2006). Elizabeth Nowicki, the purported CVRA claimant, stated that she was victimized by the defendant because her former boyfriend abused her while under the influence of drugs he purchased from the defendant. *Id.* at 558-59. In rejecting her argument, the Court noted that she was victimized by her *boyfriend*—not the defendant. *Id.* at 566. Accordingly, Nowicki could not establish a "direct and proximate" causal link between the defendant's crime and the harm that she experienced. *Id.* There is no such intervening factor at issue here, of course, given that Witness-1 seeks to describe in her victim allocution how she was directly harmed by Fluke-Ekren in connection with the offense conduct.

Similarly, in *United States v. Credit Suisse AG*, Timothy Blixseth argued that he was a CVRA victim of the defendant corporation. No. 1:14cr188, 2014 WL 5026739, at *1 (E.D. Va. Sept. 29, 2014). Credit Suisse pleaded guilty to conspiracy to make false income tax returns to the IRS. *Id.* Blixseth did not allege that he was a victim of the tax scheme; rather, he claimed that Credit Suisse had harmed him by engaging in fraudulent lending practices that used the same "sham offshore entities" as the tax scheme. *Id.* at *2. The Court denied Blixseth's motion, holding that despite allegations of similarities between the two fraud schemes, there were too many attenuating factors between the harm and the offense of conviction. *Id.* at *4. Here, unlike Blixseth, the physical and emotional harm experienced by Witness-1 can be *directly* attributed to Fluke-Ekren's conspiracy to provide material support and resources to ISIS.

In sum, Fluke-Ekren did not need the predictive prowess of astrologer Nostradamus to know that preying on powerless children, training them on behalf of ISIS to "kill the *kuffar*," and

13

instructing them to "die as martyrs" in Syria by using AK-47s, grenades, and explosive suicide belts, would inflict substantial emotional and psychological harm on any surviving victims.

### 3. *Notwithstanding the defendant's objection, Witness-1 should be entitled to speak at sentencing rather than being limited to a written statement.*

A cornerstone of the CVRA is the unassailable right of a victim to be reasonably heard at sentencing, a right akin to the defendant's own right of allocution. *See* 18 U.S.C. § 3771(a)(4); *see also* Fed. R. Crim. P. 32(i)(4)(A). Rule 32(i)(4)(B) mandates that, "[b]efore imposing sentence, the court must address any victim of the crime who is present at sentencing and must permit the victim to be reasonably heard." The Advisory Committee Notes to the 2008 amendment of Rule 32 explicitly state that "[a]bsent unusual circumstances, any victim who is present should be allowed a reasonable opportunity to speak directly to the judge."

Although the Supreme Court and the Fourth Circuit have not yet opined on this issue, it has been the longstanding practice of this Court for crime victims to speak during sentencing hearings, as noted during the defendant's plea hearing. *See* Dkt. No. 37 at 41 (The Court: "If they're genuine victims then of course under the statute they have a right to be heard, and we always invite that."). From *Moussaoui* to the *Kotey and Elsheikh* prosecutions (the two most well-known terrorism cases in E.D. Va. history), and a wide range of countless other cases in between, the Judges of this Court have permitted victims to be heard at sentencing, rather than relegating them to written impact statements. *See United States v. Zacarias Moussaoui*, No. 1:01CR455, Dkt. No. 1855 at 7 (E.D. Va. May 4, 2006) (Brinkema, J.) (The Court: "Are there any victims in the courtroom who would like to be heard before this proceeding is completed?"); *United States v. Alexanda Amon Kotey*, et al., No. 1:20CR239, Dkt. No. 310 at 4 (E.D. Va. May 17, 2022) (Ellis, J.) (The Court: "The victim impact statements will be made to my right, to your

14

left. And there's no limitation on these. I've set aside essentially the day for this so that we will do whatever is necessary to hear the victim impact statements.").

In *Kenna v. U.S. Dist. Ct. for C.D. Cal.*, 435 F.3d 1011 (9th Cir. 2006), the Ninth Circuit reversed the district court and remanded the case because the petitioning victim was limited to a written impact statement, rather than being permitted to address the Court during sentencing. *See also United States v. Vampire Nation*, 451 F.3d 189, 197 n.4 (3d Cir. 2006) ("Under the CVRA, courts may not limit victims to a written statement.") (citations omitted). The Court reviewed the legislative history of the CVRA and noted that when the statute was considered in April 2004, the primary sponsors of the bill, Senators Jon Kyl and Diane Feinstein, spoke about this precise issue:

> It is not the intent of the term "reasonably" in the phrase "to be reasonably heard" to provide any excuse for denying a victim the right to appear in person and directly address the court. Indeed, the very purpose of this section is to allow the victim to appear personally and directly address the court.

*Kenna*, 435 F.3d at 1015 (citing 150 Cong. Rec. S4268 (daily ed. April 22, 2004) (statement of Sen. Kyl); *see also id.* (statement of Sen. Feinstein) ("That is my understanding as well.").

The Court additionally noted that, after six months, the CVRA was attached to a House bill and Senator Kyl reiterated his intent behind this language in the statute:

> It is important that the "reasonably be heard" language not be an excuse for minimizing the victim's opportunity to be heard. Only if it is not practical for the victim to speak in person or if the victim wishes to be heard by the court in a different fashion should this provision mean anything other than an in-person right to be heard.

*Kenna*, 435 F.3d at 1015 (citing 150 Cong. Rec. S10911 (daily ed. Oct. 9, 2004) (statement of Sen. Kyl).

