**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **vs.** | : | **Case No. 1:22-cr-92** |
| | : | |
| **ALLISON ELIZABETH FLUKE-EKREN,** | : | |
| | : | |
| **Defendant.** | : | |

## DEFENDANT'S POSITION ON SENTENCING

The Defendant, Allison Fluke-Ekren, comes before the Court for sentencing on one count of conspiring to provide material support to a designated terrorist organization in violation of Title 18, United States Code, Section 2339B, to which she pled guilty on June 7, 2022. Ms. Fluke-Ekren hereby submits to this Honorable Court her Objections to the Presentence Investigation Report and her Position on Sentencing. For the reasons stated herein, Ms. Fluke-Ekren respectfully suggests a below-guidelines sentence will be sufficient and not greater than necessary to achieve the goals of sentencing.

## I.    OBJECTIONS/CORRECTIONS TO PRESENTENCE REPORT

### A.  General Objections to the PSR

Although a sentencing court may consider relevant information without regard to its admissibility under the Federal Rules of Evidence, such information must possess "sufficient indicia of reliability to support its probable accuracy." U.S.S.G. § 6A1.3(a), p.s.; *United States v. Wilkinson*, 590 F.3d 259, 269 (4th Cir. 2010); *United States v. Dalzell*, 455 F. App'x 306, 310 (4th Cir. 2011) (unpublished) ("We have emphasized that Supreme Court precedents recognize a due process right to be sentenced only on information which is accurate." (internal quotation and citation omitted)). Ms. Fluke-Ekren does not dispute the facts set forth in the Statement of Facts,

1

which she agrees are true.  She has pled guilty because she agrees she is guilty of conspiring to provide material support to a designated foreign terrorist organization.  However, detailed below, there are numerous allegations and factual assertions in the PSR to which the Defendant objects, and which she disputes, on the grounds that they are inaccurate, exaggerated, hyperbolic, and in many cases completely false.  The bulk of these disputed allegations and assertions were only brought forth by the government *after* the Defendant had pled guilty in this case.  Some allegations were not even obtained by the government until after the draft PSR was prepared and filed.

The Sentencing Commission has promulgated a policy statement addressing disputed facts at sentencing:

> (a) When any factor important to the sentencing determination is reasonably in dispute, the parties shall be given an adequate opportunity to present information to the court regarding that factor. In resolving any dispute concerning a factor important to the sentencing determination, the court may consider relevant information without regard to its admissibility under the rules of evidence applicable at trial, provided that the information has sufficient indicia of reliability to support its probable accuracy.

> (b) The court shall resolve disputed sentencing factors at a sentencing hearing in accordance with Rule 32(i), Fed. R. Crim. P.

U.S.S.G. § 6A1.3.

The government's position seems to be that anything told the PSR writer, or the case agent, or the attorney for the government, should be considered an established fact for sentencing,  merely by its inclusion in the PSR.  This is not so.  The Court must find the facts upon which it will determine the Defendant's sentence, in light of the applicable guidelines and sentencing factors. The weight of authority makes clear that the standard of proof for these factual findings is preponderance of the evidence.   *See, e.g.,* Commentary to § 6A1.3 ("The [Sentencing] Commission believes that use of a preponderance of the evidence standard is appropriate to meet due process requirements and policy concerns in resolving disputes regarding application of the

guidelines to the facts of a case");[1] *United States v. Grubbs*, 585 F.3d 793, 802, fn. 5 (4th Cir. 2009) (recognizing that a majority of Circuit Courts, post-*Booker*, have concluded that preponderance of the evidence is sufficient to support facts relied upon for purposes of sentencing).

The Defendant further asserts she does not have adequate time or resources to fully investigate and rebut these allegations, which include allegations by a witness ("Witness-1")[2] of horrific sexual abuse not disclosed to the Defendant until September 2022 (and which appear to be inconsistent with Witness-1's prior testimony and many interviews with the FBI dating back to 2017, as well as Defendant's Eldest Son's previous FBI interview). A full investigation into these last-minute allegations would require significant efforts including subpoenaing pediatrician records from Kansas, school records from Indiana where the children went to elementary school, obtaining medical and school records from overseas (particularly from Egypt and Turkey), and interviewing witnesses in the Midwest, Turkey, and Egypt (any potential witnesses in Syria would not be reasonably accessible to the defense). These efforts would be made all the more difficult given the remoteness in time of the allegations, the lack of any efforts by the government to investigate these allegations, and the logistical and jurisdictional difficulties counsel would certainly encounter.

### B. Specific Objections and Corrections to the PSR

The Defendant specifically disputes the following allegations and assertions of fact in the PSR.

<u>Paragraphs 40-44</u>. These paragraphs contain allegations made by Witness-1 during an interview she gave on September 22, 2022. It should be noted these statements and allegations

---

[1] Congress has instructed courts to consider any pertinent policy statements of the Sentencing Commission in determining a defendant's sentence. *See* 18 U.S.C. § 3553(a)(5)
[2] This witness shall be referred to herein as "Witness-1" to protect her privacy.

were not included in the draft PSR that was prepared on September 15, 2022, and filed on September 20, 2022.  Accordingly, the Defendant was unable to raise objections to these allegations when she sent her objections and corrections to the PSR writer.  These paragraphs contain significant and detailed allegations made by Witness-1 against the Defendant which appear to have never been previously made by her in the course of the government's years' long investigation, despite her numerous previous interviews and testimony.  These new allegations are not trivial, nor are they incidental or tangential to this case – rather, they include outrageous claims that the Defendant engaged in an apparently years-long quest to train children to do jihad, that she sought to open terrorist training centers for children disguised as schools, that she planned murders, etc.  Not only were these allegations never previously brought forth, they are inconsistent with Witness-1's prior interviews and testimony.  The Defendant asserts she has not been given a reasonable opportunity to meaningfully respond to these new allegations, and they should not be considered by the Court.  Furthermore, the fact that Witness-1 – arguably the government's most important witness against the Defendant – is just now making these claims, raises troubling questions as to why she never disclosed these allegations previously, despite many opportunities to do so.[3]

Paragraphs 45-48, and 50.  Defendant denies that she owned the property in which Witness-2 lived in a guest house.[4]  Within the section of the PSR regarding Victim Impact, reference is made to multiple victims;[5] however, Witness-1 is the only individual specifically identified as a

---

[3] Witness-1 has previously admitted to lying to investigators during the course of the investigation.  For example, she previously stated that her husband was not an ISIS fighter, and had been killed but she later admitted those were lies.

