<pre>
 1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF VIRGINIA
 2                        ALEXANDRIA DIVISION

 3     -------------------------x
       UNITED STATES OF AMERICA,  :      Criminal Action No.:
 4                                 :      1:22-cr-92
            versus                 :
 5                                 :      Tuesday, November 1, 2022
                                   :
       ALLISON ELIZABETH           :
 6     FLUKE-EKREN,                :
                                   :
 7                Defendant.       :
       -------------------------x
 8

 9          The above-entitled sentencing was heard before the
       Honorable Leonie M. Brinkema, United States District Judge.
       This proceeding commenced at 11:02 a.m.
10

                         A P P E A R A N C E S:
11

       FOR THE GOVERNMENT:    RAJ PAREKH, ESQUIRE
12                            JOHN GIBBS, ESQUIRE
                              OFFICE OF THE UNITED STATES ATTORNEY
13                            2100 Jamieson Avenue
                              Alexandria, Virginia  22314
14                            (703) 299-3700

15     FOR THE DEFENDANT:     JOSEPH KING, ESQUIRE
                              SEAN SHERLOCK, ESQUIRE
16                            KING, CAMPBELL, PORETZ & MITCHELL
                              108 North Alfred Street
17                            Alexandria, Virginia  22314
                              (703) 683-7070
18

       COURT REPORTER:        STEPHANIE M. AUSTIN, RPR, CRR
19                            Official Court Reporter
                              United States District Court
20                            401 Courthouse Square
                              Alexandria, Virginia  22314
21                            (571) 298-1649
                              S.AustinReporting@gmail.com
22


23        COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES

24

25
                                                            1
</pre>

```
 1                    TABLE OF CONTENTS

 2                         EXHIBITS

 3   On behalf of the Government:
     Admitted
 4
     Numbers 1 and 2 ..........................23
 5
     On behalf of the Defendant:
 6   Admitted

 7   Numbers A, B and C .......................67
     (Under seal)
 8                        MISCELLANY

 9   Proceedings November 1, 2022 ..............3
     Certificate of Court Reporter ............129
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
                                                    2
```

```
1                    P R O C E E D I N G S
2          THE DEPUTY CLERK:  Criminal Number 2022-92, United
3    States of America versus Allison Elizabeth Fluke-Ekren.
4          Counsel, please note your appearances for the
5    record.
6          MR. PAREKH:  Good morning, Your Honor.  Raj Parekh
7    on behalf of the United States.  I'm joined with -- at
8    counsel's table with John Gibbs, as well as paralegal
9    specialist, Larissa Illardi.  And, for your awareness, we
10   also have Gabriel Fluke, who should be in the courtroom, as
11   well as Leyla Ekren, who will be delivering a victim impact
12   statement later on in the hearing.
13         THE COURT:  All right.  Good morning.
14         MR. KING:  Good morning, Your Honor.  Joseph King
15   and Sean Sherlock on behalf of Allison Fluke-Ekren.
16         THE COURT:  All right.  Counsel, have you had
17   enough time to go over the presentence report yourselves and
18   with your client?
19         MR. KING:  Yes, Your Honor.
20         THE COURT:  All right.  Counsel -- Mr. King, you
21   need to stay at the lectern.
22         Are there any factual corrections, changes,
23   additions or deletions you want made to the report itself?
24         MR. KING:  Your Honor, we've set forth our
25   objections to the PSR writer and in our position on
```

3

1   sentencing.  It's our position -- well, at the outset, I
2   wanted to note that the defendant has no concerns at all
3   having to deal with these new child abuse allegations.  If
4   she had the time and the resources to fully investigate
5   them, I believe it would be fully rebutted.
6           It's also the defendant's position that some of
7   these allegations are so inherently incredible and come so
8   late in the game, including, for instance, the defendant's
9   daughter claiming that she was on the front lines when she
10  was 12 in a small village in Syria fighting for ISIS, that
11  they're just inherently incredible, and they don't have an
12  indicia of reliability, that they should be fully stricken
13  from the report.
14          And I just wanted to mention, in the defendant's
15  view as a mother and a teacher, the allegations coming five
16  years into the Government's investigation, to her, makes
17  what happened in Syria -- because they're so serious -- less
18  serious than her conduct -- than the conduct with regard to
19  this abuse that she really has no chance to defend against.
20          She acknowledged in this statement of facts, which
21  from my -- which, to a great extent, relies upon the
22  statements of her own daughter, that these were all true
23  because they had a basis in fact.
24          It's her position that these do not have a basis
25  in fact.  There's so many statements that are inherently

4

1    incredible in here.  Claiming that she named her son Osama

2    after Osama Bin Laden, when she had had no contact with her

3    daughter for approximately two years.  That's just

4    incredible.  And it's -- and some of the allegations that

5    her son makes are just so -- without basis of facts, so

6    incredible that they should be stricken from the report.

7              I understand that the Government is going to move

8    to have the victim impact statements unsealed and available

9    to the public.  There's an objection to that as well.

10             Those are victim impact statements that are part

11   of an under-seal document.  I don't believe there's any -- I

12   don't know if there's any authority to have victim impact

13   statements unsealed, but these are a part of the PSR, which

14   is supposed to be private, that now the Government wants to

15   be made public.  There's an objection to that, too.

16             THE COURT:  Well, that's a unique argument that

17   you've made.  But, frequently, we have victims who send the

18   letters directly to the Court sometimes and I send them over

19   to probation just so they can attach them to the presentence

20   report so that counsel can see them.

21             But I'm not aware of any authority -- I agree with

22   you that the presentence report itself is confidential.  But

23   attachments to it originating from third parties, I don't

24   think there's any authority that requires that they be kept

25   under seal.  The simple fact that they were attached to the

1   presentence report does not, in my view, automatically make

2   them subject to seal.  So that objection I would overrule.

3          The reality is -- and I warned everybody ahead of

4   time when this issue about the child abuse matters came to

5   our attention -- this defendant pled guilty to an offense

6   involving conspiracy to provide material support to a

7   foreign terrorist organization.  That's to which she pled

8   guilty, and that's for which she will be sentenced.

9   However, it is appropriate in a presentence report for the

10  officer to give, among other things to the Bureau of

11  Prisons, a full picture of the person who they're going to

12  have in custody for a significant amount of time.

13         They use that information for, among other things,

14  determining the level at which the person should be

15  confined.  Also, they can sometimes use that information to

16  determine who are appropriate visitors to meet with that

17  person.

18         And I've looked carefully at all of your

19  objections, and I'm going to overrule all of them.  I think

20  that although they are certainly, I can understand,

21  problematic for your client, I don't think they're unduly

22  prejudicial, and they do not affect the Court's decision in

23  terms of the appropriate sentence.

24         So --

25         MR. KING:  All right.

6

```
 1              THE COURT:  -- you've made them for the record;
 2   I'm overruling the objection; all right?
 3              MR. KING:  Thank you, Your Honor.
 4              THE COURT:  Having done that, that means that the
 5   offense level here is a level 41.  The defendant has a
 6   criminal history of six because she received a terrorism
 7   enhancement.  The guideline range that results from those
 8   two numbers would be 360 months to life imprisonment;
 9   however, because of the plea agreement in this case, your
10   client's maximum exposure is limited to 240 months of
11   incarceration.
12              In terms of the period of supervised release, it's
13   two years to life is the range.  The fine is $250,000 and
14   the $100 special assessment.  Those are the guidelines that
15   will be applied to this case.
16              MR. KING:  Thank you, Your Honor.
17              THE COURT:  All right.  All right.  Mr. Parekh,
18   then I'll let the United States allocute.
19              MR. PAREKH:  Yes, Your Honor.  Before I do so, the
20   two letters that were attached to the PSR were also attached
21   to the Government's CVRA motion.  They were under seal at
22   the time because we wanted to ensure that Mr. Gabriel Fluke
23   and Ms. Leyla Ekren had time to consider whether they wished
24   to appear at sentencing and whether they wished to have
25   their names publicly revealed.  They have repeatedly
```

7

 1  confirmed to me that they do.  And they do want their

 2  letters to be out there, because this is very difficult for

 3  them, of course, this is their own mother.  They would much

 4  rather not be here and much rather not be in this position

 5  of describing these painful experiences that happened to

 6  them.

 7          But they took the time to write to the Court, as

 8  the Court graciously suggested during the plea hearing.  And

 9  I have redacted copies of both of their letters, which were

10  attached to, I believe Docket Number 48 was the under-seal

11  version; Docket Number 47 was the publicly-filed version.

12  We redacted the names of any third parties that the

13  defendant did not bring up in her sentencing memorandum.

14          So we want to be responsible about this and not

15  just release them in full because they do have names of

16  third parties.  But, for the most part, they are unredacted.

17  And I can pass up those copies.  I've provided copies to

18  counsel for the defendant.

19          THE COURT:  All right.

20          MR. PAREKH:  Thank you.

21          MR. KING:  Your Honor, we would just note our

22  continuing objection to those being unsealed.  We understand

23  the Court's --

24          THE COURT:  I'm overruling the objection.

25          So I will leave it up to the -- do you want these

                                                              8

1   placed on the Court docket then?

2           MR. PAREKH:  Yes, Your Honor.

3           THE COURT:  All right.  They'll be -- we'll

4   substitute them, I guess, for the sealed attachments to your

5   memorandum.

6           MR. PAREKH:  So, Mr. Gabriel Fluke's letter was

7   attached as Exhibit 1.  Ms. Leyla Ekren's letter was

8   attached as Exhibit 2.  But the report attached as Exhibit 3

9   we would ask remain under seal until further order of the

10  Court.  That's the 302 that was submitted.

11          THE COURT:  We're not going to publish 302s.

12          MR. PAREKH:  Thank you, Your Honor.

13          THE COURT:  All right.

14          MR. PAREKH:  And just procedurally, Your Honor, I

15  understand that the defense objects to the Government

16  playing very short audio clips during its sentencing

17  presentation today.  I planned to save these near the end of

18  my sentencing argument.  But that is something that we would

19  like to do.  They consented to us bringing the trial laptop

20  here, which we appreciated.  And of course there would be no

21  reason to have the trial laptop here if we weren't going to

22  play the audio clips.

23          I think it's important because I can help explain

24  and contextualize the defendant's statements.  I know Your

25  Honor has probably heard them in chambers, but it is

9

```
 1   relevant to the 3553(a) sentencing factors.  And while we
 2   have a large volume of recordings of the defendant
 3   containing inculpatory statements, we've limited our
 4   presentation today to three.  And the third recording, I'm
 5   only going to play the last approximately four and a half
 6   minutes.  So it shouldn't be more than about six minutes of
 7   audio recordings.
 8           THE COURT:  Mr. King, we heard those in chambers.
 9   I assume you've also listened to them.
10           MR. KING:  Yes, I have, Your Honor.
11           THE COURT:  Go ahead.
12           MR. KING:  It's our position the Court has already
13   heard these, we've heard them, certainly the U.S. attorney
14   knows exactly what the content is.  They don't have to be
15   played again in court.
16           THE COURT:  Well, the point is, it's a public
17   sentencing, and so the public has a right to understand the
18   evidence that is relevant to the sentencing decision.  So
19   I'm going to overrule the objection.  They may be played.
20           MR. KING:  Thank you, Your Honor.
21           MR. PAREKH:  Thank you, Your Honor.
22           As Your Honor knows from our sentencing
23   memorandum, the United States respectfully requests that you
24   impose a statutory maximum sentence of 20 years
25   imprisonment.  But if the law is applied to the offense of
```

10

conviction and the facts in this case permitted it, we would have asked the Court to sentence Fluke-Ekren to a lifetime in prison. 20 years in prison is insufficient to fully account for her monstrous acts of terror, but it is the statutory maximum penalty in this case, and based on all the sentencing factors, the appropriate and just sentence that this Court should impose.

Understanding that the Court is fully immersed in the facts in this case, I will focus my sentencing presentation on what we believe to be the most important reasons why the Court should impose this statutory maximum sentence under the 3553(a) sentencing factors.

Going to the nature and seriousness of the offense -- and also during my presentation, I plan to rebut the fabricated claims and justifications asserted by the defendant in her sentencing memorandum.

Going to the nature and seriousness of the offense. The seriousness of the offense is set forth in detail, as Your Honor knows, throughout the statement of facts and other court documents which tell the story of how this United States citizen left a trail of betrayal and ascended the ranks of the Islamic State, and, in effect, became the empress of ISIS, given the unprecedented autonomy she was given as the leader of an all-female ISIS battalion.

In doing so, the defendant brainwashed young girls

11

1  and trained them to kill.  As Your Honor knows, she trained

2  over 100 women and young girls in Syria -- some as young as

3  ten years old -- on the use of AK-47 rifles, grenades and

4  suicide belts packed with explosives during the terrorist

5  organization's murderous crusade.  One of those young girls

6  is in this courtroom today, that's Ms. Leyla Ekren, and she

7  will be addressing the Court later on during the hearing.

8         But where did the defendant's journey begin?

9  Well, she left the United States, Your Honor, and it was her

10  decision to move her children overseas.  In fact, initially,

11  her second husband had not yet moved overseas.  She obtained

12  a job in Egypt and moved her entire family there knowing

13  that her husband did not have a job.  So she was the driving

14  force in terms of the family going overseas, and she was the

15  driving force in terms of the family staying overseas.

16         And as Your Honor knows, she was involved in one

17  of the most horrific terrorist attacks ever committed

18  against the United States, the aftermath of that attack that

19  is, and that is the September 11th, 2012 terrorist attack on

20  the U.S. Special Mission and CIA Annex in Benghazi, Libya,

21  during which four Americans were killed.

22         As the statement of facts indicates, she assisted

23  with reviewing and summarizing the contents of stolen U.S.

24  documents, which were ultimately provided to the leadership

25  of Ansar Al-Sharia in Benghazi.  As Your Honor probably

12

```
1    knows, that is the terrorist organization that claimed
2    responsibility for the Benghazi attacks.
3            And during discovery, Your Honor, I provided
4    emails that the defendant sent to her family members after
5    the attack.  She indicated that the attack had occurred and
6    told them not to worry.  Didn't mention anything about her
7    involvement in the aftermath of the attack.  And she had
8    copied and pasted that email multiple times to other family
9    members.  And throughout her time -- including up until when
10   she was arrested and brought to the Eastern District of
11   Virginia -- she continued to deny any involvement in the
12   aftermath of the attack.
13           But, as Your Honor knows, she's now admitted that,
14   yes, in fact, she did help translate those documents, and
15   she was an eyewitness to that attack.  She was living in
16   Benghazi at the time, and shortly after the attack, her
17   second husband claimed to have brought those documents home
18   where she assisted him.
19           But her terrorist crusade did not end there.  As
20   Your Honor knows, when she was in Syria, she described to
21   her own daughter, with specificity, her desire to conduct a
22   widespread terrorist attack in the United States.
23           And Your Honor probably saw that the defense is
24   now claiming that these were just statements made in the
25   heat of the moment; that she had no desire to conduct such
```

13

1    attacks, and this was just heated rhetoric.

2           Well, Your Honor, the statement of facts is very

3    clear that this was quite detailed, what she's describing to

4    her daughter.  She says that she would go to a shopping mall

5    in the United States, park a vehicle full of explosives in

6    the basement or parking garage level of the structure, and

7    detonate the explosives in the vehicle with a

8    cell-phone-triggering device.

9           This isn't a statement just made in the heat of

10   the moment where defendant is saying, oh, it's terrible that

11   these people died in Syria; I wish something would happen to

12   the United States.  She's describing with meticulous

13   clarity.  And this level of premeditation, this level of

14   calculated desire to conduct an attack is something that --

15   quite frankly, it's not credible to believe that this comes

16   out of the mouth of someone who did not want to commit such

17   an attack.

18          The fact that she's describing it to her own

19   daughter is even more depraved.  Because her daughter at the

20   time was extremely young.  She was in Syria when she was 10,

21   11, 12 years old, all the way up until she was 15.  She was

22   a minor.  She's depending on her mother to teach her right

23   from wrong.  But, instead, she's describing to her own

24   daughter how she could commit this terrorist attack and

25   stating that any attack that did not kill a large number of

                                                              14

1    individuals would be a waste of resources, and that she

2    wished that attacks that took place outside of the United

3    States had occurred on United States soil instead.

4            But it gets worse, Your Honor.  As Your Honor

5    knows from the presentence investigation report, we

6    interviewed a former ISIS member who was a woman from

7    Central America, and she was sent by ISIS officials to the

8    location where the defendant was residing in Syria in 2014.

9    I even opened up this interview to the U.S. probation

10   officer, so that way she could see her, assess her

11   credibility, and ask her any questions she so wished.  And

12   this is an individual who, when she met the defendant, the

13   defendant approached her, became friends with her and stated

14   that she wanted to recruit her to conduct an attack on a

15   specific college in the Midwest using explosives.

16           And I think it's very important, Your Honor, that

17   we talk about the details, because the statement of facts

18   indicates, in paragraphs 7 and 8, that she discussed ideas

19   for an attack involving the use of explosives on the campus

20   of a U.S.-based college in the Midwest.  Again, it's very

21   specific.  She's using explosives.  That's something that

22   she stated to her daughter.  Now she's stating it to a third

23   party, another ISIS member.  She's using explosives later

24   on, as Your Honor knows, to train women and young girls to

25   fight for ISIS.  And it's a very specific type of way that

15

1    she wanted to do this.

2          So, as they say, the devil is in the details.

3    What did she tell us?  She said that Umm Mohammed, the

4    defendant -- she's admitted that that's her kunya, or her

5    alias -- indicated that they would dress up as non-believers

6    and drop off a backpack on campus filled with explosives,

7    and that she knew where in the university to place the bag

8    as to cause the most casualties.

9          And she indicated that Abu Mohammad al-Adnani, the

10   former official spokesperson for ISIS, said:  "Blood for

11   blood."  And she realized that this particular ISIS female,

12   because of her passport from a certain country in Central

13   America, that she could be much value to her.  And so she

14   said that she had contacts that can get them across a U.S.

15   border through Mexico, and it would help them travel into

16   the United States to commit this attack.

17         Now, fortunately, this former ISIS member said,

18   I'm not doing this.  You know, even for her, this was too

19   extreme, and she declined to participate in any such attack.

20         But during that same interview that I participated

21   in with the probation officer, this ISIS female said, about

22   this defendant, that she had the mind of a terrorist,

23   supported beheadings conducted by ISIS, and stated:  "People

24   like Umm Mohammed are bad for humanity and society.  These

25   people should not get out," referring to not getting out of

                                                          16

1    prison.

2             This witness also saw the defendant's son at the

3    residence because she spent approximately 18 days with the

4    defendant.  And this is also very critical to rebutting

5    their claims, because I believe they're going to present

6    photographs of kids and talk about how she has all these,

7    you know, kids to take care of, and that's why you should

8    impose less than the maximum sentence.  Well, what was she

9    doing when the Court did not have her under her custody and

10   she wasn't here in the United States when she was out in

11   Syria committing terrorist crimes?

12            This woman said, I saw her son, who was

13   approximately 11 years old at the time, carrying an AK-47

14   rifle.  We then interviewed an entirely separate witness.