The Court stated that broad enforcement of the victim's right to be heard effectuated the statutory aims of the CVRA, which include: "(1) To ensure that the district court doesn't discount the impact of the crime on the victims; (2) to force the defendant to confront the human cost of his crime; and (3) to allow the victim 'to regain a sense of dignity and respect rather than feeling powerless and ashamed.'" *Kenna*, 435 F.3d at 1016 (quoting Jayne W. Barnard, *Allocution for Victims of Economic Crimes*, 77 Notre Dame L. Rev. 39, 41 (2001)). The Court concluded by recognizing that "[l]imiting victims to written impact statements, while allowing the prosecutor and the defendant the opportunity to address the court, would treat victims as secondary participants in the sentencing process. The CVRA clearly meant to make victims full participants." *Id.* Moreover, "[t]here may be therapeutic aspects to a victim giving a victim impact statement. And, if the judge acknowledges what the victim has said in the statement, the judge's words can be (as one victim put it) 'balm for her soul.'" Paul G. Cassell, *In Defense of Victim Impact Statements*, 6 Ohio St. J. Crim. L. 611, 621–22 (2009).

### B. The Court has broad discretion to permit Witness-1 to speak at sentencing irrespective of her CVRA status.

In imposing its sentence, a court is entitled to consider all "information concerning the background, character, and conduct of a person convicted of an offense[.]" 18 U.S.C. § 3661. Moreover, the sentencing statute requires that courts "shall consider" specific factors, including "the nature and circumstances of the offense and the history and characteristics of the defendant." 18 U.S.C. § 3553(a)(1). Accordingly, the Supreme Court has recognized that sentencing courts necessarily have broad discretion regarding the types and sources of information they may consider. *See, e.g.*, *Pepper v. United States*, 562 U.S. 476, 488 (2011) (section 3661 permits a sentencing court to "consider the widest possible breadth of information about a defendant"); *United States v. Elbaz*, 39 F.4th 214, 229 (4th Cir. 2022) (same); *see also*

U.S.S.G. § 1B1.4. Sentencing judges have the choice to allow statements from non-CVRA victims when that information would give them context relevant to their sentencing determination. *See United States v. Myers*, 402 F. App'x 844, 845 (4th Cir. 2010).

The government respectfully submits that even apart from the CVRA, this case warrants use of the Court's discretionary authority. This is the first prosecution in the United States of a female ISIS military battalion leader. Fluke-Ekren's cold and calculated terrorist acts spanned at least eight years across multiple war zones—from Benghazi to Raqqa—and involved the devastating exploitation of Witness-1, among numerous other children. Witness-1's allocution will allow the Court to better assess the full scope of the nature, circumstances, and seriousness of the offense, the history and characteristics of the defendant, and provide additional support for why the statutory maximum sentence in this case is needed to provide just punishment for the offense, deter others, and protect the public from further crimes of the defendant.

Moreover, this Court is arguably the most experienced federal district court nationwide in presiding over terrorism cases. The Court can certainly decide for itself what, if anything, from the victim's statement is helpful or not helpful to its sentencing determination after hearing the victim speak. Should the Court find anything irrelevant or unhelpful in the victim's statement, it can simply give that statement no weight, rather than taking the draconian step (as espoused by the defendant) of excluding Witness-1 from speaking at all. *Cf. United States v. Ortiz*, 636 F.3d 389, 393 (8th Cir. 2011) (holding that the district court did not err in overruling the defendant's objection "to any testimony by representatives of the victims beyond the scope of this offense" and quoting with approval the district judge's following statement: "I think Congress has clearly indicated in the [CVRA] that victims are to be given broad latitude in addressing the Court at a sentence hearing. And if it's something that goes beyond and into some other area that isn't

relevant, I won't pay attention to it."). Similarly here, Witness-1 wishes to speak at a sentencing hearing before a federal judge where the Federal Rules of Evidence are inapplicable, which eliminates any risk that exists in jury trials, for example, where curative measures might be required if objectionable evidence was inadvertently presented to the fact-finder.

Witness-1's resilience and courage in seeking to speak about the depths of Fluke-Ekren's depravity and abusive conduct during the sentencing hearing is emblematic of a victim's essential role in our criminal justice system. *See United States v. Spiwak*, 377 F. App'x 319, 323-24 (4th Cir. 2010) (the district court did not err in allowing the claimant, who alleged the defendant abused her as a child, to speak at sentencing even though she was not victim of the offense under the CVRA, because the information was relevant to the defendant's background, character and conduct under 18 U.S.C. § 3661). Permitting Witness-1 to speak at sentencing will allow her to regain her voice, along with the dignity and respect that she rightfully deserves, rather than leaving the courtroom with the terrible agony of "*bearing an untold story*" inside her.

## CONCLUSION

For the reasons stated herein, the United States respectfully asks the Court to allow Witness-1 to speak at the October 25, 2022 sentencing hearing pursuant to the Crime Victims' Rights Act.

Respectfully submitted,

Jessica D. Aber
United States Attorney

By: _____
Raj Parekh
First Assistant United States Attorney
John Gibbs
Assistant United States Attorney
United States Attorney's Office
Eastern District of Virginia

18

2100 Jamieson Avenue
Alexandria, Virginia 22314
Raj.Parekh@usdoj.gov

**CERTIFICATE OF SERVICE**

I hereby certify that on September 30, 2022, I filed the foregoing with the Clerk of Court using the CM/ECF system, which will automatically send electronic notification of such filing to counsel of record in this case. I further certify that on September 30, 2022, I will file with the Court an unredacted version of this pleading, along with Exhibits 1, 2, and 3, all of which will also be provided to counsel of record and the assigned U.S. Probation Officer.

Raj Parekh
First Assistant United States Attorney