[4] Witness-2 is a cooperating foreign source and is not identified by her actual name her.  She is referred to as Witness-2 consistent with how this witness was referred to in the affidavit filed in support of the criminal complaint. *See* Affidavit in Support of Criminal Complaint and Arrest Warrant, page 5, fn 2. *United States v. Allison Fluke-Ekren*, Case no. 1:19-mj-231, ECF 2.

[5] *PSR*, ¶ 50 ("The Government has informed all known and located victims of the offense of *their* right

victim.  In a prior version of the PSR, another individual identified in the PSR as Witness-2, was specifically identified as a victim.  Witness-2 was a paid foreign government source,[6] and adult female member of ISIS who was sent to Syria by ISIS officials[7] with the intent of "living in the land of Sharia."[8]  It is unclear whether the government is still asserting that Witness-2 is a victim. If so, the Defendant objects to Witness-2 being considered a victim, as she does not qualify as a victim under Crime Victim Rights Act.[9]  Witness-2 stayed in an adjoining home to Defendant's in Ablah, Syria for only approximately 18 days,[10] and there is no evidence she was "directly and proximately harmed" by "conduct underlying an element of the offense of conviction" of the Defendant.  *See United States v. Sharp*, 463 F. Supp. 2d 556, 563 (E.D. Va. 2006).

The Defendant further objects to the statements of Witness-2 contained in paragraphs 45-48 of the PSR. Witness-2 was interviewed by agents in 2015 and again in 2018.  Upon information and belief, she never testified before a Grand Jury nor otherwise made allegations in a sworn statement.  Her statements contained in paragraphs 45-48 of the PSR do not purport to come from her prior interviews by agents during the investigation, but are rather from an interview she gave on July 26, 2022, with the case agent, the attorney for the government, and the PSR writer.  The PSR does not indicate whether the July 26th interview was in-person or by telephone.  In her July 26th interview, Witness-2 made statements that are inconsistent with her prior statements to agents in this case.  For example, in the July 26th interview, she stated she traveled to Syria in 2014 after seeing the need of the women and children who were suffering there.[11]  Further, it should be noted

---

under the Crime Victims' Rights Act, including the right to restitution. *They* have all declined to seek restitution at this time…." (emphasis added)).

[6] Affidavit in Support of Criminal Complaint and Arrest Warrant, page 5, fn 2.

[7] Statement of Facts, ¶ 7.

[8] Affidavit in Support of Criminal Complaint and Arrest Warrant, ¶ 9.

[9] "The term 'crime victim' means a person directly and proximately harmed as a result of the commission of a Federal offense or an offense in the District of Columbia." 18 U.S.C.A. § 3771(e)(2).

[10] Affidavit in Support of Criminal Complaint and Arrest Warrant, ¶ 9.

[11] PSR, ¶ 46.

that Witness-2 did not claim in earlier FBI interviews conducted in 2015 and 2018 that she was in Syria to "spread the word of Islam." This statement is not factually supported because she did not speak Arabic and only very broken English and therefore could not communicate well with others. Witness-2 also mentioned nothing about the Defendant's purported lack of care for her children in earlier FBI interviews from 2015 and 2018.

An analysis of Witness-2's FBI interviews from 2015 and 2018 also reveal further significant inconsistencies as to important facts:

University Attack.   In 2015, Witness-2 claimed, with regard to the university attack referenced in paragraph 8 of the statement of facts, that "The plan . . . had been provided to Abu Abu Omar al- Shishani, who was the direct boss of Ebu Jacob. In turn, al-Shishani had presented it to Abu Bark al-Baghdadi, who had approved the financing for the attack."[12] Yet, in 2018, Witness-2 said that" If [she] accepted to carry out this attack, then Umm Mohammed would get the attack plan translated from English to Arabic so it could be presented to Al Shishani. . . . [Witness-2] refused and Umm Mohammed never brought it up again."[13]   In 2015, there was a whole plan with funding approval from Al-Baghdadi, the leader of ISSI. In 2018, there was just an idea and nothing more.

Weapons Training.   In 2015, Witness-2 said that after she refused to carry out the university attack, the Defendant told her she would be trained as a sniper and took her to the range.[14] This sounds like she was suggesting that the Defendant wanted Witness-2 to be an offensive sniper, whereas, in 2018, Witness-2 again mentioned a range and said the Defendant took women there

---

[12] Witness-2 Interview 2015, p. 4.
[13] Witness-2 Interview 2018, pp. 6-7.
[14] Witness-2 Interview 2015, p. 5. Witness-2 also testified that Defendant was not well-versed in sniping, and therefore this appears contradictory.

6

for defensive training.[15] She said the biggest gun they fired was a Kalashnikov, which is not a sniper rifle.[16] In addition, Witness-2 noted in the 2018 interview that women were not being sent to fight.[17]

Pregnancy.  In 2015, Witness-2 claimed that the reason the Defendant did not carry out the university attack was because she became pregnant.[18] This was never mentioned in the 2018 interview, although Witness-2 did mention the Defendant's friend was prevented from carrying out a different attack due to her pregnancy, indicating that she is conflating facts or did not recall her previous story.[19]

There are other inconsistencies in Witness-2's interviews.  For example, in 2015, Witness-2 noted that the Defendant had a tan van and white car,[11] but in 2018 she says that the van was black.[20]

The Defendant asserts that Witness-2's statements ought to be confined to what is set forth in the Statement of Facts (SOF ¶¶ 7-8).