15   This was a witness that I'll not reveal their name because

16   they testified in the grand jury.  But this witness stated

17   to us during interviews that when she went to the

18   defendant's home in Syria in 2014, her other son, who was

19   approximately five or six years old at the time, was holding

20   a machine gun at her residence, and he stated, when

21   Ms. Fluke-Ekren said something to him that, "I don't want to

22   be like the kuffar."

23            This is all relevant, Your Honor, because you

24   know, as Your Honor knows from the statement of facts, she's

25   training over these 100 women and young girls to use these

                                                              17

1    firearms and explosives, but it doesn't end at this

2    all-female battalion, and it certainly didn't start there.

3    Even her own children, including younger males, she had them

4    armed with weapons when these witnesses were going to her

5    home.

6              I then talked to an entirely separate witness,

7    another minor who was trained by the defendant, and she's

8    listed in the statement of facts.  And she indicated that

9    when she would go out in Syria, she saw that Umm Mohammed --

10   referring to the defendant -- had approximately a

11   ten-year-old son, and he was always armed with an AK-47

12   outside the home, that he was a member of the Cubs of the

13   Caliphate organization, and that at one point she saw him

14   alone purchasing a watch from a vendor in Syria while he was

15   armed with an AK-47 slung over his shoulder.  These are not

16   the acts of a responsible mother, Your Honor.

17             In Iraq, as Your Honor knows, she assisted ISIS

18   personnel who were in charge of homes for widowed women

19   whose husbands died while fighting for ISIS, and ultimately

20   she became the leader of this ISIS military battalion called

21   the Khatiba Nusaybah.

22             Now, Your Honor may hear argument from the defense

23   about the fact that this venture initially started as a way

24   for girls to get training on other matters, you know,

25   cooking or martial arts or taking care of their babies,

                                                            18

1   other seemingly innocuous activities.  But Leyla Ekren
2   described why the defendant would do that.  And she said in
3   her letter that:  "Step 1 was to have the defendant join a
4   terrorist group, such as Ansar Al-Sharia, Jabhat al-Nusra
5   and ISIS and ask for military funding.  If they denied her,
6   then she would move on to Step 2, disguising her malicious
7   intents as good deeds, such as wanting to start a school
8   and/or teach people self-defense.  And then once Allison got
9   her claws sunken into people, she would then start to
10  pervert her once innocent intentions and introduce
11  ideologies like the only way to self-defense is to attack
12  first.  Allison's teachings included ideas of suicide
13  bombing yourself so that you don't get raped in the name of
14  self-defense.  This narrative especially worked on
15  vulnerable, naive little girls.  And Allison specifically
16  wanted to train little girls because she could groom them
17  into having a fear that she could use to control them, just
18  like she did to me."
19          Your Honor, what's unique about this case is that,
20  unlike many of the national security cases that you see
21  around the country and in this court, we're relying on
22  actual eyewitness testimony in this case.  A lot of the
23  cases that Your Honor has seen and around the country,
24  they're relying on FBI undercovers, or information posted on
25  social media, or other forms of evidence.  But, in this

 1    case, Your Honor, you should have no doubt about what this

 2    defendant was up to, because these were actual eyewitnesses,

 3    including her own daughter who observed the defendant's

 4    terrorist crime spree.

 5              But there is additional corroborating evidence,

 6    Your Honor, and I turned this over in discovery.  In 2019,

 7    coalition forces found a number of ISIS documents in Syria,

 8    and a number of those documents related to this Khatiba.

 9              And, Your Honor, if I can use the document

10    scanner, I can put this up on the screen so Your Honor can

11    see it.

12              THE COURT:  All right.  Defense counsel has a

13    copy?

14              MR. PAREKH:  Yes, they have a copy, Your Honor.

15              THE COURT:  All right.  Go ahead.

16              MR. PAREKH:  Your Honor, I'm first putting up

17    the -- this is the original document that I'm putting up,

18    and I'm going to put up the English translation, all of

19    which were previously turned over to defense counsel.  It

20    bears all the hallmarks of an official ISIS document, it's

21    got the ISIS stamp.  And the translation of this document --

22              THE COURT:  Mr. Parekh, you need to stay at the

23    microphone.

24              MR. PAREKH:  Yes, Your Honor.

25              THE COURT:  Have your assistant help you with

                                                              20

```
 1    that.

 2              MR. PAREKH:  Yes, Your Honor.

 3              The translation of this document is now up on the

 4    screen.  And you'll notice that at the bottom it says:

 5    Islamic State, Wilayah of Ar Raqqah, Office of the Wali.

 6    And, of course, the Wali is listed in the statement of

 7    facts.  That's why I'm showing this to you, Your Honor.  The

 8    Wali is listed in paragraph 15 of the statement of facts.

 9    It says:  "Fluke-Ekren informed a witness -- Witness 4 --

10    among others, that she obtained authorization from the

11    Wali -- who is the ISIS-appointed mayor or governor of

12    Raqqa -- in order to establish a women's center."

13              And let there be no doubt who the leader was of

14    this center.  She's admitted to it, but this is actual

15    battlefield evidence indicating from ISIS that the women's

16    office belongs to Umm Mohammed al-Amriki.  And of course

17    that is one of the kunyas listed on the defendant's

18    statement of facts.

19              The second document, Your Honor -- I've put up the

20    original document, a copy of it, on the screen.  It's in

21    Arabic.  Again, it's got the ISIS stamp on it and bears all

22    the hallmarks of an ISIS document.  It was recovered on the

23    battlefield in Syria by coalition forces.  I'll now put up

24    the English translation, which, again, was previously turned

25    over to defense counsel before the defendant entered her
```

```
 1   guilty plea.
 2           And the reason I'm putting this up, Your Honor,
 3   is -- again, let there be no doubt about what the purpose of
 4   this battalion was.  It wasn't for self-defense, and Your
 5   Honor can see that.  I'll read it into the record.  This
 6   page states -- and, again, it's a memorandum signed by the
 7   Wali of Ar Raqqah.  And it states and underlined that
 8   another individual, who was part of the battalion:  "Umm
 9   Ahmad al-Afriqi states that she wants to be the first to
10   carry out a suicide operation."
11           There is nothing self-defense-related about
12   carrying out a suicide operation.  The defendant is listed
13   in this particular document, it's indicated that she is
14   ready to help to teach the sisters how to drive.  And as
15   Your Honor knows from the statement of facts, the defendant
16   admitted, on paragraph 19, that witnesses with firsthand
17   knowledge stated that the Khatiba Nusaybah also provided
18   certain members with instruction on physical training,
19   medical training, Vehicle-Borne Improvised Explosive Devices
20   Driving courses, among other training, and that some of this
21   training was directly provided by Fluke-Ekren.
22           This is a document recovered from the battlefield,
23   in addition to eyewitness testimony.  And I just want to
24   emphasize how important it is to not let the narrative be
25   that she somehow was providing this training or organizing
```

```
 1    this battalion for self-defense purposes.

 2             THE COURT:  All right.  Now, for the record, the

 3    first exhibit is Exhibit 1 to this sentencing proceeding.

 4    This document will be admitted as Exhibit 2 to this

 5    sentencing proceeding.

 6             You'll need to make sure you've handed up copies

 7    of the English translation, along with the Arabic.  We'll

 8    keep that as one exhibit, and then the second one the same

 9    way.  So these are each a two-page exhibit.

10    (Government Exhibit Numbers 1 and 2 admitted into evidence.)

11             MR. PAREKH:  Yes, Your Honor.  And I have a copy

12    for the Court right now, which I'm providing to the CSO.

13             And, again, I won't indicate the names of these

14    witnesses to preserve their confidentiality, Your Honor, but

15    much of the defense's argument in their sentencing

16    memorandum talks about her justification or excuses for

17    providing this training.  And what I'm about to read to Your

18    Honor are excerpts from sworn testimony that was turned over

19    to the defense, and these are from witnesses listed in the

20    statement of facts.

21             Witness 6 in the statement of facts was

22    approximately 11 or 12 years old when she was first

23    militarily trained by Fluke-Ekren in Syria in approximately

24    2015.  This is not the defendant's daughter.  And so this

25    is -- these are more minors who I personally met who
```

                                                                    23

 1    testified under oath in the grand jury.

 2             And it's important for Your Honor to hear this,

 3    because, as Your Honor knows during the plea hearing,

 4    Ms. Fluke-Ekren stated that we didn't intentionally train

 5    any minors, any young girls in Syria.

 6             That, Your Honor, was one of the most egregious

 7    statements someone can make in a case like this, when the

 8    actual gravamen of her conduct is doing exactly that.  And

 9    for her to say this in this court, in front of Your Honor,

10    illustrates that she's not capable of being rehabilitated,

11    and that until she's confronted with unimpeachable evidence,

12    she won't agree to her conduct, notwithstanding overwhelming

13    amounts of evidence that back it up.

14             So Witness 6 was 11 or 12 years old when she was

15    first militarily trained by Fluke-Ekren in Syria in 2015.

16    Fluke-Ekren sought and received permission from this minor's

17    mother to train her on behalf of ISIS, along with other

18    girls who were minors at the time.  She taught her to use

19    this suicide belt against enemies of ISIS.  This witness

20    stated, under oath, that Fluke-Ekren endorsed killing the

21    kuffar, or non-believers, meaning people who aren't ISIS

22    members.  She knew her as Umm Mohammed al-Amriki.  And this

23    particular witness, her dad died while committing a suicide

24    car bomb attack on behalf of ISIS.  Again, this is a totally

25    separate witness.  I'm not referring to the defendant's

                                                              24

1    daughter here.  And Fluke-Ekren consoled and comforted her

2    after that suicide car bomb attack, told her that her dad

3    was martyred and that he would be a green bird in paradise.

4           And we've had this type of testimony in this court

5    before, Your Honor.  I've had trials where this is

6    explained.  And the witness explained it in her testimony

7    that in ISIS, martyrs that die for the cause, they're seen

8    as their souls are being carried by green birds into

9    paradise.

10          She took courses from Fluke-Ekren with her

11   approximately ten-year-old sister.  "Courses," meaning the

12   training courses, military training courses.  And when the

13   minor girls were hesitant, she testified under oath that

14   Fluke-Ekren would give them pep talks to motivate them.  She

15   would sit next to them and whisper in their ears:  You've

16   got to do this.

17          Training was important to Fluke-Ekren to protect

18   the land belonging to the Islamic State, and important to

19   die as martyrs in Syria and kill the kuffar.  She told this

20   witness, as Your Honor knows from the statement of facts,

21   that she never wanted to return to the United States and

22   wanted to die in Syria as a martyr.  That is, I believe, a

23   verbatim quote from the statement of facts.  And that's

24   where we got it from; it's from the sworn testimony.

25          I asked her, did Allison Fluke-Ekren ever

                                                          25

1    criticize ISIS's goals to expand their land, kill the kuffar
2    or use violence to advance their murderous aims.  And she
3    said that Umm Mohammed never did so.  She never criticized
4    killings that ISIS would commit in furtherance of the
5    Islamic State.  And she would chant:  The Islamic State will
6    remain, including on the way to where she would take the
7    girls shooting.
8         This is even equally as sad, Your Honor.  She told
9    these girls that she had a son who was in the United
10   States -- and we believe she was referring to Gabriel Fluke,
11   who's in the courtroom -- that if she had to pick who to
12   save, she would save the girls she was training with, and
13   that she was ashamed of him because he left overseas.  And,
14   as Your Honor knows from his September 19th, 2022 letter, he
15   did leave Egypt, and he went back home, because he couldn't
16   take it anymore, given all of the things that he's indicated
17   she did to him.
18        And these are girls, Your Honor, that have never
19   met the defendant's son in the United States.  And they're
20   recounting these stories, which corroborates all of the
21   other evidence -- relevant evidence about this that we've
22   accumulated.  Allison Fluke-Ekren would chant "Allahu Akbar"
23   when she would hear about terrorist attacks that were
24   committed in the United States or Europe.
25        And, again, going to the self-defense claim, Your

26

1    Honor, this is sworn testimony from one of these girls.  She

2    indicated that Umm Mohammed was happy when ISIS committed

3    the November 2015 Paris attacks -- as Your Honor knows,

4    that's one of the most heinous terrorist attacks committed

5    by ISIS, where over 130 people were brutally killed --

6    because she said she got her revenge for her Muslim brothers

7    and sisters.

8           And then she told this minor witness to not leave

9    the Islamic State in 2018, to have patience, and that she

10   would be rewarded for facing these difficulties with a

11   better place in paradise.  And when she said that, she was

12   armed with an AK-47 and indicated that, through another

13   family member, she had a message communicated to Leyla that

14   she was dead, and she did that so the U.S. Government would

15   not try to find her.  And Your Honor knows that's in the

16   statement of facts as well.

17          Totally separate witness, Your Honor.  Another

18   minor girl that testified in the grand jury.  She was young

19   at the time, she interacted with Fluke-Ekren in Syria.

20   She's listed as Witness 5 in the statement of facts.  She

21   said that Umm Mohammed -- referring to Fluke-Ekren -- was

22   off the charts, and an 11 or a 12 on a scale of 1 to 10,

23   with 10 being extremely radicalized.

24          According to the same witness, she indicated that

25   Fluke-Ekren would seek to motivate her trainees by

27

1   explaining how female fighters can ensure the Islamic State

2   as kept alive by "helping ISIS expand and to remain" through

3   the use of weapons, including the firearms and the explosive

4   devices that I've already mentioned.

5          Another quote.  She indicated that Umm Mohammed

6   "would really motivate by saying how they have been so

7   victorious, and that we can help them with this as women

8   because women have not had a role in this in keeping the

9   State alive."  And, in that, she was referring to how

10  victorious ISIS had been, and the fact that, until now,

11  women had not had a role in the violence that was used to

12  keep the Islamic State alive to keep their land.  And she

13  was using that to motivate her trainees.

14         So again, Your Honor, when you hear during the

15  argument that this was about self-defense or that she didn't

16  have these intentions, that can't be further from the truth.

17  And these are witnesses that are -- have testified under

18  oath and that are named in the statement of facts.

19         In effect, she became a warped visionary for ISIS,

20  because at the time she was stating all this, ISIS had not

21  yet put out its official publication -- which, again, is

22  listed in the statement of facts -- the hundredth issue of

23  al-Naba, which was distributed in 2017 in the fall where

24  ISIS urged women to fight on the battlefield alongside men

25  in order to defend the terrorist organization.  And that's a

28

```
1    footnote in the statement of facts.
2              In effect, Your Honor, Fluke-Ekren's actions added
3    a new dimension to the darkest side of humanity.  And to
4    paraphrase the late author L.M. Montgomery, the defendant
5    attempted to turn these children's lives into graveyards
6    full of buried hopes.  And although the terror that
7    Fluke-Ekren struck in their hearts continuously haunts them,
8    she can no longer control them.
9              A number of the victims -- including the ones I've
10   mentioned, as well as her two children in this courtroom --
11   have regained their voice, along with their dignity and
12   respect that they rightfully deserve by standing up to the
13   defendant and helping us hold her accountable.
14             Now, just quickly going to the remaining factors,
15   Your Honor, the history and characteristics of the
16   defendant.
17             In her sentencing memorandum, she states that a
18   full appreciation of Ms. Fluke-Ekren, her background and the
19   factors that contributed to her coming before the Court is
20   critical, and discussed her history and characteristics as
21   told by her in an effort to "explain" her conduct for
22   mitigation purposes.
23             Let me be clear, Your Honor.  There's nothing in
24   Fluke-Ekren's background that can explain her conduct, which
25   was driven by fanaticism, power, manipulation, delusional
```

29

1    invincibility and extreme cruelty.  There's just no

2    justification conjurable by the human mind that can explain

3    her terrorist crime spree.

4            She described in her sentencing memorandum her

5    childhood as lonely, insulted the character of her parents,

6    and, at one point, called her father fake, among other

7    things.  But, as Your Honor knows, she had a sibling who was

8    only about a year or two younger than her.  He grew up on

9    the same picturesque farm in a bucolic environment in

10   Overbrook, Kansas.  We visited the defendant's childhood

11   home in preparation for this hearing.  It's a beautiful farm

12   located on an 81-acre property.  I've turned over pictures

13   to the defense and to the probation officer.

14           And her parents reported quite the opposite about

15   her history and characteristics.  They said that she and her

16   now 41-year-old brother were raised in a loving and stable

17   home where all of their needs were met.  She grew up

18   actually with role models who sacrificed in service to this

19   country.  Her grandfather was in the Navy during World War

20   II on the USS West Point moving troops across the Pacific

21   Ocean.  And her father served in Vietnam as a U.S. military

22   advisor to the Vietnamese Army strike force.  Her mother is

23   a retired teacher.

24           And as Your Honor knows from the statement of

25   facts, this is a highly-educated defendant.  She went to the

                                                            30

1    University of Kansas, she studied biology, she received a

2    teaching certificate from Earlham College, so she had some

3    graduate-level education.  And her parents noted that she

4    was actually surrounded by family and friends who cared for

5    her.

6            Given her intelligence and status as gifted

7    children, they sent her and her brother to Topeka

8    Collegiate, which is a secular school where students'

9    standardized test scores placed them among the

10   highest-achieving independent school students in the nation.

11   And her parents paid this tuition, despite their modest

12   finances.

13           And turning back to her brother, that's her only

14   sibling.  He grew up with the same parents, in the same

15   home, with the same educational opportunities, but yet she

16   now stands before this Court as a convicted global

17   terrorist, and he has a very successful profession as an

18   information technology professional outside of the state of

19   Kansas.

20           Her father told me, when I went to her childhood

21   home, "Allison is fortunate she is not being judged by the

22   people who know her best."  They asked me to tell Your Honor

23   that she should be given the maximum penalty for her crimes

24   so that she has no chance to hurt anyone else and lie to the

25   world.  They say that "give her 20 years.  She destroyed

                                                             31

1    lives left and right.  And if the Judge could send Allison

2    to prison for a life sentence, she should."

3            Her stepmother said that she's a very dangerous

4    woman who put her children through such harrowing

5    circumstances, and that if she could put her kids through

6    such harrowing circumstances, what else could she do?

7            And her father summed it up by saying, you know,

8    the Fluke, Ekren and Brooks families don't deserve to have

9    their names attached to my own daughter, and she should

10   instead be referred to as Allison of Raqqa.

11           Her mother indicated:  "Isn't there any way you

12   could send her to jail for the rest of her life?"  This is

13   her own mother saying this about her.

14           Her brother indicated that she had leadership

15   qualities and was very intelligent.  That was evident in her

16   ability to speak multiple languages.  She had potential, but

17   it was to the wrong ends, and she made terrible choices that

18   are not defensible, which included putting her kids at risk.

19   And if it was up to her brother, she would be an accessory

20   to the death of her child.  And he also supports the maximum

21   sentence of 20 years for his sister.

22           I'm not going to repeat Gabe and Leyla's letters

23   to the Court.  Your Honor has now made them part of the

24   public record.