Paragraph 54.  The Defendant should not receive an enhancement for obstruction of justice. The facts reported in the PSR as to this potential enhancement offer nothing but conjecture that Mr. Chhipa had any motive to obstruct justice or that his conduct was intentionally abetted by the Defendant. It would appear, based on the reported nature of the conversation between Mr. Chhipa and Mr. Brooks, that Mr. Chhipa was seeking assistance with regard to the Defendant's foster care case then proceeding in Loudoun County, Virginia. As such, it does not appear related to the offense conduct as  required by U.S.S.G. §3C1.1 (Obstructing or Impeding the Administration of

---

[15] Witness-2 Interview 2018, p. 6.
[16] *See id.* at p. 6.
[17] Witness-2 Interview 2018, p. 6.
[18] Witness-2 Interview 2015, p. 5.
[19] Witness-2 Interview 2018, p. 7.
[20] Witness-2 Interview 2018, p. 6.

Justice), nor does the alleged conduct indicate an intent to intimate a witness or any of the other (albeit, non-exhaustive) examples set forth as obstructive conduct in §3C1.1.

Paragraph 84.  The Defendant understands that the statements in this paragraph are according to James Fluke. However, it should be noted that James was 21 years old and the Defendant was 15 years old when they met.  They moved in together in April 1996, and their eldest son was born 10 months later.  The relationship was not a "fling."

The Defendant denies that she did not pay bills, and further asserts that James and her had a joint checking account. The Defendant's paycheck was deposited into this account from which the bills were paid. Further, their debts would have been settled in their divorce, which should be reflected in a property settlement agreement filed with the appropriate court.

Regarding alleged theft from James's bank account, this is denied. Further, to the Defendant's knowledge, she is not aware that James had his own savings account.

The Defendant denies Mr. Fluke's other mudslinging and maligning of her character in calling her names such as a con-artist.  This is not a divorce court in Kansas and the Defendant further asserts that these statements are irrelevant and do not bear on the conduct to which she has accepted responsibility.

Paragraph 101.  The Defendant denies that she coerced her daughter to marry. The person her daughtered married was 16 years old, not 17 years old.

Paragraph 113.  The Defendant met Mohammed Chhipa in late April/early May of 2021.

Paragraphs 115-126, Witness-1's Victim Impact Letter, and Defendant's Eldest Son's Letter.  The Defendant denies the allegations of abuse in these paragraphs as well as in the letters, which the Defendant asserts are riddled with incorrect facts, hyperbole, and exaggeration. The Defendant is shocked and saddened by these allegation but acknowledges

Witness-1 experienced trauma in Syria.  She cannot undo the pain that she caused in taking Witness-1 to Syria. She further denies many of the painful characterizations of her in these paragraphs and the letters.  Some of these allegations, such as the claim that Defendant's Eldest Son killed a dog for food in Egypt in order to feed the other children, are simply incredible and are rebutted by other information (for example, Defendant's Second Son's letter).  Other allegations were never previously disclosed in the multi-year investigation, and are inconsistent with information that was adduced through the investigation.  For example, Witness-1's claim, in the first paragraph of her victim impact letter, that she was apparently on the front lines in Syria with an assault rifle at the age of 12, which apparently was never previously disclosed in her many interviews with the FBI or in her prior testimony, and is inconsistent with her sworn testimony.

The Defendant is sensitive to the fact that these are her children, and as described in her statement of acceptance, PSR ¶ 55, she recognizes Witness-1 suffered trauma while in Syria, and she does not wish to be involved in a swearing contest with them in regard to abuse and neglect allegations where the Defendant has accepted responsibility to providing material support to a terrorist organization.  The statement of facts is also replete with statements by Witness-1 that the Defendant does not deny.

Paragraphs 115. With respect to the Defendant's Eldest Son's allegations that the Defendant locked him in the trunk of her car, the Defendant asserts this is false and that she never owned a car with a trunk.  There exists a 2007 accident report, provided to the defense by the Government, documenting an accident in which Defendant's Eldest Son was in a vehicle that was hit from behind.  According to the report, the vehicle was a Ford minivan (which would not have a trunk), and the driver of the vehicle at the time of the accident was Defendant's

Eldest Son's uncle, Deniz Ekren, not the Defendant. The report also lists the Defendant and other children as passengers. A copy of the accident report is attached hereto as Exhibit 1 (to be filed under seal). The Defendant denies the remaining allegations of abuse in this paragraph.

Paragraph 116. Denied.

Paragraph 117. Denied.

Paragraph 118. The Defendant denies the allegations. It is further pointed out that the allegations that the Defendant attempted to sell her own son as a sex slave in Egypt, as he reported to the PSR writer, should be compared to his letter that apparently explains the same alleged incident. The stories are so inconsistent as to expose them as not worthy of belief. Specifically, in the PSR, Defendant's Eldest Son claims his parents, while in Egypt, attempted to sell him off as a sex slave to a young man in a nice car, but he refused to get in the car. Contradictorily, in his letter, he reports that he got in the car and apparently drove off with the young man, but the young man did not have a gun and was only armed with a knife. While the young man apparently drove off with Defendant's Eldest Son, his letter implies that Defendant's Eldest Son either overpowered the young man or otherwise escaped his would-be enslaver and returned home a few hours later to the surprised look on "my mother's face."

Paragraph 119. Denied.

Paragraph 120 to 126. The Defendant understands that these are the statements of her daughter but assets cannot be taken at face value. Further, as noted above, she does not have the resources to fully investigate and rebut these claims. She vehemently denies the allegations of abuse and many of the characterizations of her in these paragraphs and points out there are no prior complaints lodged against by her large extended family to any authority.

Paragraph 122. The Defendant agrees that Witness-1 contracted Typhoid and the

Defendant took her for treatment to Turkey. The other claims are denied, including walking through a minefield between Syria and Turkey.

Paragraph 123.  The abuse is denied.

Paragraph 124.   Denied.   While Defendant's son tragically died, these statements characterizing the incident and the Defendant's conduct are false and hyperbolic.

Paragraph 125.  Denied.

Paragraph 126.  Defendant denies that she coerced or forced her daughter to marry, and denies the allegations contained in this paragraph regarding the Defendant's motives and intent with respect to the marriage.  ISIS did not recognize Hazem as the Defendant's male relative and the Defendant married again in order to prevent being placed in the Widow's Bureau.

Paragraph 128. Denied.