25           But one of the other things that she mentions is

32

```
1    that her husband -- second husband, was the driving force
2    behind her terrorism conduct.  I believe you may hear some
3    of that in the sentencing argument.  But as Your Honor knows
4    from our sentencing position, it was actually the other way
5    around.  Her own parents indicated that Fluke-Ekren
6    radicalized her second husband who, of course, as Your Honor
7    knows, ultimately ascended through the ranks of ISIS and
8    became the emir of ISIS snipers in Syria.
9           And according to Allison -- the defendant's -- own
10   father, her second husband, was good and faithful, kind and
11   generous to everyone while the couple lived in Kansas.  Her
12   mother called him a gentle person and noted that he did not
13   have the same drive to excel as Fluke-Ekren did.  This is
14   someone who became the leader of ISIS snipers in Syria, and
15   the defendant's own parents are indicating, actually, she
16   radicalized him, and he was kind and gentle before she
17   influenced him.
18          Even her former longtime friend indicated to
19   myself, the FBI and the probation officer who participated
20   in the interview, that she drugged her second husband using
21   Adderall to make him focus on what she wanted him to do,
22   that she led him, and that it was no secret that Fluke-Ekren
23   was the brains behind all things, and that she was
24   undeniably the alpha in their relationship.
25          Your Honor may hear that there was an unfortunate
```

                                                              33

 1    incident that occurred between the defendant and her second

 2    husband in 2005; however, as we stated, that single

 3    incident -- a domestic violence incident that ended up

 4    resulting in a diversion agreement -- occurred over three

 5    years prior to her initial travel overseas in 2008, over six

 6    years before her involvement in the aftermath of the

 7    Benghazi terrorist attacks in 2011 [sic], approximately nine

 8    years before the earliest ISIS-related conduct set forth in

 9    the statement of facts, and 14 years prior to the end of the

10    ISIS-related conduct in 2019 charged in this case.

11          The point, Your Honor, is the incident is entirely

12    unrelated to Fluke-Ekren's vast terrorism-related conduct

13    that occurred years later and continued nearly unabated

14    throughout her time overseas.

15          Leyla, who's in the courtroom, also indicated that

16    "my mother controlled her second husband."  Her second

17    husband was Leyla's father.  So if there's anyone who knows

18    who controlled whom, it's the defendant's daughter.  And

19    she's saying it was the other way around, that my mother

20    controlled my father, and he actively disapproved of what

21    she was doing in terms of starting a battalion and would

22    often get in the way.  And Leyla stated, "this is why the

23    most successful attempt of Allison's battalion, Khatiba

24    Nusaybah, was after he had already died."  And that's in the

25    PSR at page 51.

                                                              34

1            Turning to affording adequate deterrence to

2    criminal conduct.  It's no surprise, Your Honor, that our

3    argument is that her horrendous criminal conduct should be

4    this Court's lodestar in imposing the statutory maximum

5    sentence of 20 years imprisonment in this case, both for

6    specific and general deterrence purposes.

7            As for a specific deterrence, as Your Honor will

8    soon hear, she had access to a phone and the Internet during

9    the time that she spent committing terrorist attacks abroad,

10   dating back to 2011 and continuing until last year.  And the

11   Government does not have any evidence that she ever

12   contacted any U.S. authorities to turn herself in as a

13   member of ISIS.

14           The defense is using the statement of facts in

15   this regard.  And I just want to be very clear about this,

16   Your Honor.  We stand by the statement of facts.  There's no

17   argument whatsoever about what's being written, but we have

18   to be very careful about not parsing out the words in this

19   document to have it mean something that it does not say.

20           In the document, the vast majority of the document

21   either indicates that Fluke-Ekren told these witnesses the

22   things stated in the document, she did these things, or,

23   according to a witness, these things happened.

24           But when it comes to this whole notion of turning

25   herself in, paragraph 23 of the document indicates that

1  "Fluke-Ekren also stated that she informed the local Syrian

2  authorities in 2021 that she was an American and wanted to

3  leave Syria at that time.  Fluke-Ekren further stated that

4  approximately two weeks later, she was taken into custody."

5          That was very purposeful, Your Honor, because

6  those are statements from her.  That is what she told us

7  after she was arrested, she was Mirandized, she was

8  interviewed by the FBI.  Those are her own self-serving

9  statements.  And she wanted that in the statement of facts,

10 we put it in there.

11         But let's be clear, we don't have any

12 corroborating evidence that she turned herself in.  In fact,

13 the audio calls that Your Honor will soon hear indicates

14 quite the opposite.  We don't disagree that she stated these

15 things to the FBI during the interview.  And that's what the

16 statement of facts is referring to, that she made these

17 claims, she stated that she turned herself in.

18         But if she wanted to turn herself in, Your Honor,

19 one must ask the question, why isn't she contacting the

20 Government where she was born, the United States?  The

21 country where she left.  The country that she was once proud

22 to call herself a United States citizen.  She's still a

23 United States citizen.  Why isn't she contacting the

24 authorities in the United States?  So I just want to be very

25 clear that the statement of facts indicates her version of

36

1    events and that she stated those things; not that we are

2    corroborating those claims of turning herself in.  So that's

3    very important for specific deterrence purposes.

4         And we'll get to the calls in a moment, Your

5    Honor.  But on the calls -- last year on a recorded call

6    that I'll play in court today, she states that, until the

7    very end, she begged to remain and fight on behalf of the

8    callous terrorist organization, even if it meant abandoning

9    all of her children in Syria.

10        Now, I'm paraphrasing, but Your Honor will hear on

11   the call, and the words speak for themselves.  But the calls

12   indicate that she was a fervent ISIS leader until the very

13   end, and that when she had the opportunity to turn herself

14   in, she could have told her daughter.  She was speaking to

15   her daughter, who's in this courtroom, who was in the United

16   States.  She could have said, hey, I've got to get out of

17   here, I've got these kids, help me get out of here.  Her

18   daughter even tells her that the FBI spoke to me.  But she

19   does no such thing, and Your Honor will hear that in a

20   moment.  So, Your Honor, we believe that she's incapable of

21   being deterred, and imposing the statutory maximum sentence

22   would recognize that.

23        Additionally, given the extremely serious nature

24   of this case, which has been closely followed in this

25   district, nationwide and around the world, the general

37

1    deterrence value in imposing a statutory maximum sentence is

2    significant.

3            Occasionally, Your Honor, a case comes along that

4    has the ability to reach audiences nationwide and worldwide.

5    The Eastern District of Virginia has seen, perhaps, a higher

6    number of these cases than other courts and has been

7    arguably -- has arguably amassed more experience in handling

8    terrorism cases than any other federal court dating back to

9    the Zacarias Moussaoui prosecution.

10           But it's not every day that these cases come

11   along, and those that truly have the ability to carve their

12   place in history by exposing the atrocities of the defendant

13   on a global scale, those are the types of cases where the

14   general deterrence value can work the most.  And this is one

15   of those cases, Your Honor.  And we believe that imposing

16   less than the statutory maximum sentence in this case, with

17   the egregious and horrific facts like this one, will detract

18   from that unique deterrence message.

19           Your Honor knows there are cases day in and day

20   out in this courtroom.  They're all important, but how many

21   of these cases are like this one that, truly, whatever Your

22   Honor decides to do today, it will be carved in history?

23   Individuals will know about it today, and they'll know about

24   it for decades and decades to come.  And anything less than

25   the statutory maximum, we believe, would lead to questions

                                                            38

from the public, given the statement of facts and given all the conduct that we're describing today.

But imposing the maximum sentence will send an unmistakable message that terrorism is a scourge on the entire international community, and that these unfathomable acts of terror and cruelty will be met with full accountability in our courts. For any terrorist who seeks to harm the United States, the passage of time will offer you no escape. And that's the message Your Honor will be sending by imposing a statutory maximum sentence in this case.

Turning to unwarranted sentencing disparities, I've described that in the sentencing memorandum. But, put simply, Your Honor, there is no comparable ISIS case in this district to this defendant that did not involve murders.

The sheer breadth, scope and egregious nature of her crimes makes this case unique. As Your Honor knows, it's the first prosecution in the United States of a female ISIS military battalion leader. Her acts of terror spanned at least eight years across multiple war zones, from Benghazi to Raqqa, and involved the devastating exploitation of her own daughter to further her terrorism-related goals, among numerous other children that she coerced to take this military terrorism training.

And she's also, Your Honor, among the eldest

39

1    material support defendants to come before this Court for

2    any terrorist organization.  I know Your Honor stated in the

3    Nicholas Young sentencing that at the time -- he was

4    38 years old at the time of the original sentencing.  And

5    that's a factor that Courts can take into consideration

6    because "older people are expected to be a bit more mature

7    in their approach to things."

8            Well, this defendant is now the oldest ISIS

9    defendant to have ever been prosecuted in this district.

10   And unlike the vast majority of ISIS defendants who have

11   been prosecuted nationwide, she successfully traveled to

12   ISIS-controlled territory and committed crimes in Syria on

13   behalf of ISIS from 2014 through in or around May of 2019.

14           Most defendants, Your Honor knows, not just here,

15   but nationwide, thankfully, they're arrested at the airport

16   before they can commit their crimes, and Courts sentence

17   them on a routine basis based on what they intended to do.

18   Those are attempted material support cases.  And we've had

19   those cases here, right, where defendants will get in their

20   car, they'll drive to the airport, they'll tell an FBI

21   undercover online what they had planned to do if they make

22   it to Syria.  But, thankfully, they don't make it to Syria,

23   and they still receive lengthy sentences.

24           You know, in other courts nationwide, some of

25   those defendants have been maxed out, have been given 20

                                                              40

1    years of imprisonment, including the two individuals that I

2    mentioned in the sentencing memorandum, Bernard Augustine

3    and Zakaryia Abdin.  Augustine was in the Eastern District

4    of New York; Abdin was in the District of South Carolina.

5    Those are fairly recent cases.  Both courts there imposed

6    20 years of imprisonment, despite the fact that those

7    individuals were young.  They were as young as 18 and

8    20 years old.  And they were not ISIS leaders, nor did they

9    successfully travel to ISIS-controlled territory.

10          I actually worked on the Bernard Augustine case

11   and helped EDNY charge that case.  Make no mistake, he

12   deserved those 20 years, but that case was very different to

13   this defendant.  He actually never made it anywhere in

14   ISIS-controlled territory and never had the opportunity to

15   do anything for ISIS.  Here, Your Honor has page after page

16   of someone who successfully joined a terrorist organization,

17   joined other terrorist organizations, and did a multitude of

18   terrorist acts on behalf of those organizations.

19          Additionally, I'm aware -- unaware, Your Honor, of

20   any other material support case in this court that involved

21   a defendant using their own child in furtherance of

22   terrorist acts or for any other purpose.

23          Of course sentencing is individualized for each

24   defendant.  And, here, the defendant's conduct is set forth

25   in the statement of facts.  It leads to the inescapable

41

1   conclusion that she should be sentenced to the maximum

2   penalty under the law.

3          Just a few more points about this, because it was

4   raised in the defense's sentencing memorandum.  You know,

5   they claimed that it would send the wrong message if you

6   imposed the stat max because she pled guilty and came back

7   to the United States.

8          One, again, Your Honor, we don't have any

9   corroborating evidence that, you know, she turned herself

10  in.  That's what she stated.  She was captured by other

11  foreign authorities and ultimately turned over to the United

12  States.  She could have come back at any time, right,

13  between 2011 and 2021 on her own.  She never did.

14         Two, she received a huge benefit from pleading

15  guilty.  And she's not doing this for altruistic purposes,

16  such as, you know, having her daughter not testify against

17  her; this was about the benefit that she received.  She

18  pleaded guilty to one count.  We didn't overcharge this

19  case, Your Honor.  When I was a young prosecutor in your

20  court, that's one of the things I learned.  If you've got a

21  good case and it's strong and you've got the evidence, no

22  need to overcharge the case.  Trust the justice system.

23  Trust that the Courts will do the right thing.

24         And, here, we could have insisted on her pleading

25  guilty to numerous counts.  We could have, quite frankly,

42

 1   charged the mandatory minimum.  18 U.S.C. 2339D is receiving

 2   military training on behalf of a terrorist organization, and

 3   it requires a Court to impose either probation or ten years.

 4   There's no middle ground.  But we didn't do that because,

 5   here, the conduct speaks for itself.

 6          Yes, she was willing to plead guilty, and, you

 7   know, that's something that should be considered.  But

 8   ultimately Your Honor should weigh that against all of the

 9   aggravating factors in this case and the conduct itself and

10   the fact that we didn't just insist on a trial.  And we

11   don't want to create those incentives, right, for younger or

12   less experienced prosecutors who say, well, look what they

13   did in that Fluke-Ekren case.  You know, she got less than

14   20 years for that egregious conduct, so, no, I'm not going

15   to give a plea offer.  Let's just go to trial.  And then

16   that way the Court can say, well, this defendant went to

17   trial.  We don't want to create those incentives, and we

18   didn't in this case.

19          And we also don't want to create venue shopping,

20   Your Honor.  I pointed out a couple of those cases where

21   much less egregious facts have led to statutory maximum

22   sentences.  We're the leader in terrorism cases, Your Honor.

23   We don't want to create the impression for the public, for

24   law enforcement, for anyone, that, you know, these cases, if

25   they come to the Eastern District of Virginia, they're going

43

1    to be given less harsh penalties.

2            In fact, Your Honor stated quite the opposite

3    during the Nicholas Young sentencing and said, if you aid a

4    terrorist organization, people have to know that, at least

5    in this district, there's a very harsh penalty to be paid.

6            And in this type of case that is so well known and

7    will continue to be well known throughout history, imposing

8    less than the stat max, we believe, will lead to questions

9    and may, in a perverse way, incentivize other people to come

10   to the Eastern District of Virginia.  Which we don't want to

11   happen, because they may think that they're going to get a

12   lighter sentence when they view their conduct vis-a-vis this

13   defendant's conduct.

14           She also didn't cooperate, Your Honor.  And so --

15   she repeatedly lied to the U.S. Government.  And so this

16   whole notion that, well, you're sending the wrong message if

17   you give her the stat max because then other individuals may

18   not want to turn themselves in.  She didn't turn herself in;

19   she didn't cooperate.  If she did those things, then

20   maybe -- maybe -- we would have something to talk about.

21   But this would create the wrong message, because it would

22   show that other terrorists who commit egregious crimes can

23   come back here and not cooperate.

24           I mean, this defendant probably is a gold mine of

25   intelligence, given all the time she's spent overseas, all

                                                              44

1   the things that she's learned by ascending to the higher

2   echelons of ISIS, all the people that she's met, all the

3   co-conspirators that she trained.  But she didn't cooperate,

4   and so she shouldn't be given credit for, in that sense, to

5   receive a less than a statutory maximum penalty, and we

6   think the opposite message will be sent if she was given

7   less than that 20 years.

8         Your Honor, to turn to the PTSD diagnosis.  We

9   filed a memorandum on that, so I won't repeat those

10  arguments.  But, very tellingly, Your Honor, the expert did

11  not review any of the numerous 2021 audio recordings between

12  the defendant or her daughter, or so it appears.  She listed

13  a lot of the interviews that we turned over, but she didn't

14  list any of the audio recordings between the defendant and

15  her daughter, including the ones that I'm going to play

16  today.

17        It appears from the report that the expert did not

18  even attempt to speak with the defendant's father, mother,

19  stepmother, the two children that are here in this

20  courtroom, or any of her friends, including her former

21  longtime friend who spoke to the U.S. probation officer.

22        In fact, we would have gladly helped set up those

23  interviews for this so-called expert if we were contacted.

24  It would have been up to the family members, and it would

25  have been up to Leyla and Gabe, but there was zero advance

45

1    notice of this report.  The expert didn't take the time to

2    interview the people who know her best.  And then she even

3    writes in her report that:  "This report reflects my

4    professional opinion at the time of this writing based on

5    the data sources listed earlier in this report.  My opinion

6    is subject to change should new information become

7    available."

8            The report also conveniently says nothing about

9    Fluke-Ekren's terrorism conduct in Egypt, Libya or Iraq, and

10   focuses solely on Syria.  And even that, it does nothing to

11   explain or justify her conduct in Syria.  There's no

12   coercion, domestic violence, diminished capacity or any

13   other mitigating circumstance in the report for why the

14   defendant engaged in this heinous conduct, nor could there

15   be.

16           And if she's now exhibiting PTSD, it is a direct

17   consequence of her voluntary choices, including supporting

18   multiple terrorist organizations overseas, training over 100

19   women and young girls to kill, aspiring to commit attacks

20   against the United States, and moving her children across

21   several war zones while evading capture for over a decade.

22           And as you will soon hear from her daughter,

23   Leyla, Fluke-Ekren began making a video out of the corpse of

24   her dead five-year-old child when he was killed by a tank

25   missile strike at their home in Syria.  That does not

46

1  reflect the behavior of someone who was "shocked by the

2  horrors of war," as the defendant stated in her sentencing

3  memorandum.  She gravitated toward it.  She was attracted to

4  death and destruction and sought to capitalize on its

5  aftermath.  And, Your Honor, we believe that the Bureau of

6  Prisons is well equipped to provide treatment for her

7  physical and mental needs.

8          And, you know, one thing we do agree with is that

9  if she is eligible for the Resolve Program -- which the

10  expert mentions in her report -- as determined by the Bureau

11  of Prisons, then she should take advantage of it.  In fact,

12  FMC Carswell in Fort Worth, Texas is an administrative

13  security prison within BOP that may be suitable for

14  Fluke-Ekren.  Convicted female terrorist Aafia Siddiqui is

15  housed there, for example.  But just as we defer to the BOP,

16  we would ask that the Court defer to the BOP without making

17  any sentencing recommendations in this case.  She can obtain

18  the mental health treatment in any BOP facility in which she

19  is designated and need not receive any special treatment

20  given the callous and repugnant conduct in which she

21  engaged.

22          Now, just ending, Your Honor, the last section is

23  promoting respect for the law, providing just punishment for

24  the offense, and ensuring that the defendant does not commit

25  further crimes and that the public is protected from further

47

```
 1    crimes of the defendant.
 2            I've already talked about how her actions
 3    demonstrated an utter lack of respect for the law and human
 4    dignity in our sentencing position.  We've listed examples,
 5    including her attempt to mislead this Court under oath.
 6    Again, she says:  "You know, Your Honor, just -- the only
 7    thing I would say is that we didn't intentionally train any
 8    young girls.  They may have been in attendance, but I
 9    can't -- but --"
10            And, Your Honor, this statement did not have a
11    scintilla of truth to it.  She intentionally began training
12    her own daughter, as you will hear.  These other girls who
13    were listed in the statement of facts were, of course,
14    intentionally trained.  You don't unintentionally train
15    someone with a suicide belt.  You don't unintentionally
16    train a minor to kill the kuffar.  It just has no ring of
17    truth to it whatsoever.
18            She told the probation officer that when she was
19    talking to her daughter in Syria, that "she did not know she
20    was wanted by the authorities."  That's a quote.  It's in
21    the PSR, paragraph 107.  She was "at a crossroads" and "did
22    not know she was wanted by authorities."  She was talking to
23    her daughter at the end of 2020 and in 2021.  For her to
24    tell the probation officer she didn't know she was wanted by
25    the authorities after she had done all of the acts that are
```

48

 1    in the statement of facts is truly incredible in the worst

 2    way.