Paragraph 129.  Defendant recognizes these are statements of a person who was a friend of the Defendant prior to her involvement in ISIS.  The Defendant was friends with this person for approximately 10 years. The Defendant further points out that the individual says nothing about abuse, neglect, or poor conditions in the Defendant's home in Egypt. This friend spent many weekends at the Defendant's home and stayed with the Defendant's family at times. The Defendant respectfully disagrees with a number of characterizations made by this person regarding the Defendant's relationship with her husband.

## II.    DEFENDANT'S POSITION ON SENTENCING FACTORS

### A.  Legal Standard

Since the Sentencing Guidelines were held to be advisory in *United States v. Booker*, 543 U.S. 220, 226 (2005), imposing a sentence is no longer a strictly mathematical exercise.  While "a district court shall first calculate (after making the appropriate findings of fact) the range prescribed by the guidelines," *United States v. Hughes*, 401 F.3d 540, 546 (4th. Cir. 2005), district courts must now make "an individualized assessment based on the facts presented" after calculating the advisory Guidelines range. *Gall v. United States*, 552 U.S. 38, 50 (2007).  The Guidelines range is but one of several factors a court must consider when imposing a sentence and it is legal error to treat those ranges as default sentences. *See United States v. Mendoza-Mendoza*, 597 F.3d 212, 216-17 (4th Cir. 2010); *Nelson v. United States*, 555 U.S. 350, 352 (2009) (per curiam); *Spears v. United States*, 555 U.S. 261, 263-64 (2009).  A court must also weigh the factors enumerated in 18 U.S.C. § 3553(a) when imposing a sentence.

The mandate of the Court at sentencing is to "impose a sentence sufficient, but not greater than necessary 'to accomplish the goals of sentencing,'" *Kimbrough v. United States*, 552 U.S. 85, 101 (2007) (quoting 18 U.S.C. § 3553(a)).  Courts are not required to point to "'extraordinary circumstances to justify a sentence outside the Guideline range." *Gall v. United States*, 552 U.S. 38, 47 (2007).  The factors for the court to consider in fashioning a sentence include: (1) the nature and circumstances of the offense and the history and characteristics of the defendant, (2) the kinds of sentences available, (3) the Guidelines range, (4) the need to avoid unwarranted sentencing disparities, (5) the need for restitution, and (6) the need for the sentence to reflect: the seriousness of the offense, to promote respect for the law, to provide just punishment for the offense, to afford adequate deterrence to the defendant and others, to protect the public from further crimes of the

defendant, and to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment. *See* 18 U.S.C. § 3553(a). The Court must weigh each of these factors when determining the appropriate sentence. *Id.*

### B.  The History and Characteristics of the Defendant

A full appreciation of Ms. Fluke-Ekren, her background and the factors that contributed to her coming before the Court is critical to ensuring that her sentencing does not become a formulaic exercise with no acknowledgment of the many dimensions that comprise us all.  While it may be difficult to ascertain entirely the confluence of forces that led Ms. Fluke-Ekren to come before the Court, it is indisputable that we are all better than the worst thing we have ever done.[21]

There are some striking themes that seem to suggest that the roots of Ms. Fluke-Ekren's need to belong are rooted in her early development and were strengthened during her adulthood. These considerations are relevant under 18 U.S.C. §3553(a)(1) as they relate to Ms. Fluke-Ekren's "history and characteristics," and mitigate her conduct in that they explain it, without excusing it. In so doing, they suggest that had Ms. Fluke-Ekren's formative years been less bereft of positive familial and romantic relationships, her life trajectory would have taken a different path. Moreover, under 18 U.S.C. §3553(a)(2)(B) and (C) they are relevant to the very low likelihood of recidivism by Ms. Fluke-Ekren.

When describing her childhood and adolescence, the word Ms. Fluke-Ekren repeatedly uses is "lonely."  Her mother suffered from severe and incapacitating depression, and, in Ms. Fluke-Ekren's view, vehemently disliked being a mother, often telling Ms. Fluke-Ekren that she could "not wait for [her] to grow up." Her relationship with her father was not any better. She

---

[21] Bryan Stevenson, JUST MERCY, 17 ("Each of us is more than the worst thing we've ever done.") (2015).

recalls her father as "disapproving, distant, fake and judgmental" and that she was scared of him and of being punished by him.  Ultimately, her parents divorced.

Perhaps not surprisingly, given the absence of a nurturing nuclear family she had experienced, at the age of sixteen Ms. Fluke-Ekren became pregnant and applied through the juvenile court to marry her child's father, James Fluke, which she did in September 1996.  James Fluke was five years Ms. Fluke-Ekren's senior, which at 21 and 16 years old respectively, is a greater difference than it might be in later years.  When she had just turned seventeen, Ms. Fluke-Ekren's first child, a son, was born, followed by a second child, a daughter, less than a year later. PSR, ¶ 83.  To her credit, despite being the young mother of two very young children, Ms. Fluke-Ekren obtained her General Equivalency Diploma (GED) and started her undergraduate studies at the University of Kansas.  She continued on to receive a bachelor's degree.  As her former teacher, Larry Miller, has said, Ms. Fluke-Ekren's "love for learning made her stand out."[22]

While getting her undergraduate degree at the University of Kansas, Ms. Fluke-Ekren had met her second husband, and the father of six of her children, Volkan Ekren.  Mr. Ekren had mental health issues and an explosive and violent temper.  Indeed, those were so severe that in 2005 domestic battery charges were lodged against him in Kansas.  PSR, p. 16, ¶87. Notwithstanding the volatile domestic situation she was enduring, and in yet another measure of her strength and determination, in 2007 Ms. Fluke-Ekren commenced her graduate studies at Earlham College in Indiana.  She did this despite having four young children (two by Mr. Fluke and two by Mr. Ekren) and effectively being a single parent because Mr. Ekren was living three hours away in Ohio.

---

[22] Tim Hrenchir, *Ex-Topeka Collegiate Teacher Remembers Allison Fluke-Ekren, Who Is Accused of Leading ISIS Fighters*, Topeka Capital Journal (Jan. 31, 2022).