 3              I'm now, Your Honor, going to play the recorded

 4    voice messages.  I've handed up transcripts that are

 5    prepared just for aid purposes.  I've provided a copy to the

 6    defense.

 7              And if we can first start with the first

 8    recording, which is January 4th, 2021.  It's a very short

 9    recording.

10              THE COURT:  All right.

11                        (Audio played.)

12              MR. PAREKH:  So, Your Honor, that was a recorded

13    call on January 4th, 2021.  It was between the defendant and

14    her daughter, Leyla, who is in this courtroom.

15              And, Your Honor, that's how much pain and anguish

16    Fluke-Ekren inflicted on her daughter.  The depth of harm

17    that she caused is so great that her own daughter recorded

18    her in an effort to help us locate and capture her.

19              She's in Syria at the time.  She says initially,

20    of course I'm wanted.  And then you can sort of see what

21    Leyla and Gabe were talking about in their letters in terms

22    of the emotional manipulation that she uses when she says:

23    "That's good.  That's very good.  And you're doing great,

24    Ley.  I'm proud of you.  You be smart right now."

25              You know, she just talked about how the FBI was

                                                                    49

1    questioning her and how they were looking to get American

2    citizens, you know, who were over there, and that's how she

3    responds.  And she ends it with:  "You'll be fine the day

4    you come back here."  Knowing the pain and anguish that she

5    caused her daughter.  At this point, her daughter, as you'll

6    hear, has been raped by an ISIS fighter, she came back to

7    the United States, had gone through unbelievable trauma.

8           And, by the way, the Court -- one must ask itself,

9    why didn't she leave with her own daughter?  Her daughter

10   was back in the United States in 2017.  That's when I met

11   her, weeks within her coming back, and her mother's

12   remaining in the Islamic State stronghold.  She left her own

13   daughter to go back, and now she's telling her, "you'll be

14   fine the day you come back here.  And you come.  You don't

15   belong there."

16          The next call is a call between -- it's just

17   Fluke-Ekren telling Leyla, her daughter, a message.  And

18   that's a call on January 21st, 2021.  Again, just last year.

19          We can play that call now.

20                    (Audio played.)

21          MR. PAREKH:  As the defense knows, right before

22   this call she tells her daughter she loves her, and then she

23   tells her to delete everything.  It is illustrative of the

24   emotional manipulation that she uses on her own children.

25          And this is last year, Your Honor.  This is,

                                                              50

 1    arguably, obstruction.  They just had a conversation a few

 2    weeks prior where she says:  "Am I wanted?  Of course I'm

 3    wanted."  And now she's saying that she knows that the

 4    messages between the two of them can get her and the kids

 5    and everybody in prison immediately.

 6            And the reason for that, Your Honor, is that she's

 7    describing to her daughter generally where she's located in

 8    Syria.  At one point she sends her daughter a video of her

 9    home, and she realizes that if that got out and that was

10    captured by law enforcement, that that could lead to her

11    capture.  So she's instructing her own daughter to delete

12    everything and to engage in these obstructive acts.

13            The last call, Your Honor, is a little bit longer.

14    I'll start it at three minutes and approximately 21 seconds.

15    It will be about four and a half minutes long.  The

16    transcript, for the Court's purposes, it will start on

17    page 4.  The defense has the entire call, but in an effort

18    to save time, I'll start it at three minutes and 21 seconds,

19    please.

20                        (Audio played.)

21            MR. PAREKH:  Just to put context for this last

22    recorded call, Your Honor.  This was just last year.  The

23    date is January 24th, 2021.  And the call starts out -- the

24    portion that we didn't play, just to save time, the call

25    starts out with Leyla asking her about how she felt leading

                                                                    51

1  the Khatiba, referring to the ISIS battalion where she was

2  the leader and organizer on behalf of the terrorist

3  organization.  And she asked her:  "How did that feel?"

4         And if I had to guess, you know, the defendant --

5  or the defense may get up here and say, no, I was talking

6  about how, you know, Leyla's daughter was at the time.  That

7  can't be further from the truth, Your Honor.  Your Honor can

8  see that from the actual words that the defendant uses.

9  Leyla asks her specifically about the ISIS battalion, and

10  then she tells her this is really devastating in terms of,

11  you know, the core thinking that she has any ability to

12  rehabilitate herself or that she feels any kind of regret.

13  Because in the event that she decides to allocute today --

14  and that's her choice, she's not required to, but it's my

15  understanding that she might -- I would like these words to

16  be recognized, and they're chilling.  Which is that she says

17  that:  "I was devastated when I left, Leyla.  I cried, and I

18  begged Abu Mariam to let me stay."  Abu Mariam is the

19  defendant's fourth deceased husband.  Meaning he's now

20  deceased, fourth husband.  Her first husband, of course, is

21  not deceased.

22         But this comes -- she marries her second

23  husband -- and it's no coincidence that all of these

24  husbands are leaders of ISIS; right?  Her second husband

25  ascends to become the sniper emir of ISIS in Syria.  Her

                                                              52

1    third husband was working on a project involving drones for

2    ISIS where he was seeking to commit attacks outside of the

3    United States [sic].  And then another project was to attach

4    chemical weapons on drones on behalf of the Islamic State.

5    And then the husband she marries after that husband dies is

6    Abu Mariam.  And she says, in her own words, despite what

7    she says today, this is last year on this recorded call,

8    that:  "I begged Abu Mariam to let me stay."

9            He's listed in the statement of facts, not by

10   name, but now you know his name, as the ISIS military leader

11   in charge of defending Raqqa.  Because, at the time,

12   Raqqa -- there was the siege where the SDF was advancing on

13   the ISIS territory, and they were seeking to reclaim land

14   back with the Islamic State.  And so Abu Mariam, her fourth

15   husband, is an ISIS military leader in charge of ISIS's

16   defense of Raqqa.  She's saying:  I begged Abu Mariam to let

17   me stay.  And then when he said no, I begged.  And he said,

18   you have all these kids.  I told him, take my kids; let me

19   stay.

20           So any notion that this defendant cares about her

21   kids is belied by the very words in this recording.  Her own

22   words.  Her own chilling words.  She's telling this ISIS

23   military leader to let me stay, and he's even saying, you're

24   too extreme for me.  And that's a common theme throughout

25   the defendant's time overseas.  She's consistently rejected

53

1  by terrorists who say, listen, that's too extreme, you've

2  got to go, you've got all these kids.  And she's saying on

3  this call, I begged him, let me stay.  I told him to take my

4  kids.  These are her own kids that she's saying in this

5  call, I told him to take my own kids.

6          And then she talks about how you can't give up.

7  And, again, it's even more horrific that she's describing

8  this to her own daughter.  You can hear -- her kids are

9  wailing in the background; she's doing nothing.  And then

10 she says:  "You don't lose when somebody dies."  I'm not

11 sure how that can be interpreted as anything but reflecting

12 her deeply-committed Jihadist mindset.

13         And then, finally, at the end, she says:  "And

14 when you lose something because you are doing something that

15 you believe in, like Ahmed, for example, or your dad."

16 Ahmed, as Your Honor knows from the PSR, is the middle name

17 of her five-year-old child who was killed by that tank

18 missile strike.  The one where I believe Leyla will describe

19 she was making a video out of his corpse in order to use it

20 as an ISIS propaganda video to motivate her trainees -- the

21 ones that she was training on behalf of ISIS with the

22 firearms and explosives.  She says:  When you lose something

23 because you were doing something you believe in, like Ahmed,

24 for example, or your dad.

25         What is she doing that she believes in involving

54

1  her five-year-old son?  She's with ISIS, and she's training

2  people.  And so the fact that she lost her five-year-old son

3  or she lost Leyla's dad, who died while doing reconnaissance

4  on a hill attempting to commit a terrorist attack on behalf

5  of ISIS, this is deeply reflective of her mindset.  And she

6  ends it by saying:  Then you don't really feel regret.  You

7  don't feel regret.  You feel sad, but you don't feel regret.

8          Your Honor, these are her own words from last

9  year.  And this is what she's saying when the Court's not

10 listening, when the public's not listening.  This is what

11 she's saying on these recorded calls with her own daughter

12 that she thought was private, and that reflects more than

13 anything that she or the defense could possibly say today.

14         I'm now going to conclude, Your Honor.  In terms

15 of protecting the public from further crimes of the

16 defendant, I've talked about her exceptionally serious acts

17 of terror across multiple organizations in Libya, Iraq and

18 Syria for a span of at least eight years; I've talked about

19 everything in the statement of facts and the fact that she

20 placed her own reverence for terrorism above her own

21 children.

22         Put simply, Your Honor, this defendant left a

23 trail of betrayal, led an ISIS battalion for a terrorist

24 organization that is unmatched in its cruelty and violence,

25 and plunged herself even further into the dark abyss by

                                                          55

1    inflicting surreal horror upon children, including her own.

2    Every member of her family with whom we spoke, including her

3    mother, father, stepmother, brother and her two children in

4    this courtroom have requested the maximum punishment in this

5    case.

6              THE COURT:  All right.

7              MR. PAREKH:  That type of uniformity in seeking

8    the maximum allowable sentence under the law from the

9    defendant's own family members is exceptionally rare, if not

10   unprecedented.  Based on our own careful considerations of

11   the sentencing factors, we respectfully agree with that

12   request and ask that you impose the statutory maximum

13   sentence of 20 years imprisonment in this case.  Thank you.

14             THE COURT:  All right.

15             Mr. King.

16             MR. KING:  Thank you, Your Honor.  May it please

17   the Court.

18             I wanted to address a few items from the United

19   States's sentencing argument.  One is whether

20   Ms. Fluke-Ekren turned herself in.  She maintains that she

21   did.  She brought herself to the attention of Syrian

22   authorities in June of 2021, and that resulted ultimately in

23   her extradition to the United States.  And the United

24   States, in its proffer today, has provided no evidence that

25   that is not the case.

                                                            56

1           How else was she found unless she brought herself

2    to the attention of the Syrian authorities?  It seems like

3    that would be the most logical explanation.  If she was

4    really able to maintain herself out of reach of law

5    enforcement for more than a decade, why couldn't she have

6    just continued with that?  I think that her explanation

7    there that she brought herself to the attention of the

8    Syrian authorities is true.

9           And with regard to her statement, following up on

10   this, to the probation officer that she did not know that

11   she was wanted, there is no way that she could completely

12   know that she was wanted and that there was an under-seal

13   criminal complaint from the Eastern District of Virginia.

14          And, in fact, when we listened to the call that

15   was played by the Government, the January 4th, 2021 call,

16   her daughter, Leyla, is trying to assuage her concerns that

17   she is wanted, telling her that she has not heard about her

18   mother being inquired about by the authorities for a long

19   period of time.  So that is a completely reasonable

20   statement that she made to the probation officer that she

21   did not, in fact, know.

22          Now, certainly she suspected that she was wanted,

23   and so she knew when she brought herself to the attention of

24   Syrian authorities -- which is the same as turning herself

25   in -- saying that she's an American, that there's a great

                                                            57

1    chance that she's going to be taken into custody ultimately

2    or be transferred to the custody of the American government.

3    And that, in fact, happened.  And she should be given credit

4    for that.

5          She is not like the case that was recently before

6    the Court where somebody fought extradition -- not in this

7    particular courtroom -- for a number of years.  You know,

8    she went -- brought herself to the attention, and then all

9    those things followed where she ended up in a Turkish

10   prison, and then she was transported here.

11         I just wanted to address very briefly some of the

12   context to the last call that the Government played.  I

13   believe that was from January the 21st, 2021 between

14   Ms. Fluke-Ekren and her daughter.  The beginning of the call

15   was not played, but the Government did summarize what --

16   some of the statements that were made in there where

17   Ms. Fluke-Ekren is begging her husband at the time, Abu

18   Mariam, not to -- not to leave Raqqa or not to be taken out

19   of Raqqa.

20         Ms. Fluke-Ekren indicates there was a lack of

21   context that the Court has not been provided, that there's

22   other background that's really important.  Is that Abu

23   Mariam did want to leave with Ms. Fluke-Ekren -- ultimately

24   he was not in Raqqa at the time of the siege -- and take the

25   children to another location.

                                                              58

1          She did not want to leave with him at that time

2     because Leyla wouldn't leave.  She wanted to stay there and

3     get Leyla out.  But, ultimately, that didn't happen, and

4     they became separated.  That's context that the Court

5     doesn't have with regard to that phone call.

6          A few other things that we wanted to address with

7     regard to the Government's presentation.  Government's

8     Exhibit 1, which is a document indicating the formation of

9     the Widow's Bureau in January of 2017 -- I'm sorry, of the

10    Khatiba.  That is under the Widow's Bureau; it's not under

11    the military arm of ISIS.  And it's our position that

12    indicated -- said it was not an offensive organization.

13         With regard to Government Exhibit 2, that's from

14    December of 2016, Umm Ahmad al-Afriqi, the defendant

15    indicates that that's not her; that's somebody else.  And

16    maybe their vision of the Khatiba Nusaybah would be

17    something different and would be offensive, but that wasn't

18    Ms. Fluke-Ekren's view of it.  She says that that's not her,

19    and that is a document that's been taken out of context.

20         I wanted to go back just very briefly and just

21    address the -- or mention some things about the abuse

22    allegations but not go into them, except to say that now

23    that these have been reported in the press and that she's

24    not had -- she didn't have the resources or ability to rebut

25    all these here, is that this is going to multiply her

1    punishment, as the Court had indicated.  These are also

2    statements that are going to be in the PSR that's going to

3    follow her to the Bureau of Prisons.  This may place

4    Ms. Fluke-Ekren at an increased risk from other inmates.

5    This is printed on the Internet.  People are going to see

6    this for purported crimes against children or otherwise make

7    her a pariah.  And also it's going to have more impacts in

8    that the punishment is just not going to stop.

9           The -- as the Court may be aware is that there are

10   six children that left with Ms. Fluke-Ekren from Syria, and

11   we're going to present a few pictures of them later on in

12   the presentation with regard to their home life there.  And

13   there has been a custody case that's been going on in

14   Loudoun County, and the Court there decided, in the Circuit

15   Court, to place her children in foster care.  But it's not

16   for any lack of care, it's not for any abusive conduct

17   toward them.  All indications are that those children were

18   very healthy, they were very well treated.

19          I believe that I saw CPS documents indicating that

20   when they came off the plane after they were flown from

21   Syria to the Eastern District of Virginia, they had all

22   their items labeled, they were all in good health.  That

23   decision now has been that those children would go into

24   foster care due to her status of being incarcerated.

25          That case is going to be on appeal.  And if she

                                                              60

1  prevails on appeal when it comes back, now she's going to

2  have to contend with all these other allegations of whether

3  she's going to be a fit parent.  So it's going to be another

4  hurdle that she'll have to overcome if she prevails on

5  appeal in that case.  So the punishment for that is

6  continuing.

7          And as the Court has said, that's not what she's

8  being sentenced for; she's being sentenced for the crimes

9  that she committed while with ISIS and in Syria.  And she

10 does acknowledge that the conduct was serious, but she does

11 ask for the Court to take in mitigation the circumstances of

12 it.

13         This training did occur during a brutal war when

14 combatants were being killed on all sides, there's violence

15 all around with brutal acts being committed against women

16 and children.  In that context, it would be understandable

17 that the people that she did train with weapons would want

18 to be able to defend themselves in case the PKK were to

19 invade Raqqa.  Or, even worse, Assad's forces were to knock

20 on their door and come in.  Because it was well known that

21 Assad's forces especially created incredibly brutal acts of

22 rape against women and children.

23         Also with regard to the training itself, the

24 defendant's daughter, Leyla, mentioned -- it's either in an

25 interview -- I believe it's in an interview -- that this

61

```
 1    training, as she described it, was lame, L-A-M-E, lame.

 2    That she also -- her daughter also stated that while the

 3    Wali of Raqqa, who is the mayor of Raqqa, created the

 4    forming of this Khatiba, it was never serious, and they were

 5    never actually going to fight.  And that's what

 6    Ms. Fluke-Ekren's daughter said, and Ms. Fluke-Ekren knew

 7    that as well.  Also, there's no evidence that anyone

 8    associated with it -- that included persons detailed to be

 9    cooks, babysitters and nurses -- ever did anything.

10          The defendant herself never fired a shot against

11    anyone.  While there was talk of purported attacks by a

12    Government witness -- and the defendant admits and takes

13    responsibility that she made such statements, and they are

14    in the statement of facts.

15          These statements were made in a war zone.  And I

16    believe that Ms. -- well, I'm not going to mention the name,

17    one of the witnesses the Government had mentioned who was

18    from a different country that may have had a passport from a

19    different country, indicated that when these statements were

20    made, there had been an airstrike that had killed innocent

21    civilians, including children.

22          And we ask the Court that these statements made in

23    the context of a war zone where it's -- there's brutality on

24    all sides, and they were never acted on or significantly

25    mitigating.
```

1          The Government remarked that the person who was

2     the emir of snipers with ISIS and rose to that level,

3     Volkan Ekren, there was many good things that people had

4     said about him.  Nonetheless, he was the emir of snipers.

5     He was a huge man.  He was approximately 6-foot-6,

6     220 pounds.  And the Government is now saying and family

7     members are saying that she absolutely controlled him, in

8     fact, drugged him with Adderall somehow in order to control

9     his behavior.  She disputes that.  There was a domestic

10    violence incident that was in 2005 that the Government

11    mentioned, and the defense had provided the court documents

12    that we had obtained from Kansas with regard to that.

13          At one point, she did, in fact, want to leave him

14    and divorce him and came back to the United States in 2010

15    to try to get away from him.  This is corroborated by her

16    own son, Gabriel, who stated in one of his interviews he

17    believed that they had been divorced there.  She did want

18    out of that relationship, and only returned -- and also by

19    another Government witness -- this is in the PSR, I believe

20    it's in paragraph 129 -- who was longtime friends with

21    Ms. Fluke-Ekren, Ms. Fluke-Ekren had indicated to her that

22    she did want a divorce.

23          But the relationship was brought back together

24    after she came to the United States where she had -- the

25    child that was, unfortunately, lost in Syria, he was

63

1    actually born in the United States in 2010.  She brought the

2    children back to Egypt, and, after that, she had to follow.

3    And many things followed after that where they had moved to

4    Libya.  And Volkan Ekren, who was involved in the terrorist

5    group that the Government had mentioned, brought documents

6    from the embassy into her home, further trapping her in this

7    situation.

8         And there was other domestic violence that we set

9    forth in the position on sentencing, and it's also in the

10   PSR.  It wasn't a one-sided thing where she simply

11   controlled this huge man in an Islamic society who was the

12   emir of snipers for ISIS.