After receiving her graduate degree in 2008, Ms. Fluke-Ekren, her husband and children moved abroad to Egypt, where she had four more children by Mr. Ekren.  The family also adopted a child who was orphaned when his parents were killed during the war in Syria.  Tragically, seven years after leaving the United States, and in the first of many losses Ms. Fluke-Ekren would suffer, she lost her young son at the age of five.  The year after his death, Ms. Fluke-Ekren, pregnant at the time, was widowed when Volkan Ekren was killed in Syria.  Five months later she gave birth to another child, a daughter.

To avoid the fate and living conditions that would have befallen her had she remained a widow, in July, 2016, Ms. Fluke-Ekren married Mohammed Zafer who was killed just two months after they wed.  Again, in an act of self-preservation and out of concern for her children's health and well-being,[23] after the mandatory Muslim widow's mourning period, Ms. Fluke-Ekren married Mohammed Doe by whom she had three children, twins and a boy.[24]  Tragically, at 26 days old, one of her twins died, and Mohammed Doe was killed in 2018 after he and Ms. Fluke-Ekren had been married for nearly two years.  Like her former husband, Mr. Ekren, Mohammed Doe was emotionally controlling and abusive to Ms. Fluke-Ekren.

After Mohammed Doe's death, in 2019, Ms. Fluke-Ekren abandoned her involvement with ISIS.  Ms. Fluke-Ekren lived with her family primarily in Qobassin, Syria, where she devoted herself to caring for her children and helping her community. She married a non-ISIS Syrian,

---

[23] Based on the requirement that boys beyond a certain age be separated from their widowed mothers in the widows' camps, had Ms. Fluke-Ekren not remarried, she would have been separated from her son, Defendant's Second Son who had been injured when a bomb hit the home where they had been living in 2015.   Defendant's Eldest Son already had returned to the United States (in 2011) to complete his secondary education.

[24] Ms. Fluke-Ekren named the boy Osama after Osama bin Zaid, a famous companion of the Prophet Mohamed. Osama is a very common Arabic name.  The allegation in Witness-1's victim impact letter that Ms. Fluke-Ekren named the boy after Osama Bin Laden is unfortunately another example of jumping to a false conclusion and Witness-1 striking out against her mother. *See* pp. 8, paragraph 2 of Witness-1's victim impact letter. When Osama had been named, Ms. Fluke-Ekren had not spoken to Witness-1 for some time, and Witness-1 had left Syria two years before.

Mahmood Mustafa, in an effort to bring safety and stability to her children and to allow herself to settle down and live as normal a life as possible. She worked as a data collector for an NGO,[25] and served as a school teacher. Ms. Fluke-Ekren personally contributed to building a two-room schoolhouse [26] that served approximately 50 children ranging in age from preschoolers to teenagers. The schoolhouse opened in January 2020 and replaced a gravel floor tent that had served as the prior school. Ms. Fluke-Ekren taught English and Arabic writing at the school, which her own children attended, for no salary. She also worked with the city council in Qobassin to obtain desks, benches, supplies, and two full-time teachers for the school. She used her own money to purchase books and supplies for the students and developed a curriculum to assist other teachers.



A child learning at the school Ms. Fluke-Ekren helped build in Qobassin.
(the faces of the children have been obscured to protect their privacy)



Ms. Fluke-Ekren's students. The desks and benches in the photographs were contributed by the Qobassin city council.
(the faces of the children have been obscured to protect their privacy)

---

[25] Mr. Fluke-Ekren was employed by the Needs Assessment Society for Syria (NASS). NASS provided data on migration and humanitarian issues to the World Health Organization. She was paid $420 per month.
[26] In fact, the school stands on land owned by her then-husband who bought the cinder blocks to construct the school.

Her life after leaving ISIS reflected her disavowal of violence.   Unfortunately, when the relationship with her new husband ended, and as she was considering her options, she wanted gain security and stability for her children, leading her to make the decision to turn herself into local Syrian authorities.

### C.  Ms. Fluke-Ekren's Mental Health Warrants a Downward Departure

Unsurprisingly, given Ms. Fluke-Ekren's extensive personal history of trauma and loss, and her other experiences in war-torn Syria, she has been diagnosed with severe post-traumatic stress disorder.[27] PTSD has been recognized as directly relevant to and mitigating in sentencing. *See generally Porter v. McCullom*, 558 U.S. 30, 33 (2009) (acknowledging the mitigating relevance an abusive childhood, trauma, long term substance abuse, and impaired mental health).

The caselaw under U.S.S.G. § 5K2.13 is instructive in how to take Ms. Fluke-Ekren's mental health into account under 18 U.S. Code §3553. In the context of departures under U.S.S.G. §5K2.13, courts have acknowledged post-traumatic stress disorder as a basis upon which to depart downward at sentencing.  *See e.g.*, *United States v. Cantu*, 12 F.3d 1506, 1513 (9th Cir. 1993) ("'Reduced mental capacity,' . . . comprehends both organic dysfunction and behavioral disturbances that impair the formation of reasoned judgements . . .[A] defendant suffering from post-traumatic stress disorder, an emotional illness, is eligible for  . . . a departure [under U.S.S.G. § 5K2.13] if h[er] ailment distorted his reasoning and interfered with his ability to make reasoned decisions"); *United States v. Pelloski*, 31 F.Supp.3d 952 (S.D. Ohio 2014); *United States v. Ferguson*, 942 F. Supp.2d 1186, 1189 (M.D. Ala. 2013) (stating that "PTSD occurs in persons who experienced an extremely traumatic event and, following the event, re-experience the event in their day-to-day lives"); *United States v. Flowers*, 946 F.Supp.2d 1295 (M.D. Ala., 2013).  *See*

---

[27] *See* Report of Lucy Guarnera, Ph.D., page 10 (filed under seal as <u>Exhibit 2.</u>).

*also*, Betsy J. Grey, *Neuroscience, PTSD and Sentencing Mitigation*, 34 Cardozo L. Rev 53 (2012).