13        And with regard to punishment, in the three years

14   where she was in Syria from 2015 to 2018, she did suffer

15   tremendous losses.  Not only with family and friends being

16   killed in the war all around her -- and, yes, she chose the

17   wrong side and chose an organization that she shouldn't have

18   been with, but thousands of other people did, too.  It's not

19   that necessarily unique.  Many people of the Islamic faith

20   believed in some tenets of ISIS and joined them.

21        She had a son that was killed.  Her husband of 14

22   and a half years, despite their troubles that they had had,

23   was killed, Volkan Ekren.  Eight months after that, another

24   husband was killed.  And she had a child who was just

25   26 days old who died.  And she doesn't know the ultimate

                                                              64

```
 1    reason.  Perhaps it was just an illness.  And that was

 2    another loss.  In the year following that, she had a third

 3    husband that was killed.

 4           And so it's no surprise that with all the trauma

 5    that she suffered -- and the Government blames it on her --

 6    not all of this is her fault.  She didn't choose to have a

 7    tank from Assad's Army fire into a civilian area and into

 8    her home and kill her young child and injure badly another

 9    one, who is now recovered and now lives in Turkey.  Who, by

10    the way, very much disputes any of the abuse allegations.

11    That that happened to her.  And, yes, she's in a war zone,

12    and there's some responsibility there, but there's all sides

13    that were inflicting violence.  And civilians,

14    unfortunately, as we know in war, often pay unfortunate

15    prices.

16           I wanted to speak a little bit about the foreign

17    custody that Ms. Fluke-Ekren endured.  There was actually

18    two stints.  One, we agree that she would not get credit for

19    where she was in a PKK internment camp where she suffered

20    concentration-camp-like conditions.  But for the second

21    one -- which she was able to leave there.  And apparently it

22    was not hard to get out of these as long as you were able to

23    provide something to a guard, you could just be let go.

24           But the second was the Turkish jail where the

25    conditions were poor.  And that was from approximately
```

65

June 29th, 2021, until she was transported to the United
States on January the 28th, 2022.

This is a -- we calculate it's approximately
213 days in foreign custody that she should be credited for.
She was there in the Turkish jail.  There's no other local
charges that are pending that's due to the arrest warrant
from the United States.  So she should be given credit for
that.

And, also, there's her life after ISIS.  She did
leave ISIS in 2019, and she attempted to achieve normalcy
living in Syria.  We detail this in significant -- in
more -- we detail this in our position on sentencing where
she's living in a small town in Syria.  She's gotten a job
with a non-profit.  She has her six children that she is
raising.  And her and her husband -- and she is an educator,
she does have a good education, and the United States
mentioned that.  And, actually, her longtime friend in the
PSR -- I'm not going to mention the name -- also indicated
that she was such a good teacher.

She and her husband at the time built a school.
And before that it was like a tent that was outdoors.  But
an actual school that served 50 children, including her own.
She taught at that school for no pay.  She interacted with
local officials to get teachers designated at the school.
She built desks for the students herself.  And we have

66

1    pictures of that in our position on sentencing.  And she

2    also trained teachers there.  She trained, in her estimate,

3    approximately 20 teachers.  She was doing good work there

4    trying to -- in her -- in the ways that she could to rebuild

5    the community that was around her.

6            She was peacefully raising her children.  I want

7    to share with the Court -- and these have been provided to

8    the Government -- some photos that we would like to provide

9    to the Court and also be placed under seal, because it shows

10   their faces, and we don't want the children to be identified

11   in any way.  With the assistance of the Court security

12   officer, I would like to submit to the Court Exhibits A, B

13   and C.

14           THE COURT:  All right.  Defense Exhibits A, B and

15   C will be a part of the record under seal.

16   (Defense Exhibit Numbers A, B and C admitted into evidence

17                        under seal.)

18           MR. KING:  Thank you, Your Honor.

19           Those are photos that show well-cared-for, happy

20   children that -- and one of them is showing a pizza night

21   that they held once a month.  And that's something that she

22   indicates she had with her children going way back in time.

23   That's something that she always did.  And they reflect the

24   happiness of those children and how she cares for children,

25   provides for children.  They are happy, they are healthy,

                                                              67

 1    they are well cared for.  There's not a hint of abuse.

 2             The Government spoke of general deterrence, and

 3    it's our position, as we indicated in our position on

 4    sentencing, that that does cut both ways.

 5             Ms. Fluke-Ekren is not the only one who's come out

 6    of Syria, and it -- will be punished for being associated

 7    with ISIS.  But she indicates there's also many other women

 8    in Syria.  There's thousands of women, and many more men,

 9    that went and joined ISIS in Syria.  No doubt that they have

10    very mixed motives.  But there's many people there that are

11    going to be afraid.  They're now afraid to return to their

12    home countries for fear of prosecution.

13             Ms. Fluke-Ekren should be getting credit for

14    bringing herself to the attention of Syrian authorities, for

15    turning herself in.  And if she's given the maximum

16    sentence, it also sends the message.  And I understand the

17    Government's argument, well, she didn't get charged with

18    every possible count that she could have been charged for.

19    We agree the case has garnered a lot of attention.  And if

20    she receives the maximum sentence of 20 years, it will place

21    fear into the other people that are still there.  Don't turn

22    yourself in.  Don't come home.  Stay here.  Take our

23    chances, no matter how tough the circumstances are here.

24             And it's not just the chance -- when she brings

25    herself to the attention of the Syrian authority when she

                                                                68

```
1    turns herself in -- of being prosecuted, she also took the
2    chance of losing her minor children.  And she has repeatedly
3    said to counsel -- and there's nothing to contradict this --
4    that there is nothing more important to her than her
5    children's case in Loudoun County.  There's nothing more
6    important to her than her children.  But she wanted
7    something better for them.  There was bad -- even though
8    there was some normalcy that she achieved in Syria
9    developing the school, working, providing those children,
10   there was still certainly risks there.  That civil war has
11   not ended, and she wanted something better for them, and now
12   she's at risk of losing them completely.  If she receives a
13   sentence of 20 years, they'll all be grown.
14          She also should be given credit for the early plea
15   that she made in this case.  She waived a preliminary
16   hearing, that was not contested.  She pled guilty by
17   information so the case did not have to go to a grand jury.
18   And she was motivated.
19          And this has all come undone and apart to not put
20   her daughter and the other young people through a trial.
21   That was a motivation of hers.  And there's no reason to
22   doubt that.  I mean, they're her children.  Leyla is her
23   child.  She didn't want her daughter to have to testify
24   against her.  She didn't want that to happen.  And it's only
25   now that it actually is, in fact, happening, which was not
```

                                                                69

1    anticipated at all at the time that she pled guilty.

2              These new accusations didn't come about until

3    September of this year, and that was only after a person

4    that Ms. Fluke-Ekren knew went to Kansas and attempted to

5    communicate with Leyla.  All of a sudden, there's this

6    barrage of -- this is a -- the person who went there, it's

7    in the -- I don't have the paragraph, but I'm sure the Court

8    is familiar.  The person that went to Kansas attempted to

9    talk with Leyla there, and this happened after she had --

10             THE COURT:  Well, isn't that person the alleged

11   current husband?

12             MR. KING:  Yes, Your Honor.  That is who it is.

13             I was -- I didn't want to provide the name on the

14   Court record.

15             THE COURT:  I'm not saying the name.  I mean,

16   that's the alleged current husband.

17             MR. KING:  That's right.  He went to Kansas, and

18   it's after that these new allegations have flown in.

19             THE COURT:  And this is a person who your client,

20   as I understand it, met online, married -- I didn't know you

21   could do a marriage online.  Married shortly before she

22   turned herself in, at least what you've described as turning

23   herself in, which makes me suspicious as to why you would

24   marry a stranger, and then within a few weeks or months,

25   turn yourself in.

                                                              70

1          It could also be interpreted to be part of a plan

2    that's a bit more devious that we -- it's not an issue in

3    this case, but it's very troubling.  And it was very

4    troubling to the Court that this person, who would have no

5    relationship with those children, would have been trying to

6    become the guardian for them.

7          Anyway, we're not going to get into that a whole

8    lot.  I think that's not a good argument to be making.

9          MR. KING:  Yeah.  I -- I won't get into it a whole

10   lot.  But Ms. Fluke-Ekren is also trying to find a placement

11   for her children and doesn't want them to be in foster care,

12   and wants them in the -- the outcomes of foster care are

13   oftentimes negative.  That's not what she wanted.  And I

14   think maybe I've said enough there and -- with regard to --

15   you know, she wanted a plan for those children, and that

16   has, unfortunately, not materialized so they would not have

17   to go into foster care.

18         But the defendant is also somebody who does have

19   talent.  She has great potential, as reflected in what she

20   did after ISIS in Syria.  She, again, became a teacher.  You

21   know, she set up the school.  And she can and will continue

22   to do these types of work when she has the opportunity to do

23   so again.

24         And by saying that her childhood was filled with

25   no struggles, we don't believe that that is an accurate

                                                          71

1    portrayal to the Court.  She became a teenage mom when she

2    met somebody who was 21, and I think she was 15 at the time.

3    And that's a significant age difference.  And it's after,

4    you know, she drops out of high school because she has

5    children, and she had mononucleosis at one point.  And she

6    sticks behind her story that she had limited emotional

7    support from her family.

8            She earned a GED on her own as a teenage mom.  She

9    undertook college on her own, not with any support from her

10   family.  She actually indicates that her father was

11   surprised that she was actually able to go to college and

12   earn a degree from KSU.  And she went to get her master's

13   degree without family support on her own, or a teacher's

14   certificate, which is all reflected in the student debt that

15   she still owes to this day.

16           She's taught at several schools, including a

17   school that was in Wichita; the school in Egypt where she

18   taught; and then later, after ISIS, the school in Syria.

19           The -- and so she does have an ability in which

20   she -- and she's a great educator, and she also, during her

21   period of incarceration, has the opportunity to educate

22   other inmates.  That's something that she wants to do, and

23   certainly will do if given the opportunity.

24           The Government mentions the need for -- or saying

25   that this is a case which is completely outside the norm and

                                                              72

1    there's nothing that's ever like it.  The U.S. Sentencing

2    Commission did do an analysis in material support cases as

3    to what the average sentence given was.  And it is based on

4    data from 2017, but there's no indication that it's changed.

5    It was 157 months.

6           And there was a recent case here that went to

7    trial -- and I understand that the facts are, you know, very

8    different -- where the person was -- fought extradition for

9    years and was finally brought to the Court, pled not guilty,

10   and it just involved financial support as opposed to being

11   on the ground in Syria.  That person went to trial and, you

12   know, fought extradition, was sentenced to three years.  And

13   certainly amongst those cases, the other material support

14   cases, there were many where people, in fact, fought and

15   committed acts of violence, which she didn't do.  And so she

16   doesn't deserve the maximum sentence.

17          You know, in conclusion, she's somebody who does

18   have great potential.  She is regretful for her conduct.

19   She pled guilty, she's accepted responsibility.  She does

20   wish to address the Court about -- in her allocution.  And

21   based on the full grown mitigation that we presented and the

22   position on sentencing, the psychological report that was

23   attached to that, a variant sentence is appropriate.

24          THE COURT:  All right.  Well, I'll allow any

25   victim who wants to be heard at this time.

                                                              73

1             MR. PAREKH:  Yes, Your Honor.  Ms. Leyla Ekren

2     would like to be heard.

3             THE COURT:  All right.  For the record, please

4     state your name.

5             MS. LEYLA EKREN:  Yes.  Hello.  My name is

6     Leyla Ekren.  Thank you for taking the time today to listen

7     to me.

8             I feel like my -- I'm going to vomit out my heart

9     on this podium.

10            THE COURT:  You need to speak up so we can hear

11    you.

12            MS. LEYLA EKREN:  All right.  I'm really nervous.

13    I slept, like, three hours last night.  I have a nervous

14    laugh and smile, so I apologize if that comes out.

15            My goal for this speech is to tell Your Honor a

16    couple of stories and why they're relevant to Allison aiding

17    ISIS.  I would like Your Honor to keep in mind what you were

18    like when you were 10 or 15, because these stories will be

19    around that age range.  I'll begin now.

20            The relevance of these two stories that I will say

21    right now are the whole reason why Allison wanted to start

22    the Khatiba, the battalion, is her lust for control and

23    power.  She failed for many years, thanks to my father, but,

24    I mean, she had to exercise her dark desires somehow, so she

25    did this by sexual harassment.

74

```
1              A lot of things that came back to memory in
2    preparation for this court I won't be able to mention
3    because they came back too late for the other side to
4    prepare for it.  So, I mean, some of it was mentioned in the
5    letter.  Amongst that, verbal harassment.
6              I -- she didn't -- at times I didn't have
7    sufficient clothes, so I would be wearing my abaya, which
8    was like a dress you wear to go outside to cover yourself in
9    the Islamic State.  And sometimes I would have nothing
10   underneath it, and she would urge me to take it off, knowing
11   that that was the case.
12             For most of my life, I have urinated myself during
13   my sleep.  It stopped recently after I was already back in
14   the U.S.  Come to find out, you know, that can be a sign of
15   sexual abuse.
16             THE COURT:  Let me ask you a question.  How did
17   you come back to the United States?
18             MS. LEYLA EKREN:  So she abandoned me in the City
19   of Raqqa with my rapist.  And then the situation was getting
20   really bad.  Our house got bombed, and so I left with his
21   family.  I then got arrested by the Kurdish military, went
22   into prison and --
23             THE COURT:  Did you tell them you were an
24   American?
25             MS. LEYLA EKREN:  At some point I did tell them I
```

75

```
 1   was an American, and I was doing interviews with agents.

 2              THE COURT:  Were you pregnant at that time?

 3              MS. LEYLA EKREN:  Yes, I was.  It sucked.

 4              THE COURT:  How pregnant were you?

 5              MS. LEYLA EKREN:  I'm not sure.  Maybe I was in

 6   the fifth month.

 7              THE COURT:  Okay.

 8              MS. LEYLA EKREN:  Something like that.

 9              THE COURT:  And then they eventually -- I assume

10   somebody brought you to the United States?

11              MS. LEYLA EKREN:  Yes.  After I cooperated, which

12   wasn't as much as I'd liked because I was in prison with my

13   rapist's family.  So after I would do interviews with the

14   Americans, I would go back and basically be interrogated by

15   them.  Yeah.  So, you know, asking questions like, did you,

16   you know, rat us out, whatever, whatever.  So I wasn't as

17   helpful.  But when I came back, I cleared it up.

18              THE COURT:  And you had the baby here in the

19   United States?

20              MS. LEYLA EKREN:  Yes.

21              THE COURT:  Okay.  All right.

22              MS. LEYLA EKREN:  So let's see.  So, yeah, as I

23   was saying about sexual harassment, how did this make me --

24   made me feel?  Very degraded.  My entire life.  Yeah.  I

25   don't really know how to get into depth on how it made me
```

76

1  feel.

2         Another form of torture that she would use on me,

3  chemical torture.  She -- and this is just torture that she

4  specifically did to me.  So she did all sorts of other kinds

5  of torture to my other siblings, but this is not about that;

6  this is about what happened to me.

7         Some background.  We were in Syria, and we had

8  lice from being in a village, and so she bought us some

9  applicant for the lice that was -- it was some strange

10 off-brand thing.  I just remember that when you -- when it

11 made contact with my skin, it hurt a lot.  It was -- it was

12 very painful.  It damaged, you know, the skin at the time.

13        She asked me to apply it to one of my younger

14 siblings.  And I was doing that and he was crying from the

15 pain, and he was, you know, trying to get it off of his

16 head.  And then he touched his eyes, and then it started

17 hurting him even more, and he started screaming.

18        And she looked at me, and she told me that I did

19 that on purpose.  And she thought I was, you know, just --

20 just punishment to -- she put me on the floor -- and how old

21 was I?  Maybe I was 11.  Laying on the floor, she got on top

22 of me, she sat on my chest, and my arms were to my side, I

23 couldn't move them.  And she poured it on my face, and, you

24 know, held me down there.  It was difficult, if not

25 impossible, to breathe because she was pouring the whole

                                                          77

```
 1   bottle.

 2            When she realized what she had done -- she usually

 3   tried to do kinds of tortures that wouldn't show up in front

 4   of other people, but because this was on my face, she

 5   realized that it had a potential to blind me, so she said --

 6   she said we need to wash this out of you so it doesn't blind

 7   you, others can't see that.  She grabbed me by my hair

 8   while, you know, my face was still burning and blistering

 9   from whatever this chemical was.

10            And, you know, I -- I was very fed up at this

11   point.  The -- the abuse had been going on for a while now,

12   so -- and she had been getting away with it.  So I wanted

13   people to see what kind of person she was.  I wanted it to

14   blind me.

15            So she took me to the sink by my hair.  She held

16   me the entire time, and she was trying to pull me to the

17   water.  And I was pulling away, and she would bash it into

18   the sink.  And bash.  And I would pull away, she would bash

19   it into the sink again.  And I would pull away, and she

20   would bash it into the sink again.

21            Finally, I -- I didn't know if it was an active

22   decision or I just gave up.  And she would -- you know, she

23   made the water situation difficult, too, because, you know,

24   you can't breathe in water.  So she wasn't gently removing

25   it with water; she was drowning me in the water.  That was
```

78

1    something.

2            That wasn't enough, though.  It went on.  She took

3    me to the other room that had no heating.  It was in the

4    dead winter at the time.  And she gave me like a really

5    light blanket.  There was -- it had the warmth of a barn.

6    The door that went to the outside, there was a big gap, a

7    lot of the cold air came in from the door and the windows.

8    And I spent the night there alone, cold, and in pain.  I

9    woke up, my face was all swollen and disgusting.

10           And, at this point, I hadn't spoken to my father

11   in a while just because I hated him for not standing up to

12   her.  And he knew that, and he was embarrassed to speak to

13   me.  But he came into the room, and because we hadn't spoken

14   in a while, and because I knew it pained him to speak to me,

15   and it pained me to speak to him, I knew that she had sent

16   him in to talk to me.  And he opened the Quran, and he

17   said -- he opened it to a chapter, Maryam, which -- Mary was

18   what they called me.  And he was like you need to be like

19   Mary.  You need to be righteous.  Blah-blah-blah.  I don't

20   even remember his point.

21           THE COURT:  All right.  Ms. Ekren, we do have to

22   move this along; all right?