In explaining the relevance of PTSD to a departure for diminished capacity under U.S.S.G. § 5K2.13, in *Cantu* the Ninth Circuit explained that the "inquiry into the defendant's mental condition and the circumstances of the offense must be undertaken 'with a view to lenity, as section 5K2.13 implicitly recommends.'" *United States v. Cantu*, *supra*, 12 F.3d at 1511, quoting *United States v. Chatman*, 986 F.2d 1446, 1454 (D.C. Cir. 1993). Moreover, the Ninth Circuit recognized that "the disorder need be only a contributing cause, not a "but-for" or sole cause, of the offense . . . The defendant's eligibility [for a departure under 5K2.13] remains the same whether his impairment contributed greatly to the commission of the offense, or hardly at all." *Cantu*, 12 F.3d at 155, *citing*, *inter alia*, *United States v. Perkins*, 963 F.2d 1523, 1526 (D.C. Cir. 1992). *See also*, *United States v. Leandre*, 132 F.3d 796, 803-804 (D.C. Cir. 1998) ("[R]educed mental capacity need not be the necessary cause of the commission of [a] crime . . . for [an offender] to be eligible for a downward departure under section 5K2.13 . . . Whether a defendant's reduced mental capacity 'contributed to the commission of a crime' is an individualized factual determination to be made by a sentencing court in light of the factual record before it . . . [T]he court is called upon to consider the defendant's individual characteristics in exercising its decision to depart") (citation omitted); *United States v. Speight*, 726 F.Supp. 861, 868 (D.D.C. 1989) (recognizing that co-morbid substance abuse and mental health affliction does not defeat departure under U.S.S.G. § 5K2.13).

### D.  A Significant Toll Already Has Been Exacted from Ms. Fluke-Ekren Through a Multitude of Enormous Losses She Has Suffered

Over the course of three years, between 2015 and 2018, Ms. Fluke-Ekren lost two children and three husbands to the Syrian conflict.  In 2015, at the age of just five years, Ms. Fluke-Ekren's

son died.  PSR, ¶ 98.  Less than a year later, her husband of 16 years, Volkan Ekren, was killed, PSR, ¶ 100, and eight months after that, her husband Mohammad Zaffer was killed.  In 2017, when he was just 26 days old, another of Ms. Fluke-Ekren's sons died, and the following year her husband Mohammed Doe was killed. PSR, ¶ 103.

Shortly before ceasing her involvement with ISIS in May, 2019, Ms. Fluke-Ekren was detained in a PKK jail from January to March, 2019, where she suffered horrific conditions.  PSR ¶ 105.[28]  In May, 2021, she went to a local police station and announced that she was an American citizen, and her former husband was a member of ISIS, and as a result of that she was taken into custody a few weeks later, along with her six children who were living with her at the time.  PSR ¶ 110.  From late June to late November, 2021, she was held at a Turkish prison where she experienced very poor conditions.  PSR ¶ 111.  That period of custody culminated with her being taken into U.S. custody and flown to Dulles International Airport on January 28, 2022.  Upon arriving at Dulles, the Defendant's children were transferred to the custody of the Loudoun County Department of Family Services.  She has not been in the same room with her children since that day.

Of all the losses she has suffered, being without her children is perhaps the most painful for her.  Five of the six children are United States citizens, although they have never lived in the United States until they were brought here in 2022.[29]  The bond between Ms. Fluke-Ekren and her children is profound.  For example, her 8-year-old daughter wrote to Ms. Fluke-Ekren in April 2022 "It [has] been so long [since] I [saw] you . . . I wish [I could] see you again.  Please can I

---

[28] The horrific conditions within the detention centers in Syria are notorious.  *See e.g.*, '*Unknown number' of foreign nationals have died in squalid Syrian camps, say rights experts*" (Feb. 8, 2021), available at https://news.un.org/en/story/2021/02/1084172; Syria: Dire Conditions for ISIS Suspects' Families (July 23, 2019), available at https://www.hrw.org/news/2019/07/23/syria-dire-conditions-isis-suspects-families

[29] The one child who is not a U.S. citizen was adopted by Ms. Fluke-Ekren when he was seven-months old, after both his parents were killed.

come with you? I love you."  *See* <u>Exhibit 3</u> (filed under seal).  *See also* <u>Exhibit 4</u> (filed under seal) (letter from her 8-year-old son, asking whether his mother is okay and saying he wished he could visit with her).  Ms. Fluke-Ekren's role as a devoted mother is also borne out by the words of Defendant's Second Son, who has said of his mother that she is "nothing but extremely genuine and someone who cares a lot about her kids," adding that "[s]he loved us so much and . . . would do anything for her kids."  In enumerating the life lessons he has learned from his mother, Defendant's Second Son shared that she "taught[him] a number of life lessons . . . [including] . . . to respect [him]self and to take responsibility[, . . . ]that everyday is a new day and with each new day, we can change and become better[, and  . . .] to strive to be the best version of who [we are]." *See* <u>Exhibit 5</u> (filed under seal).

The fact Ms. Fluke-Ekren's young children are in the United States, a foreign place to them, without any family, is extremely distressing to Ms. Fluke-Ekren.  Upon information and belief, none of Ms. Fluke-Ekren's relatives living in the United States have expressed any willingness to be involved with her children.  From her education and training as an educator, she is well aware of the statistics regarding difficulties children who grow up in foster care are at risk of experiencing.

If given a Guidelines sentence of 20 years, Ms. Fluke-Ekren's youngest child (3 years old) would be an adult when she is released.  A significant prison sentence is certain to irreparably harm her relationship with the young children, who would grow up, all the way to adulthood, without their mother.  The toll she has already suffered is undeniable, and should be taken into consideration by the Court in fashioning an adequate sentence.

### E.  A Criminal History Category of VI Substantially Overstates the Defendant's Criminal History and Likelihood of Recidivism

"If reliable information indicates that the defendant's criminal history category substantially over-represents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit other crimes, a downward departure may be warranted." U.S.S.G. § 4A1.3(b)(1). "A departure pursuant to § 4A1.3 is encouraged, provided that the criminal history category does not account adequately for the defendant's past criminal conduct or the likelihood that he will commit other crimes." *United States v. Dixon,* 318 F.3d 585, 588 (4th Cir.2003).  Ms. Fluke-Ekren's criminal history consists of minor traffic offenses from more than 15 years ago. *See* PSR, ¶¶ 67-69. Her unadjusted criminal history category is 1. PSR, ¶ 71.  Application of the terrorism enhancement, U.S.S.G. section 3A1.4, automatically adjusts her criminal history category from the lowest category of I, to the highest category of VI. Ms. Fluke-Ekren submits that a criminal history category VI over-represents her criminal history as well as the likelihood that she will commit other crimes.