23           MS. LEYLA EKREN:  I apologize.  I'll keep --

24           THE COURT:  Your letter is part of the record.

25           The only other incident I would like you to talk

                                                           79

```
 1    about, if you can, is this marriage.
 2              How old were you when you were married?
 3              MS. LEYLA EKREN:  13.
 4              THE COURT:  And how long were you actually with
 5    this man?
 6              MS. LEYLA EKREN:  A year, or --
 7              THE COURT:  Had you --
 8              MS. LEYLA EKREN:  -- and a half or something like
 9    that.
10              THE COURT:  Had you met him ever before you were
11    married to him?
12              MS. LEYLA EKREN:  I met him maybe once or twice.
13    Allison attended the meeting.  It was a short meeting, no
14    longer than 30 minutes or so.
15              She -- my father had died at that point, so -- and
16    she was in her mourning period, which, in Islam, you can't
17    leave the house to do anything in that period.  So instead
18    of waiting to get a husband for herself to help her with the
19    battalion, and instead of being legally obligated to listen
20    to the husband, she thought why not just give me to some
21    random ISIS fighter as a sex slave so that she can -- she
22    can work with him to help her with the battalion.
23              THE COURT:  All right.  And when you were married
24    to him, then did you move out of your house with your mother
25    and move into his house?
```

```
 1                    MS. LEYLA EKREN:  Yes.

 2                    THE COURT:  Uh-huh.  All right.  Thank you.

 3                    We've got your letter in the record; all right?

 4       Thank you.

 5                    MS. LEYLA EKREN:  Okay.

 6                    MR. PAREKH:  Your Honor, there's one more

 7       incident.  Specifically --

 8                    THE COURT:  We've heard enough.  Thank you.  We've

 9       heard enough.  All right.

10                    Does the defendant wish to make -- is there

11       another victim who wants to be heard?  Yes?  All right.

12       Come forward.

13                    MR. PAREKH:  And, Your Honor, for the record,

14       that's Gabriel Fluke.

15                    THE COURT:  All right.

16                    MR. PAREKH:  In candor to the Court, he was not in

17       Syria at the time.

18                    THE COURT:  Well, the only evidence that is truly

19       relevant to this case is conduct that went on in Syria.  If

20       you had communications with the defendant while she was in

21       Syria and statements were made that you want the Court to

22       consider, that's fine.  But the other situation, I'm not

23       going to hear; it's not relevant.

24                    MR. GABRIEL FLUKE:  Yes, Your Honor.

25                    THE COURT:  Can you take off your mask so we can
```

81

```
 1    hear you.
 2              MR. GABRIEL FLUKE:  Oh, my apologies.
 3              I did have a very small amount of communication in
 4    2014 --
 5              THE COURT:  All right.
 6              MR. GABRIEL FLUKE:  -- with my mother as she was
 7    trying to lure me to come over there.  I believe that that
 8    email is in the record.  I did give it to -- right here.  It
 9    is dated Friday, 25th April 2014.  It is the end of a series
10    of correspondence I had with her as she was attempting to
11    get me to move over there, because she believed that I had
12    information that might compromise her if I stayed here in
13    the U.S.
14              In it, I end the correspondence by saying:  Every
15    single year of my life, you made me give up everything just
16    so you could go off on your next adventure.  Piece by piece
17    you took away every friend and family member I had.  Just so
18    I could try to stay with my brothers and sisters, not
19    because I loved you, but because if I didn't take the blame
20    for what they did, you would beat me instead of them.
21              She was attempting to hold my siblings over me,
22    particularly by referencing an incident in which one of my
23    brothers had both of his arms broken as a threat of what
24    might happen to my siblings if I did not come, but I
25    refused.
```

                                                              82

1          According to my sister, and based on previous

2    incidents, she was going to attempt to be rid of me so that

3    I could not help the U.S. Government in eventually finding

4    her.  Unfortunately, I failed to get any attention, as I was

5    a pretty stupid child, in preventing what happened to my

6    siblings from happening.

7          THE COURT:  All right.  Thank you.

8          All right.  Mr. King, I believe you said your

9    client wants to allocute.

10         MR. KING:  Your Honor, we would ask for a very

11   brief recess, perhaps five minutes to consult with our

12   client prior to the allocution.

13         THE COURT:  All right.  All right.  We'll take a

14   five-minute recess.

15              (A brief recess was taken.)

16         THE COURT:  Mr. King.

17         MR. KING:  Yes, Your Honor.  Ms. Fluke-Ekren would

18   like to allocute to the Court, Your Honor.

19         THE COURT:  That's fine.  Yes, ma'am.

20         THE DEFENDANT:  Your Honor, I would like to say

21   that I am absolutely shocked and horrified about some of the

22   accusations that were made today.  Since I read the

23   Government's filing, I've been unable to eat or sleep.  I

24   emphatically deny any claims that I abused my children in

25   any way.  These claims are so outrageous and incredible, and

                                                          83

1    I would just like to point out that there's no evidence in

2    support of these claims.

3             For example, my children all attended the same

4    pediatric office in Kansas from 2001 to 2010, and there was

5    never a report made by these pediatricians of abuse or

6    neglect or mistreatment.  I used to take my kids to my

7    parents for weekend visits at least monthly and on extended

8    holiday visits.  The older ones visited their dad every

9    other weekend and were involved with his parents as well.

10   They attended school, and no teacher ever made a report of

11   abuse or neglect or mistreatment.

12            We all lived with my dad for a year and a half.

13   My brother-in-law lived with us for two years while he was

14   going to school in the U.S.  Every summer after moving

15   overseas for the first three or -- three years, I think,

16   that we lived overseas, we spent at least a month with my

17   family in Kansas and another month with Volkan's family as

18   well.  These kids were, by no means, isolated and, yet,

19   there is not one report of mistreatment.

20            Even in my 2002 divorce and all of the subsequent

21   proceedings in Kansas, there's not one mention of

22   misconduct.  Additionally, my younger children have been in

23   CPS custody here in Virginia for nine months, and there have

24   been no allegations of abuse or mistreatment or anything

25   other than the fact that I've been incarcerated in any of

84

1    those proceedings.

2          In the last few weeks since reading these

3    disgusting accusations, I've asked myself over and over why

4    they would say these things.  And all I can think of is my

5    2020/2021 conversations with Leyla -- some of which were

6    played here today -- in which she made many similar

7    accusations against her older brother, Gabe, saying that she

8    was forced to sleep in the closet, that she was physically

9    and emotionally abused, that she was kept a prisoner in the

10   house, that she had her daughter forcibly taken from her.

11   All of these statements are in the conversations that were

12   recorded that I had with Leyla.

13         She told me at that time also in these recorded

14   conversations that her brother hated me and that he would

15   torment her by threatening to harm me, and that he would

16   blackmail her with videos that he kept specifically for that

17   purpose.  These conversations are present in the

18   Government's evidence for your reference.

19         So is she really being abused now or coerced into

20   making these new allegations, or were those untruths, which

21   are strikingly similar to the new and heinous accusations

22   against me, also lies?  I will probably never know, but I do

23   know that these new and disgusting accusations and abuse

24   against me are absolutely not true in any way.

25         It is also shocking to me the way that the

85

1    Government has brought these allegations.  In their recent

2    filings, the Government almost sets aside the criminal

3    conduct and focuses extensively on these allegations, which

4    were never mentioned in tens of interviews over five years.

5           The prosecutor claims that this is somehow normal

6    for abuse survivors; however, that doesn't make sense at all

7    in this case.  Those making these allegations, Leyla,

8    specifically, has been cooperating fully for more than five

9    years.  Leyla especially gave testimony that is almost the

10   entire foundation of the criminal conduct in my -- in the

11   statement of facts.

12          If she said all of these things, if she gave all

13   of this testimony about what happened in Syria and my

14   conduct previously, why did she leave out all of these

15   horrible accusations?  She wasn't shy about blaming me.  She

16   wasn't shy about saying that I did wrong things.  Why is it

17   that none of these abuse accusations came up until September

18   of this year?

19          Also, why did none of these new allegations come

20   up in the extensive investigation until mere weeks before

21   sentencing?  It simply doesn't make sense.  Why is the

22   Government so drastically shifting the focus at the last

23   hour to -- it just -- it seems to me far too sensational to

24   be fitting for a federal court.

25          I would like to address this narrative that I

                                                              86

1   somehow radicalized Volkan or somehow compelled him into

2   terrorism.  It's simply not in accordance with the facts.  I

3   was in Egypt, living in Egypt and working in Egypt, and we

4   separated.  He went to Libya by himself, and I stayed in

5   Egypt.  How could I have forced him to go to a completely

6   different country and do whatever it is that he was doing

7   there?  I stayed in Egypt from May to December while he was

8   in Libya until he came.  And, according to witnesses, when

9   he came -- we had separated, we had divorced, and he came

10  back to Egypt, and then we abruptly left.  So this is much

11  more indicative of him doing what he wants and then coming

12  and grabbing me and taking me along.

13          As far as what happened in Libya, I was at home

14  asleep and Volkan brought this box from the consulate.  I

15  had no knowledge of the attack before it happened.  I didn't

16  even know there was a consulate in Benghazi until he woke me

17  up with this box.

18          Obviously this is conduct that he did by himself

19  and that I certainly did not compel him to do that.  I left

20  Syria -- the first time that we entered Syria, I left Syria

21  after less than two months while he stayed there, and I

22  lived in Turkey for almost a year all by myself.  But Volkan

23  didn't come with me.  I was not controlling him.  I was

24  multiple, multiple times trying to separate myself from him,

25  trying to not even be in the same country as him.  It is

                                                              87

1    simply not reasonable to suggest that I forced him to do

2    what he did.  I was at home with the kids almost all of the

3    time.

4            In terms of my comments and this conversation that

5    I had with Leyla, I'm really taken aback at how these

6    comments were taken out of context.  As I just mentioned in

7    these conversations that I had in 2020/2021, I hadn't talked

8    to Leyla for three years, and I had no idea what had

9    happened to her.  And when I said that I was on my knees

10   begging Abu Mariam to stay, I just want to point out to the

11   Court there are some real contradictions between what Leyla

12   is saying that I forced her to marry a rapist, and the fact

13   that I left Raqqa.  My husband and my children and I were

14   leaving Raqqa.  We were not staying there for the fight.  We

15   didn't want to be there.  We were not trying to fight; we

16   were trying to leave this battle.  And I went to Leyla's

17   house where she --

18           MR. PAREKH:  Your Honor, this is --

19           THE DEFENDANT:  I went to Leyla's house, and I

20   begged her, I literally begged her to come with me, and she

21   refused.  And so when Abu Mariam was going to leave Raqqa, I

22   was begging him that we could stay to try and get Leyla to

23   come with us.  And then I told him, okay, you take the kids

24   and go; I'll stay here.  And then, in reality, what

25   happened, Abu Mariam took me and my kids out of Raqqa, and

88

1    he, himself, came back to try to convince Leyla to leave.

2          So these conversations that I was having with

3    Leyla in 2021 and 2022 -- the end of 2020 and 2021, she's

4    telling me that she's being mistreated.  She was telling me

5    that she's being abused.  She was telling me that her

6    brother slammed her hand in the door and broke it.  All of

7    these are in the recordings.

8          The overarching topic of all of these

9    communications was how horribly she's being treated.  And I

10   did not pressure her to come back to Syria.  I asked her.  I

11   said, Leyla, what do you want to do?  What's the solution?

12   What's the way out?  It even went so far that I contacted a

13   domestic violence shelter in Wichita, Kansas and made

14   arrangements for Leyla to be able to go there.  This is the

15   context that we were having these conversations in.  And all

16   of these are present in these conversations.

17         One other thing I would like to point out is

18   there's a striking absence of my son, Nael, in both the --

19   he's my adult son as well -- in both the PSR and in the

20   victims.

21         The Government is fully aware of his whereabouts

22   and his phone number, because I talk to him almost every day

23   on the phone.  Yet, he told me last week -- and I asked him

24   on two different occasions, two days -- that he had not been

25   informed that he had a right to speak today as a witness.

89

1          The PSR and the Government's arguments rely

2     heavily on people that I have had little to no contact with

3     for over a decade, but blatantly ignores my son who lived

4     with me for the entirety of the conduct.

5          So I've been in jail now here for nine months.

6     And, since that time, I have been thinking daily about what

7     I would say to you today -- excuse me.  I'm sorry -- and I

8     couldn't come up with anything.  About two months ago, my

9     six-year-old daughter, she told me, mommy, when are you

10    going to tell the Judge your story so you could come home?

11    I guess maybe, you know, the people at CPS explained to her

12    that I would come and talk to you and you would decide what

13    would happen.

14         So as I was thinking, all I could think about was

15    her advice.  So I would like to tell you my story, but I

16    want to preface by taking full responsibility for my

17    actions.  There were many forces outside and pressures

18    outside of my control, but I accept that my actions are my

19    decision alone; however, the reality is no one lives in a

20    vacuum.

21         I am, first and foremost, a mother.  A vast

22    majority of my time -- a vast majority of my time has always

23    been spent taking care of my children.  As the Government

24    notes -- as the Government notes in the statement of facts,

25    repeatedly, I always traveled among others, and that would

90

1    be my children.

2           The criminal conduct in my case began one morning

3    when I was woken to my husband bringing a box into our

4    bedroom.  He asked me to take a look through it, and as I

5    looked through the documents, I realized they were from the

6    American consulate, and I was horrified.  I would like to

7    mention that I had no idea about this attack prior to its

8    happening and that I was not a voluntary participant.

9           At that moment, I realized that I was now involved

10   entirely unwittingly in a shocking event, and I did not know

11   what to do.  My fingerprints were on the documents, and I

12   saw no way to deal with this terrifying situation without

13   destroying my family and possibly serving a long prison

14   sentence for something that I wanted nothing to do with in

15   the first place.  So I argued with my husband, and he took

16   them away.

17           THE COURT:  Well, you know, that's inconsistent

18   with what you admitted to in paragraph 3 of the statement of

19   facts.  There you said you assisted your second husband with

20   reviewing and summarizing the contents of the stolen U.S.

21   Government documents.  The stolen documents, an electronic

22   device, along with the summaries that you helped prepare

23   were ultimately provided to the leadership of --

24           THE DEFENDANT:  Yes.

25           THE COURT:  Yes.

                                                            91

1          THE DEFENDANT:  Yes, Your Honor.  Yes, I did.  I

2   read through them, and we discussed what was in them.  And

3   in the process of this argument, he made a summary, and he

4   did return those.  That's -- all of that is true.

5          But it wasn't in a context of me wanting this

6   event to happen or me planning this or me having really very

7   much agency in this process.

8          THE COURT:  Well, it's called an accessory after

9   the fact in the criminal justice system.

10          THE DEFENDANT:  So after this event happened,

11   after this, I began to try to convince Volkan to leave Libya

12   and to go to Turkey.  He finally agreed to move.

13          And Number 4 of the statement of facts, Leyla said

14   that I went to Syria for Jihad.  But I just want to point

15   out that she was nine years old at the time and did not

16   understand the situation or the adult conversations.  We

17   were discussing our views on religion, on Jihad, and we're

18   both religious people.  And I won't stand here and say that

19   I don't -- that I didn't believe in some of the tenets of

20   Islamic law or -- and that I do believe that these tenets of

21   Islamic law, if they were ever to be lived in a peaceful and

22   true way, then I believe that that would be a good form of

23   government; however, Leyla at that time was not part of

24   these conversations, and she could not have understood all

25   of the details.

                                                              92

```
1              So -- but I just would like to point out that

2   actions speak louder than words.  And when we did go to

3   Syria, Volkan -- I stayed there a very short time, and then

4   Volkan stayed there alone, while I left and I went back to

5   Turkey, and at that time I tried -- I did try to come home

6   to America.

7              During this time when I was -- so Leyla became

8   sick, and we came to Turkey, and we lived in Turkey, the

9   children and I.  I lived with my children happily in Turkey

10  for almost one year, and it was a really joyful time for all

11  of us.

12             It was just the children and I, and when my twins

13  were born -- I was pregnant -- I decided that I needed to

14  get away from Volkan and come home, and I wanted to start

15  over.  So I went to the American Embassy to get passports

16  for my babies, but they refused to issue them without

17  Volkan's consent.

18             I was interrogated at that time about Volkan's

19  activities, and I became terrified and felt even more

20  trapped.  I feared for my children if I was put in prison,

21  and I did not see a way out of my situation.

22             Some months later, Volkan showed -- about

23  six months after this, Volkan showed up and told me again

24  that I could come or -- come with him to Syria or stay, but

25  that he was taking the children.  And I see how weak I was.
```

1   But, at the time, I was afraid of his criminal conduct and

2   it would spill over on me.  I was afraid of what I had done

3   in Benghazi.  I was afraid that if both of us went to jail,

4   who would take care of my children.  And, in reality, if I

5   would have spoken up at that time, I would have been

6   standing probably here in this courtroom ten years ago.  And

7   I just didn't see a way out.

8           So about six months after I had gone to the

9   embassy and tried to get passports, Volkan showed up, and he

10  told me again that I could stay or come with them, but he

11  was going to take the kids to Syria.

12          I had these six children, and I was living in a

13  foreign country where I didn't speak the language fluently.

14  I was afraid of Volkan, and I was terrified that he would

15  take my kids and I would lose them in Syria forever, and I

16  didn't see a way out.

17          I would like to address the statements that were

18  made about attacks in America.  And people would show

19  videos -- I didn't have these, actually, and I didn't even

20  have a phone at that time of my own.  But people would show

21  videos of attacks, you know, like in group settings.  And

22  then there would be discussions, you know.  And I often was

23  horrified, and I even encouraged my children not to watch

24  such videos.  I didn't allow it.  I didn't -- we didn't have

25  the phone in the -- me and the kids didn't have a phone.

94

```
 1   This was not something that I encouraged.
 2            But people would come, and people would -- other
 3   ISIS members would make comments about, you know, praising
 4   these attacks.  And I would say things -- it's not even --
 5   it's not -- I specifically remember saying that it wouldn't
 6   even be that hard.  You just take some bombs and put them in
 7   a trashcan in a mall.  And the context I was saying that in
 8   is that it's not something praiseworthy.  It's -- I -- I
 9   don't find that killing random people in any place,
10   anywhere, even in a war zone, is something that's
11   praiseworthy.
12            In addition, I did, many times -- and I fully
13   admit -- make statements in reaction to the horrors of war
14   and collateral damage.  And I think that that's something
15   that we can all relate to.  And I think, you know, people
16   looking at the horrors of the war in Ukraine right now will
17   say many things about Russians or Russia or Putin.  I'm sure
18   that -- you know, after 9/11, I heard -- and many people
19   make threats, and these are statements that are made -- you
20   know, they should pay or suffer somehow, whoever "they"
21   happens to be.
22            And I just want to say that no one can understand
23   the actual horrors of a bombing unless they've walked
24   through its aftermath.  And, like, if -- I mean, we all know
25   how horrified we were when we saw what happened on
```

95

1  September 11th.  But what I felt in Kansas is nothing

2  compared to what people felt in New York, or even here.

3  Because when you see the actual horrors of murder for no

4  apparent reason, it's a completely different thing.  No one

5  can understand the horrors of a bombing unless they've

6  walked through its aftermath and you see entire walls of

7  buildings torn off to reveal people's living rooms,

8  bedrooms.  You see the pieces of people's homes and lives

9  strewn about violently, unnaturally in the street.

10  Clothing, toys, beds.  You can see the blood on the

11  mattress, and you know that someone was sleeping, just

12  sleeping there when a bomb fell and killed them.

13         I knew shopkeepers who were killed.  Innocent

14  Syrians who had nothing to do with anything, they just

15  wanted to live their lives.  My children played with some of

16  the children who died.