The terrorism enhancement is unique among the independent enhancements available in the federal sentencing guidelines. All other independent enhancements set forth in chapter 3 (the "Adjustments" chapter) of the Guidelines entail an increase of only 1 to 5 levels. Though some specific offenses also involve upward adjustments, none exceeds the severity of the terrorism enhancement since it increases both the offense level increase and criminal history category assignment.  The presumption under § 3A1.4 is incompatible with 18 U.S.C. § 3553, which requires that a defendant be evaluated individually to justify her sentence.  Fixing a defendant's Criminal History Category at VI creates a legal presumption that the defendant is a recidivist career offender who cannot be deterred by fear of prison or efforts toward rehabilitation, and who is certain to commit serious offenses in the future.  It substitutes a legal presumption for an

individualized profile, and treats defendants – even first offenders like Ms. Fluke-Ekren – as undeterrable and incorrigible recidivists.

The Supreme Court and the Sentencing Commission have opined that the deference to be given to the Sentencing Guidelines derives principally from the fact that the Guidelines were developed based on the experience of thousands of cases over a period of years;[30] however, "[n]othing in the history of U.S.S.G. section 3A1.4 would indicate that any reliable data was used to determine if a person convicted of a material support offense is more likely to be a recidivist." James P. McLoughlin, Jr., *Deconstructing United States Sentencing Guidelines Section 3a1.4: Sentencing Failure in Cases of Financial Support for Foreign Terrorist Organizations*, 28 Law & Ineq. 51, 115 (2010).[31]  In the absence of an empirical basis for § 3A1.4's manipulation of the criminal history category, the Court should find that ascribing a criminal history category VI for Ms. Fluke-Ekren will result in a sentence "greater than necessary" to achieve § 3553(a)'s purposes. *Cf. Kimbrough v. United States*, 552 U.S. 85, 89 (2007) (holding that it is not an abuse of discretion for a district court to conclude that the crack vs. powder cocaine guidelines disparity yields a

---

[30] *E.g.*, *Rita v. United States*, 551 U.S. 338, 349 (2007) ("The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time...."); U.S. Sentencing Guidelines Manual ch. 1, pt. A(3) ("[T] mission sought to solve both the practical and philosophical problems of developing a coherent sentencing system by taking an empirical approach that used as a starting point data estimating pre-guidelines sentencing practice. It analyzed data drawn from 10,000 presentence investigations, the differing elements of various crimes as distinguished in substantive criminal statutes, the United States Parole Commission's guidelines and statistics, and data from other "relevant sources in order to determine which distinctions were important in pre-guide- lines practice.").

[31] To the contrary, the growing body of statistical data regarding recidivism in terrorism cases strongly suggests recidivism rates of these offenders is actually *lower* than conventional offenders. *See, e.g.*, Hodwitz, Omi, "The Terrorism Recidivism Study (TRS): An Update on Data Collection and Results," *Perspectives on Terrorism*, vol. 15, no. 4, 2021, pp. 27–38. *JSTOR*, https://www.jstor.org/stable/27044233. Accessed 19 Oct. 2022 (finding a recidivism rate of 1.6% for offenders convicted of terrorism-related offenses in the United States between 2001 and 2020, which is significantly lower than rates found among conventional or apolitical offenders); Renard, Thomas, "Overblown: Exploring the Gap Between the Fear of Terrorist Recidivism and the Evidence," *CTC Sentinel Combating Terrorism Center at West Point*, vol. 13, issue 4, April 2020, pp. 19-29, https://ctc.westpoint.edu/overblown-exploring-the-gap-between-the-fear-of-terrorist-recidivism-and-the-evidence/ (examining statistics and academic literature on recidivism rates among terrorism offenders).

sentence "greater than necessary" to achieve § 3553(a)'s purposes, because the Commission departed from its empirical approach in formulating the crack guidelines).

Here, the Court should look to Ms. Fluke-Ekren's actual lack of a criminal history as it relates to her history and characteristics, and as it relates to what sentence will be "adequate" to deter her from committing further offenses.

### F. Defendant's Continuous Custody

As of the date of her sentencing, Ms. Fluke-Ekren will have been in continuous custody for 483 days. She was foreign custody from June 29, 2021, to January 28, 2022, and has been in federal custody since January 28, 2022.[32] By statute, Ms. Fluke-Ekren is entitled to credit for the 270 days she has been in federal custody. *See* 18 U.S.C.A. § 3585(b). This Court should also take into account the 213 days she spent in foreign custody prior to that. Courts have considered time spent in foreign custody when imposing sentences in similar circumstances. *See United States v. El-Jassem*, 819 F. Supp. 166, 182 (E.D.N.Y. 1993), *aff'd*, 48 F.3d 1213 (2d Cir. 1994) (awarding credit to defendant for time spent in custody in Italy); *United States v. Wahad*, 378 F. App'x 53 (2d Cir. 2010) (unpublished) (noting the district court's awarding credit to the defendant for the 5 months he spent in custody in Afghanistan, as part of the basis for upholding the district court's sentence).

In addition, the Defendant's period of incarceration to date has been made extraordinarily more severe as a result of the COVID-19 pandemic and apparently due to the nature of her offense. During the 270 days of her pretrial confinement at the Alexandria Detention Center, she has been on *at least 22 hour a day lockdown.* There have been extended periods where she was on 23 or 24-

---

[32] PSR, p. 1.

hour-a-day lockdown.[33]  As the court in *United States v. Lizardi*, put it, "[a] day spent in prison under extreme lockdown and in legitimate fear of contracting a once-in-a-century deadly virus exacts a price on a prisoner beyond that imposed by an ordinary day in prison.  While such conditions are not intended as punishment, incarceration in such circumstances is, unavoidably, experienced as more punishing." No. 11-CR-1032 (PAE), at *7 (S.D.N.Y. Oct. 9, 2020); *see also United States v. Rodriguez*, 492 F. Supp. 3d 306, 311 (S.D.N.Y. 2020) ("the pandemic, aside from posing a threat to [Defendant's] health, has made [Defendant's] incarceration harsher and more punitive than would otherwise have been the case."); *United States v. Mel*, No. CR TDC-18-0571, 2020 WL 2041674, at *3 (D. Md. Apr. 28, 2020) ("The fact that [Defendant] has been incarcerated [] during a serious outbreak of COVID-19 inside the facility sufficiently increased the severity of the sentence beyond what was originally anticipated ...").