17         Anyone who has seen that would be angry, and they

18  should be angry.  We should all be angry about senseless

19  violence and killing, no matter where it happens, no matter

20  who the victims are; however, over time as I lived in the

21  war, I realized that all sides in any war drop bombs and

22  kill innocent people.  There's no right side to war and this

23  violence; there isn't.  I've come to see violence, whether

24  perpetrated by terrorists, by Russia, even the United

25  States, is not an answer.

96

```
 1              With regards to my involvement in Iraq, Number 11
 2    and 12 in the statement of facts, what I -- one day I was at
 3    my daughter's school, and a woman came to the school office
 4    asking for help.  I was actually upstairs in the daycare.
 5    She spoke no Arabic and was a widow living in a widow's
 6    guest house and was having trouble with the ISIS
 7    administration.  Because I could communicate with her, and
 8    at that time I spoke passable Arabic -- and, actually, Leyla
 9    helped me because she was fluent in Arabic -- I met with her
10    and the official in charge of their guest house and tried to
11    help her revolve her issues with food, housing and custody
12    of her son by translating and by advising them, this
13    official help, because they were not treating her well.  It
14    was not a job, and it was a one-time meeting.  While the
15    statement of facts is literally true, I feel it gives an
16    exaggerated impression of what really happened.
17              The bulk of what I -- the work that I actually did
18    in Syria spans over about eight months beginning in October
19    of 2016 until about May of 2017.
20              The first thing is personally and not financially
21    supported by ISIS in any way, or directed by ISIS in any
22    way.  Although I did have to have ISIS approval to open the
23    Women's Center, it was a private venture.  And it lasted
24    about four months from October until -- of 2016 until
25    February of 2017, the beginning of February.
```

1        We opened it, and when we opened the Women's

2   Center, we had -- it was meant to be a community center, and

3   that's, in fact, what it was.  We had three divisions within

4   the Women's Center.  There was a health division where there

5   were doctors and midwives and nurses that spoke a variety of

6   languages.  They were able to service foreigners who could

7   not communicate in Arabic and had a really hard time getting

8   their health needs taken care of.  We had an education

9   division, and I was personally responsible for that.  We had

10  a preschool.  We had language classes, we can cooking

11  classes.  There was a CPR class.  There was aerobics.  And

12  that was the education division in the Women's Center.

13        Additionally, there was another woman who had a

14  social services division, which was another major issue that

15  people were facing in ISIS.  There were many foreigners who

16  couldn't speak.  And so -- for example, like this woman in

17  the -- in Iraq that I helped who were women who were being

18  oppressed in the Women's -- in the Widow's Bureau, and they

19  were not able to communicate, so we did translation, and we

20  did social services for these -- in these cases.  That's

21  what the Women's Center was, and that's what it was most of

22  the time it was open only these four months.

23        Towards the end, it became clear that there was an

24  imminent attack by the PKK forces on Raqqa.  And in this

25  imminent -- their bombings became overwhelming.  There were

98

1   bombings every day, mostly on civilians, and mostly innocent

2   Syrians who were from Raqqa and had no reason to be killed

3   by any side.  And women and children, many children, who

4   should never be victims of war.

5          So we developed a three-day program, and the first

6   day was like survival training kind of.  So people would

7   lose their homes and their water sources and their gas

8   sources, so we were talking about how to cook, cooking using

9   a pressure cooker.  Just basically like -- almost like

10  camping, basically.  That was the first day.  It was about

11  survival in a war zone.

12         The second day was self-defense.  And we taught in

13  that how to use -- how -- we didn't even shoot a gun; we

14  just taught.  And I did -- I fully accept, and I do not deny

15  the statement of facts that I did train people about suicide

16  belts.  But the entire training that I gave on suicide belts

17  was to explain the range to tell which one was C-4 and which

18  one was TNT, so that -- because C-4, if I remember right,

19  explodes on impact.  So if you give it a good impact, it

20  will explode.  And I was trying to explain to people to be

21  more careful with their weapons and how the mechanism

22  worked.  This was -- that was the extent of the training.

23         I have never seen a suicide bomb explode.  I've

24  never exploded one.  Personally, I know no women who have

25  ever exploded one, or a grenade.  And that was also the

                                                          99

1    entirety of the training I gave in grenades.  This is a
2    grenade, this is how you pull the plug, please don't do so
3    in a small room, you'll kill your children.  This was the
4    extent of the training, as well as how it could be used if
5    someone was actually trying to invade their home.  That, I
6    did tell, and the range.  So this was the extent of the
7    training on suicide belts and grenades that I ever gave
8    or -- Khatiba Nusaybah, or at the Women's Center that we
9    gave to anyone.
10           In terms of the gun, a large part of what we
11   talked about was safety, because these were women, and there
12   were many, many accidents, horrible accidents, where
13   children, unfortunately, would get ahold of weapons that
14   people carelessly left around their house and would have
15   horrible accidents.
16           I particularly remember around this time when we
17   decided to start doing this training that I was having tea
18   at a friend of mine's house.  And maybe there were about
19   five of us, and we were sitting there in her apartment, and
20   we heard a gunshot.  And then we heard screaming.  And we
21   run out the door, and it's the neighbor's house.  And she's
22   carrying this five-year-old little boy.  Blood is dripping
23   everywhere.  So she's standing there in the hallway just
24   screaming.  I mean, we didn't know what to do.  And her 10-
25   or 11-year-old son is standing there behind her just

1    absolutely silent.  The little boy died.  And the tragedy is

2    that it was his older brother who shot him.  And I just

3    can't imagine this mother's pain.  Like, because she lost

4    both of her sons in the same day, because how could she ever

5    feel -- I mean, every time she looked at her older son, she

6    saw the person who killed her younger son.  And these were

7    tragedies that really happened all the time.

8              And I understand ISIS is a terrorist organization,

9    and I understand -- and I accept that they did many violent

10   attacks in which innocent people died, but neither do these

11   children deserve to die because their parents were being

12   stupid and careless with weapons, and I couldn't just ignore

13   this.  And I felt like I was able -- I mean, I'm a teacher,

14   and I care about children, and I care about families, and I

15   couldn't just ignore this situation.

16             There was many, many examples.  Another person

17   that I personally know, the child took a grenade and threw

18   it at his mother, and his mother died.  These are -- I

19   personally know these two examples.  And there were many,

20   many, many more.  And I felt like something needed to be

21   done about this.

22             And I also felt that people had a right to defend

23   themselves.  In Syria, it has been documented that there are

24   untold violence against women and children.  And the

25   prosecution would like to crucify for me for training 13-,

101

14-years-olds how to use a gun.  But I would answer to that, that when one of Bashar al-Assad's soldiers, or two or five are breaking into a house and they see a young girl, and Leyla's been this tall since she was 12, almost this tall, they're not going to ask her how old are you?  Are you 18? The right and the need to defend themselves was real in that situation, and it was horrifying.

And I personally know at least 20 women and girls who were raped violently in this war.  And it's something that no woman should -- sexual violence is not okay in any circumstance, and women have a right to defend themselves.

THE COURT:  Well, you know, you mentioned the word rape, and your daughter did as well.

Do you dispute that you allowed her to marry at the age of 13 somebody who she did not know?

THE DEFENDANT:  She was a few weeks away from 14, Your Honor.  And I --

THE COURT:  That doesn't make much of a difference.

THE DEFENDANT:  No, she -- I don't dispute that. She did get married when she was that age.

THE COURT:  And did you arrange the marriage?

THE DEFENDANT:  I mean, somebody came and proposed, and I told her about it, and she sat and met with him, which is the Islamic custom.  And that's how I got

102

```
1    married.  I met with him in a meeting, and then we got --
2    and this is very common in the Arab world and in many parts
3    of the world.
4              And, in fact, she agreed after the first meeting.
5    And I was very upset, and I told her -- I was crying, and I
6    told her, meet him again, make sure, make sure.  And she
7    did.  And I very much -- I mean, she -- it was her decision.
8    I never forced her.
9              THE COURT:  That's not consistent with the
10   statement of facts.
11             THE DEFENDANT:  About the marriage?
12             THE COURT:  Where's the -- what paragraph is that?
13             THE DEFENDANT:  To my knowledge, Your Honor, the
14   marriage is not in the statement of facts.
15             MR. PAREKH:  Your Honor, it's not in the statement
16   of facts.  Leyla was 13 years old.  Her father just died.
17   Fluke-Ekren was her only parent and to say --
18             THE COURT:  Right.
19             MR. PAREKH:  -- it was her decision to --
20             MR. KING:  Your Honor, this is the defendant's
21   allocution.
22             THE COURT:  All right.  Let the defendant finish.
23             MR. PAREKH:  Your Honor, what she's saying,
24   though --
25             MR. KING:  Your Honor, this is --
```

```
 1              THE COURT:  No.  Let the defendant finish.  We
 2    need to wrap this up.
 3              THE DEFENDANT:  After my work at the Khatiba -- at
 4    the Women's Center, I was asked to help with the Khatiba.
 5    And as you saw, the document that the Government presented,
 6    I would just like to point out that this document placed --
 7    the first document that he showed, this document placed the
 8    Women's Center under the (in Arabic), which is the office
 9    for the prisoners and the -- and the --
10              THE COURT:  Well, it says to the members of the
11    Detainees and Martyrs Center.
12              THE DEFENDANT:  Yes.  "Detainees," meaning it's
13    for the wives of the prisoners, and the wives of the people
14    who've been killed.  The wives of the martyrs.
15              Actually, if you were a man, you couldn't be under
16    the (in Arabic).  This office was for widows and for the
17    wives of prisoners.  And it was not part of the military
18    operations of ISIS in any way.  It was -- they distributed
19    the salaries, they ran the guest houses.  That's what this
20    office was for.  And that was the office that they put the
21    Khatiba under because it was never meant to be an offensive
22    branch.  It was never meant to be -- and Leyla made the same
23    statements previously in other testimonies and other
24    interviews that it was never going to be an offensive unit.
25              THE COURT:  But you understand you can give
```

104

1   material support to a terrorist organization without it

2   being part of the offensive element?

3          THE DEFENDANT:  Absolutely, Your Honor, and I'm

4   not denying that.

5          THE COURT:  All right.

6          THE DEFENDANT:  I just want to tell you my story.

7   I want to tell you what happened, and I want to give the

8   context for why these things happened and how they happened.

9          So when I was asked to do -- to work on the

10  Khatiba, it was basically this three-day training that we

11  had done, but with more -- with some practical application

12  of the self-defense training.  And I did this work for about

13  four months.  And, all together, in this capacity over this

14  eight-month period, I trained about -- I would guess about

15  100 people.

16         But the Khatiba was not -- it was not something

17  offensive.  There were babysitters.  Out of the people who

18  were working in and with the Khatiba, there were

19  babysitters, there were cooks, there was a group of people

20  who were trained as nurses, as emergency responders because

21  of the increased bombing and violence that was happening.

22  And this was the work that we were doing in the Khatiba.

23         To summarize, I would just respectfully like to

24  refer back to the actual conduct that's in the statement of

25  facts, and that it includes what happened in Benghazi, which

105

1  was my unwitting and not planned examination of the
2  documents that were brought from the U.S. consulate in
3  Benghazi.  This conduct lasted a few hours.
4        That I traveled to and lived in Syria.  Although
5  my -- the evidence clearly shows that I went to the U.S.
6  embassy and that I tried to get passports and that I was
7  trying to get out of my situation.  Additionally, the
8  conduct does include various statements that I made in times
9  of extreme sadness, fear and horror at the hundreds of
10  innocent people being killed in bombings, which I never
11  acted on in any way.
12        The conduct also includes a conversation that I
13  had to translate and assist a woman who was having problems
14  in an ISIS widow's home.  My work at the Women's Center for
15  four months from October 2016 to January -- the end of
16  January 2017 and my work for the Widow's Bureau on Khatiba
17  Nusaybah for four months from February to May of 2016.
18        The statement of facts only describes a few months
19  time out of seven years that I was in Syria.  I was a mom
20  raising my children.  I homeschooled my children, and I
21  always opened my home to neighbors because schools were not
22  functioning.  At times I taught 40 kids in my home.  A vast
23  majority of my time was spent cooking, cleaning, taking kids
24  to doctors and putting antiseptic on scraped knees and
25  mediating sibling disputes.

1              I didn't do all of this because I wanted to be a

2    terrorist.  I didn't teach preschool, start the Women's

3    Center or even work for the Khatiba because I supported

4    ISIS.  I began and continued my work for women and children

5    because I saw a real need in the community.  Kids were

6    injured and killed on a weekly -- kids were injured on a

7    weekly basis because these weapons were not stored safely in

8    homes.  Weapons were reality in every single home in Syria.

9    And Syria is -- was and still is a dangerous war zone where

10   war crimes are not uncommon.

11             In addition to the accidental deaths that were a

12   regular occurrence, there were many acts of sexual violence

13   and war crimes perpetrated by all sides in the war.  What

14   are innocent people supposed to do when they're faced with

15   this unimaginable threats?  In war, all sides cause civilian

16   collateral damage, rape and murder.

17             Rape and murder are, unfortunately, a part of the

18   violence that is a cancer for humanity.  Violence and

19   oppression breed violence and oppression.  In any war,

20   Ukraine, Tigray or Syria, do we blame women for learning to

21   use a weapon to defend themselves or their children against

22   rape or murder?  These are real questions, real problems

23   faced by thousands of innocent women and children around the

24   world.  I, for one, do not know the answer.  I deeply regret

25   my choices, but I also deeply sympathize with innocent women

107

1   and children victims of rape in Syria, mass murder in

2   Ukraine or school shootings in Texas.

3        I have been thinking about ways to use my

4   experiences as a voice against war, violence and extremism.

5   I'm not sure how that's going to look, but I hope to start

6   with my children by teaching them that my building peace and

7   understanding, we can live in a more just and safe world for

8   everyone.  I turned myself in to authorities when no one had

9   found me, and I was under no threat or duress.  I talked to

10  Leyla for the first time in the end of 2020 and beginning of

11  2021, and she was telling me all these horrible things were

12  being done to her and how she was suffering.

13       There was one call where she was just crying over

14  and over and calling herself horrible names and saying I

15  don't deserve a mom like you.  I was worried about Leyla.

16  And these conversations where I was asking about the FBI and

17  whether I was wanted and what Leyla knew, I was trying to

18  understand the situation so that I could make a reasonable

19  decision about what I was going to do.

20       I felt like Leyla needed me, and I wanted to be

21  there for her, which sounds pretty crazy considering what

22  she's recently said.  But what she's very recently said is

23  vastly different than what she was saying before.

24       In this case, I pled guilty and did not challenge

25  the charges against me.  My case has been publicized

1   worldwide, and, therefore, it will be an example.  On the

2   one hand, if my sentence is long, it will show that the U.S.

3   is harsh on terrorism.  But that is already a

4   well-established fact; however, if my sentence allows me to

5   still care for my children, it will show something more

6   important and more beneficial in the war on terrorism.  It

7   will show people like me who wanted out but were fearful of

8   such long prison sentences and the damage done to their

9   children by losing both parents, that there is an

10  alternative, and there is a way out of groups like ISIS.

11          I also feel that my case may become propaganda

12  that terrorist groups could use to prevent the thousands of

13  women and children worldwide from getting out of violent and

14  dangerous situations.

15          If these women do not see a way out, that will

16  only serve to pull them deeply into extremist mentalities.

17  I'm not advocating clemency, I'm not asking for this Court

18  not to punish me.  But, rather, I'm asking and I'm

19  advocating for viable pathways which allow affected women to

20  truly transition back into society.

21          I would like to say to my daughter, Leyla,

22  although -- I would like to say to my daughter, Leyla,

23  although I'm heartbroken by the horrific false accusations

24  that you made about abuse, I love you, and I'm truly so

25  sorry for your pain.  I really should have done better.  I

109

hope that you can forgive me for what my actual mistakes really were.  God is forgiving, and God is merciful, and I love you, Leyla.  And my door and my heart will always be open to you, and I pray for you every day, and I hope that you can move past your hurt and live a life that you can be proud of.

And to anyone who has been harmed by my actions, I ask forgiveness.  I cannot change the past, but I can only work to be a better person in the future.  I hope sincerely for a more peaceful world for all people.  I would like to offer to this Court reasons why I feel that I'm not a threat at this time.

First of all, I voluntarily turned myself in.  I had a good job in Syria.  According to Syrian standards, I made a lot of money.  I was well known in the community.  I had a school.  I was training teachers.  I was working with other schools to train teachers.  I did not have a need to turn myself in.

Secondly, I did not propagate on social media. All my actions were localized responses to the situation that I was actually living in.  I never spread propaganda. I didn't encourage people in other places to join fighting, to do any kind of terrorist acts.

Third, my son, who is not here now, he lives overseas still, he lives in Turkey.  I sent my son out of

110

1    Syria rather than allow or encourage him to join ISIS.  This

2    is something that, if I was the person that they're saying

3    that I am, that I'm so committed to violence and terrorism

4    and extremism, it doesn't make any sense that I would send

5    my son to his family in Turkey to get an education when he

6    was old enough that he could theoretically have gone to

7    fight.  This simply doesn't compute with the picture that

8    they're trying to paint.

9         I never fought myself.  If I was so interested in

10   Jihad and I wanted to commit violence, I never did.  I never

11   committed any violence.  I never shot or fired one bullet in

12   any kind of a fight, nor, to my knowledge, did anyone whom I

13   taught the use of weapons.

14        I lived in Syria for two and a half years after I

15   left the -- after I was able to leave ISIS, where I worked

16   hard for the benefit of the community by establishing two

17   schools and a training teacher, and I was no danger there.

18   The only thing that -- so I was no danger there in Syria.

19        If -- in that still unstable sectarian situation

20   where there were many different groups and ISIS was still

21   active, if I was such a committed terrorist, as the

22   Government is trying to portray me, I certainly would have

23   continued to do terrorist acts.  I certainly -- it was an

24   easy -- and anybody who wanted to do violence, they had a

25   way.  In a day, you could do whatever you wanted to do in

111

 1    Syria, but I didn't do that.  I worked hard in education to
 2    try to better the community.
 3            And, additionally, I didn't just try to benefit
 4    ISIS children.  The schools that I opened, they were open
 5    for all kinds of children, even people who had supported
 6    Assad who were -- which was responsible for my son's death.
 7    The people -- all of the factions.  And many of my very
 8    beloved family members died in this war, and I did not
 9    discriminate or treat these people in any way differently.
10    I built -- I worked hard to increase the education for all
11    the members of the community.
12            Another reason that I'm not a threat is the only
13    thing that I have left to live for is my six small children.
14    I want to raise them in safety and security to be productive
15    members of society.  I came back to the United States
16    intentionally for them and for Leyla so that my small kids
17    could have a better life, and I would not put that at risk
18    again after all these sacrifices that I have made after I'm
19    facing 20 years in prison.  If I ever get out, I would never
20    put that at risk again.  Another reason I regret my actions
21    and I made deliberate steps to make amends and to take
22    responsibility and to deliberately choose the difficult path
23    to trying to make things better.
24            Number 7, I lived in the U.S. for 29 years without
25    any involvement with terrorist groups, and I cut my ties

                                                            112

1      with ISIS and with extremism four years ago.