### G.  The Nature and Circumstances of the Offense

Ms. Fluke-Ekren does not seek to diminish the egregiousness of her actions, or the seriousness of the offense she has accepted responsibility for and for which she will be sentenced. But in order for this Court to fashion an appropriate sentence, there is some context that must be taken into account.  The bulk of the Defendant's actions resulting in her conviction occurred under extraordinary circumstances in a war zone more than four years ago. Her motive in providing weapons training in Syria was to provide self-defense training for women and girls in a dangerous environment in which women and children had been sexually assaulted and raped by the warring factions,[34] not to launch attacks against civilian targets.  *See* SOF, ¶¶ 15, 17.

---

[33] For example, during her first COVID quarantine, Ms. Fluke-Ekren spent 10 days on 24-hour-a-day lockdown. That was immediately after being separated from her children. She had to be quarantined a second time during her confinement, which constituted 6 days of 24-hour-a-day lockdown, and 6 days of 23-hour-a-day lockdown.

[34] *See e.g. Thousands of women, men, children raped in Syria's war: U.N. report*, Reuters, March 15, 2018, available at https://www.reuters.com/article/us-mideast-crisis-syria-warcrimes-sexual/thousands-of-women-men-children-raped-in-syrias-war-u-n-report-idUSKCN1GR1PZ (last accessed August 11, 2022, at 8:00PM EDT).

From March 2011 to March, 2021 there were over 140,000 documented civilian deaths in Syria.[35] Many deaths resulted from bombings and airstrikes in civilian-populated areas.[36] While the extent to which U.S. or U.S.-led coalition forces were responsible for such deaths remains a matter of some controversy,[37] the belief that such forces were responsible for civilian deaths was widespread in Syria during the time Ms. Fluke-Ekren lived there.

Ms. Fluke-Ekren experienced, first-hand, the devastation and carnage caused by these attacks on civilian-populated areas.  In 2015 one of her children was killed, and another severely injured, from such an attack on a residential neighborhood. She saw numerous friends, neighbors, and children killed in similar incidents during the war. It was in this context – in the midst of, and in response to, the shock and horrors of war – that she made statements indicating her approval of attacks on the United States. Ms. Fluke-Ekren never acted to carry out any such attacks, and ultimately chose to abandon any involvement with ISIS in May of 2019 (SOF ¶ 23).

Even by the government witnesses' accounts, this training was not advanced, offensive, nor even particularly effective. It was a basic self-defense training.  In fact, while the organization she led was named the women's battalion (Khatiba Nussayeb) by ISIS, the term "battalion" is a misnomer.  The term "battalion" evokes an image of a large number of disciplined troops, but as Witness-1 herself testified, "[i]t was called a military battalion, but it wasn't."  In reality, the Khatiba Nussayeb had barely one hundred women, including members designated as babysitters, nurses, and cooks. The loosely organized group had no formal ranks, were not issued uniforms or weapons, never engaged in fighting, nor fired a shot against an enemy.

---

[35] Rep. of the U.N. High Commissioner for Human Rights, 50th Sess., June 13–July 8, 2022, ¶ 23, U.N. Doc. A/HRC/50/68 (June 28, 2022). The total number of civilians killed in the conflict is unknown, but is reliably estimated to exceed 300,000. *Id.*, ¶ 24.
[36] *Id.*, ¶ 21.
[37] *See, e.g.*, Dave Philipps and Eric Schmitt, *How the U.S. Hid an Airstrike That Killed Dozens of Civilians in Syria*, N.Y. Times, Nov. 14, 2021 (updated Nov. 15, 2021), https://www.nytimes.com/2021/11/13/us/us-airstrikes-civilian-deaths.html.

The actual formation of the "battalion" came about because the mayor of Raqqa was "always being sent letters from the women of ISIS" who wanted to get in the fight. The mayor allowed women to sign up to fight, "not that he would actually allow them to do it, but just to keep them quiet so he can focus on other things."  " So many women signed up for this, but, yeah, it was just to sign up and to throw the paper away." Physical training undertaken by women within ISIS was further aptly described, or derided, by the same government witness as "lame."

### H.  A Below-Guidelines Sentence Will Promote the Goal of General Deterrence

When Ms. Fluke-Ekren brought herself to the attention of Syrian authorities in June of 2021, she was fully aware that she was likely wanted by the United States and would be exposed to a prison sentence;[38] however, she was motivated by a desire to protect her children from the difficulties of living in war-torn Syria and wanted them to have a better life.  At that point she had already abandoned her involvement with ISIS.  Such conduct is significant, and is indicative of a person who is capable of reform and rehabilitation.

The Defendant asserts that where a person like herself abandons the terrorist group, effectively turns themselves in, and then pleads guilty, they should be granted leniency by the Court at sentencing.  Obviously this is beneficial to the individual.  But the Defendant asserts that in doing so the Court can demonstrate to individuals who are still involved with terrorist organizations that there is an incentive for them to cease that involvement and come forward to the authorities.  She notes that her case has received widespread media attention.  There are undoubtedly other women with children living (or hiding) in Syria and elsewhere who want to leave that life.  Ms. Fluke-Ekren respectfully suggests that if she receives the harshest punishment,

---

[38] PSR, page 25, footnote 13.

it will send the message to those women that it is better to stay in a camp and raise their children there rather than have their children taken away for decades, if not forever.

### III. CONCLUSION

For the reasons set forth herein, the Defendant respectfully suggests a below-Guidelines sentence is appropriate.

Respectfully submitted,

_____/s/_____
Joseph King (VSB# 65632)
Sean A. Sherlock (VSB# 82633)
King, Campbell, Poretz & Mitchell PLLC
118 N. Alfred Street
Alexandria, Virginia 22314
(703) 683-7070
Fax: (703) 652-6010
sean@kingcampbell.com
jking@kingcampbell.com