2              Another very important illustrative example of why

3      I'm not a threat is, one of the witnesses in this case was

4      actually a woman who worked with me as an assistant director

5      from Day 1 until the Women's Center closed, including all of

6      the military training that we did.  Not military.  All of

7      the self-defense training that we did.

8              This woman now lives in the U.S. with her

9      children.  In fact, after living for several years in the

10     Syrian camp, she was brought back to the U.S. and not

11     charged at all.  She, along with multiple other women, whom

12     I personally know from my time in Syria, are living in the

13     U.S. and were never charged.  These women have never

14     committed any crimes since their return and are an example

15     for how the U.S. can create pathways out of extremism for

16     families.

17             In my legal research, I found that if an inmate's

18     children -- that if an inmate has children and the caretaker

19     for those children dies, it is grounds for a Judge to

20     consider compassionate release.  In this case, I would ask

21     the Court rather for compassionate sentencing, because my

22     children don't have anyone but me.  And I -- and I suggest

23     that this compassionate sentencing would help not only my

24     six children, but to potentially many children of other

25     women who would see a viable way out of extremism.

                                                                   113

1            I respectfully ask the Court to sentence me to

2     24 months in prison, plus ten years home confinement and

3     then a lifetime of probation.  This sentence punishes me.

4     It also incentivizes women to turn themselves in to

5     authorities, which prevents children from growing up in

6     extremism and becoming terrorists in the future.

7     Additionally, this sentence gives consideration to the six

8     small children who are sad and separated from each other

9     because I did what I thought was right and turned myself in.

10            I would just like to ask the Court to just take a

11    look at those pictures.  And those pictures of my children

12    are from when we were in Syria, and that's how we lived.

13    Not -- we just lived a very normal life.  And the pictures

14    reflect how my children were taken care of and how they were

15    loved and their health.

16            Finally, I would just like to read these -- this

17    is a picture my daughter drew.  It's a picture.  This is

18    just like the bus that they picked them up from at the

19    airport.  It says, stop, help.  Hey, I'm jacked.  And it has

20    a picture here of a little girl wearing a backpack like the

21    one that she had when they brought her here.  And it has an

22    X over this child.

23            This is -- my four-year-old daughter wrote for me.

24    The only thing she knows how to write is her name and I love

25    you, mommy.  My son wrote me this.  He's nine.  Dear mom, I

114

```
 1    wish we were with you.  We got to talk -- it says their
 2    brother's name here -- today, and I got to play with them.
 3    He's referring to toys that I sent to him.
 4            Another letter that the same son wrote.  As-salamu
 5    alaykum -- that's the Islamic greeting -- I love you so
 6    much.  I wish I was with you in jail.  Are you okay?  I'd
 7    love it if I was with you.  If I visit with you.  I got this
 8    letter just last week from my nine-year-old daughter.  I
 9    wish you were with me.  Heart.  I miss you very much.  I
10    wish you were with me and we could talk more.  I love you
11    very much.  Allah will help us.  I wish I was with you.
12    Mom, I love you.
13            My -- other daughter, not the same as these.  How
14    are you doing?  It's been so long since I see you.  Do you
15    remember the days we used to go to um imro (phonetic)?  She
16    used to teach us Quran, and she was all our friend.  I wish
17    I was with you again.  Please, can I come with you?  I love
18    you.  And this one is just love you, mom.
19            Thank you.
20            THE COURT:  Well, I would normally not permit this
21    much discussion of motherhood and raising children in a
22    criminal case, but this was made as a major mitigating
23    argument in the defendant's papers, and, therefore, it had
24    to be addressed.  But, as I said in my earlier order in this
25    case, the defendant was going to be sentenced for what she
```

115

1  has admitted to doing, and that is how she will be sentenced

2  today.

3         And I am satisfied that a sentence at the high end

4  of the sentencing guidelines is appropriate.  First of all,

5  I must say, in all candor, that I don't find this allocution

6  to be wholly credible.  It is inconsistent with statements

7  that you made when you were not under the pressure of facing

8  justice.  You've used the term "regret" several times in

9  your allocution.  You said you regret, you regret.  And yet,

10  in the letter -- I'm sorry, in the conversation you had with

11  your daughter back in 2021 -- in fact, I think it's one of

12  the last quotes in the Government's opposition as well --

13  you say:  I might feel sad, but I don't regret what I did.

14  I think that is a more accurate statement of your true

15  mindset than what you have expressed today.

16         I'm also very troubled by the way in which you, I

17  think, downplayed the impact of the Benghazi situation.

18  You're obviously a very intelligent woman.  You're a very

19  articulate woman.  And I don't accept the argument that you

20  were somehow an almost passive dupe in the Benghazi matter.

21  I don't believe there's any evidence you planned it or

22  participated in it, but, as I've said before, you would have

23  been, in my view, a knowing and voluntary accessory after

24  the fact in the extent that you were helping to translate

25  and summarize those documents.  And you admitted in the

116

```
 1    statement of facts the documents did get into ISIS's hands.
 2    So that is a problem.
 3              And then you mentioned that the Women's Brigade --
 4    that's what I'm going to call it -- only existed between
 5    October of 2016 and February or so of 2017.  But the
 6    Government began this -- or their -- its allocution with
 7    these two exhibits, Exhibits 1 and 2.  Exhibit 1,
 8    apparently, was a letter or a communication October 3rd of
 9    2016, within that time frame.  This is the one that you
10    wrote to the officer in charge of the Detainees and Martyrs
11    Center --
12              THE DEFENDANT:  Your Honor, excuse me.  I didn't
13    write that.
14              THE COURT:  I'm sorry.  His response to your
15    request.
16              THE DEFENDANT:  Your Honor, I didn't write that
17    document.
18              THE COURT:  Well, whatever it is, it was
19    apparently related to this operation.  And it says:  We ask
20    Allah to make it beneficial for Islam and Muslims.
21              And then, in your letter, which was from you, as I
22    understand it, right, the one that's Government Exhibit
23    Number 2?  December 2nd of 2016, you say to the Wali:  I
24    require the following --
25              THE DEFENDANT:  No, Your Honor, I didn't write
```

117

```
 1    that document.
 2              THE COURT:  Was that not written by the defendant?
 3              MR. PAREKH:  No, Your Honor.  It's at that time
 4    where the defendant is certainly -- when she's admitted that
 5    she's organized and led this Khatiba, but this document
 6    wasn't written by the defendant.
 7              THE COURT:  But it was written on behalf of that
 8    organization?
 9              MR. PAREKH:  That's correct, Your Honor.
10              THE DEFENDANT:  Prior to my involvement with it,
11    Your Honor.  I was running the Women's Center at that time.
12              THE COURT:  This was December of 2016.
13              THE DEFENDANT:  Yes, Your Honor.  I was running
14    the Women's Center.
15              THE COURT:  But the Women's Center becomes part of
16    that group.
17              THE DEFENDANT:  If you'll note, Your Honor, the
18    other document is the end of January 2017, and that's when
19    the Women's Center became part of -- there was no actual
20    Khatiba before.
21              THE COURT:  In any case, though, you have admitted
22    that suicide vests were something that was discussed.
23              THE DEFENDANT:  Yes, it was.
24              THE COURT:  All right.  And suicide vests cannot
25    possibly be considered a type of self-defense.  They are an
```
                                                            118

1    offensive weapon used by terrorists to create havoc.

2              In any case, the issue in a case of this sort is

3    the appropriate sentence.  There's no question that you were

4    providing material support to a terrorist organization, that

5    you knew you were assisting ISIS, and I think there is no

6    question as well that you've not cooperated with the United

7    States.  These examples you gave of other women who may have

8    returned and who perhaps have not been sentenced, I think

9    one of the other differences is, most likely, they've been

10   cooperating, and you have not, according to what the

11   Government has said.

12             I don't find any tremendously mitigating

13   circumstances in your case.  And, quite frankly, in terms of

14   the argument about the precedent this might set, as I said

15   at the very beginning, the guidelines in this case are 360

16   to life.  The Government chose to work with you all on a

17   plea bargain that exposes you to a maximum of 240 months,

18   basically cutting off the potential for a life sentence, and

19   actually giving you a sentence significantly lower than what

20   you otherwise could easily have been facing.

21             And so I am satisfied that a sentence of

22   240 months is sufficient but not greater than necessary to

23   achieve the purposes of Section 3553(a) of Title 18 of the

24   United States code.  I'm not at all satisfied, frankly, that

25   this would be a case in which the two levels for acceptance

1  of responsibility should even have been given, because I

2  don't really find that your allocution today was credible

3  based upon everything else that's in this record, as well as

4  what I think were your admissions during this statement of

5  facts.

6  Now, I'm going to also find that the amount of

7  credit you should get would begin on January 28 of 2022,

8  that that's -- that is the appropriate time.  You either

9  turned yourself in or were arrested by foreign forces.

10 Nobody has given me any direct evidence one way or the

11 other.  The Government disputes your argument, and I'm not

12 making a finding one way or the other.  But the only

13 evidence I have that's solid that the U.S. Government

14 actually at some point got involved such that you were being

15 held under U.S. authority, so to speak, would be the

16 January 28, 2022 date.  So that's the date the sentence --

17 for which credit will be given on this sentence.

18 I'm not going to make a recommendation as to a

19 designation.  I think, given the sensitivity of this case

20 and the potential need for maybe some mental health

21 treatment, that's up to the Bureau of Prisons to make the

22 designation.  So I will not include a recommendation, other

23 than the Bureau of Prisons should take into consideration

24 any mental health needs that the defendant may have.  Other

25 than that, it will be up to them to decide.

120

 1                 The sentence of 240 months in the custody of the
 2     Bureau of Prisons will be followed by a period of 25 years
 3     of supervised release.  And the terms and conditions of
 4     supervision are, first of all, spelled out on pages 33
 5     through 36 of the presentence report, which I assume you
 6     read; yes?
 7                 THE DEFENDANT:  Yes.
 8                 THE COURT:  All right.  And, Mr. King, you went
 9     over those with your client as well?
10                 MR. KING:  Yes, Your Honor.
11                 THE COURT:  All right.  So all those conditions
12     will apply.  And, in particular, you obviously cannot
13     violate any federal, state or local laws while on
14     supervision; do you understand that?
15                 THE DEFENDANT:  I do.
16                 THE COURT:  And you must follow all the conditions
17     of supervision that will be printed on the judgment order;
18     do you understand that?
19                 THE DEFENDANT:  I do.
20                 THE COURT:  Now, among those conditions, Number 1
21     will be that you must participate in a program approved by
22     the United States Probation Office for mental health
23     treatment.  You will have to fully comply with any
24     directions that the mental health people provide, such as
25     therapy, medication, in or outpatient treatment; do you

                                                              121

 1   understand that?

 2             THE DEFENDANT:  I understand.

 3             THE COURT:  All right.  You will have to waive any

 4   privacy rights that you have to the mental health evaluation

 5   and treatment so the probation officer can monitor your

 6   compliance and progress.  And because of your financial

 7   situation, any and all fees for evaluation or treatment will

 8   be waived; do you understand that?

 9             THE DEFENDANT:  I do.

10             THE COURT:  Secondly, you must comply with the

11   requirements of the computer monitoring program that's

12   administered by the probation office.  And you will have to

13   consent to the installation of computer monitoring software

14   on any computer or Internet-capable device to which you have

15   access.  And the installation will be performed by a

16   probation officer, and it may restrict or record any and all

17   activity on the computer, including the capture of key

18   strokes, application information, Internet use history,

19   email correspondence and chat conversations; do you

20   understand that?

21             THE DEFENDANT:  I do.

22             THE COURT:  There will be a notice placed on the

23   computer at the time of installation to warn others of the

24   existence of the monitoring software, and you shall notify

25   all others of the existence of the monitoring software.  You

1  will not be permitted to remove, tamper with, reverse

2  engineer, or, in any way, circumvent the software.  And the

3  costs of that monitoring will be paid by you, to the extent

4  you are able; do you understand that?

5        THE DEFENDANT:  I do.

6        THE COURT:  You will also have to submit to a

7  search of your person, property, house, residence, vehicle,

8  papers, computer or other electronic communications or data

9  storage devices or media at any time by any law enforcement

10  officer or probation officer with reasonable suspicion

11  concerning any unlawful conduct or violation of any of the

12  conditions of supervision upon prior notification to and

13  approval by the Court or with a warrant; do you understand

14  that?

15        THE DEFENDANT:  I do.

16        THE COURT:  Your written communications online

17  must be conducted in the English language unless you have

18  received permission from your supervising officer to

19  communicate in any other language; do you understand that?

20        THE DEFENDANT:  I do.

21        THE COURT:  You are not permitted to communicate

22  or otherwise interact, and that includes in-person, through

23  a third-party, by telephone or mail, electronic or

24  otherwise, or through social media websites and

25  applications, with any individual known to be associated

123

1  with an extremist organization, including, but not limited

2  to, the Islamic State of Iraq and al-Sham, which is ISIS; do

3  you understand that?

4           THE DEFENDANT:  I do.

5           THE COURT:  All right.  You shall not promote or

6  disseminate any terrorist views; do you understand that?

7           THE DEFENDANT:  I do.

8           THE COURT:  And you must provide access to any and

9  all of your financial information to the probation officer

10  at the officer's request; do you understand that?

11           THE DEFENDANT:  I do.

12           THE COURT:  All right.  The Court finds that you

13  are financially unable to afford the costs of any of the

14  statutory fines, any costs of supervision other than what

15  I've indicated, or any costs of incarceration.  But the

16  mandatory $100 special assessment must be paid; do you

17  understand that?

18           THE DEFENDANT:  I do.

19           THE COURT:  And my understanding is there's no

20  request for restitution, and there's no issue of forfeiture

21  in this case; is that correct?

22           MR. PAREKH:  That's correct, Your Honor.  I did

23  check with the victims.

24           And just to correct the public record, what the

25  defendant stated, as Your Honor noted, was not credible, and

124

1    she neglected to tell you --

2           MR. KING:  Your Honor, I believe the Court's made

3    its --

4           THE COURT:  Mr. King, just a second.

5           MR. PAREKH:  I've waited patiently until she was

6    finished.

7           What she stated about there being other women who

8    assisted her that are now in the United States and weren't

9    charged, those women were minors, they were extremely young

10   at the time.  She admitted in the statement of facts, some

11   were as young as 10 or 11 years old.  So, no, we didn't

12   charge a 10-year-old.

13          But anyone else, as I've noted repeatedly in

14   pleadings, who were co-conspirators, were adult women.  That

15   may or may not be the case in the future.  I'm not going to

16   speak as to any ongoing investigation.  But I don't want the

17   public record to stand on her statement that these other

18   women who assisted her weren't charged, because they were

19   extremely young at the time; and other women, that may not

20   be the case.

21          THE COURT:  Again, I'm announcing the sentence at

22   this point.

23          MR. PAREKH:  Yes, Your Honor.

24          THE COURT:  Are there any other conditions of

25   supervision the Government is requesting?

                                                          125

1           MR. PAREKH:  Yes, Your Honor.  The defendant's

2    United States-based family members, namely her two children

3    in the courtroom, her mother, her father, her stepmother,

4    her brother, and her first husband would like there to be no

5    contact.  And we've already seen her husband -- her current

6    online husband went to Kansas to try to look for Leyla.

7    We've taken certain security measures, and we want to make

8    sure that never happens again.

9           So we would ask Your Honor also to make sure the

10   defendant does not reach out to them whether -- within jail,

11   I believe they can -- if we provide them the phone numbers,

12   they can put it into their system so she can't use her PIN

13   code to reach out to them.  That she cannot have any third

14   parties, such as her online husband, reach out to them.  And

15   then when she gets out of prison after 20 years, that she

16   not be permitted to contact them.

17          THE COURT:  I think that's a reasonable request.

18          Obviously, if, for some reason, your son or

19   daughter changes their mind and wants to contact you,

20   they're free to do that, but you cannot reach out to them

21   yourself, nor anybody on your behalf that you've directed to

22   do so; do you understand that?

23          THE DEFENDANT:  I do.

24          THE COURT:  All right.

25          MR. PAREKH:  And, Your Honor, I have a list of

126

1  those individuals I can pass up.

2  THE COURT:  It will help my -- yes.

3  MR. PAREKH:  Thank you, Your Honor.

4  THE COURT:  Is there anything else you wanted

5  added to the conditions of supervision?

6  MR. PAREKH:  No, Your Honor.

7  THE COURT:  All right.  Mr. King, was there

8  anything else you wanted the Court to address in terms of

9  the sentence?

10  MR. KING:  No, Your Honor.  Well, one thing, Your

11  Honor.

12  I wanted to be sure --

13  THE COURT:  All right.  The defendant should have

14  a seat.

15  MR. KING:  Your Honor, I just want to be clear of

16  the Court's order.  The way I understood it, she's not going

17  to receive credit for being in foreign custody in Turkey?

18  THE COURT:  She starts --

19  MR. KING:  -- or in Syria?

20  THE COURT:  Not in Syria; in Turkey.  She starts

21  to get it as of January 28 of 2022.

22  MR. KING:  All right.  Thank you, Your Honor.

23  That was the only -- I just wanted to make sure I understood

24  that, and I understood it correctly.

25  I have nothing further, Your Honor.

127

```
 1                THE COURT:  All right.

 2                MR. PAREKH:  And, Your Honor --

 3                THE COURT:  Yes.

 4                MR. PAREKH:  -- I know she has a waiver of appeal,

 5   but --

 6                THE COURT:  I'm going to go through that.

 7                MR. PAREKH:  Yes, Your Honor.

 8                THE COURT:  All right.  Ms. Fluke-Ekren, I want to

 9   tell you, under your plea agreement, you waived your right

10   to appeal your sentence.  And even though you did that --

11   and your conviction, for that matter.  Even though you did

12   that, I'm advising you that you still have a right to file a

13   notice of appeal of either your conviction or your sentence.

14   If you plan to do so, it must be noticed within 14 days of

15   today's date.  You have the right to be represented by

16   counsel.

17                Mr. King, you'll need to explain to your client

18   the uphill battle she would have because of the nature of

19   the law of waiver.  Nevertheless, if your client wants to

20   appeal, it's your obligation to file the notice of appeal.

21                You have a right to be represented by counsel at

22   the appeal.  If you cannot afford an attorney, one will be

23   appointed for you.  Whether it would be your same counsel or

24   others, that's down the road.

25                Mr. King, do you understand that?
```

```
1              MR. KING:  I do, Your Honor.
2              THE COURT:  All right.  Make sure you have that
3    conversation with your client.
4              MR. KING:  I will, Your Honor.
5              THE COURT:  Anything further for this case?
6              MR. PAREKH:  No, Your Honor.
7              THE COURT:  All right.  We'll recess court for the
8    day.
9              (Proceedings adjourned at 2:24 p.m.)
10             ----------------------------------
11   I certify that the foregoing is a true and accurate
12   transcription of my stenographic notes.
13                                    Stephanie Austin
14                             Stephanie M. Austin, RPR, CRR
15
16
17
18
19
20
21
22
23
24
25
```

129